IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| ALAN BRADLEY,<br>Plaintiff<br><br>vs.<br><br>GORDON R. ENGLAND,<br>Secretary of the U.S.<br>Department of the Navy,<br>Defendant | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | C.A. NO. 04-412ML |

# APPENDIX

GORDON R. ENGLAND, SECRETARY,
DEPARTMENT OF THE NAVY,

By his attorneys,

ROBERT CLARK CORRENTE
United States Attorney

/s/ Anthony C. DiGioia
ANTHONY C. DIGIOIA, #2495
Assistant U.S. Attorney
Chief, Civil Division
United States Attorney's Office
Fleet Center
50 Kennedy Plaza, 8th Floor
Providence, Rhode Island 02903
(401) 709-5000
(401) 709-5017 (Fax)
Email: anthony.digioia@usdoj.gov

believe.

Q. Could it have been 2002?

A. 2002, 2003. I'm sorry.

Q. Do you have any documents that would help you to pinpoint that date?

A. Okay. It was 2002.

Q. And do you -- do you know approximately what month that was?

A. May.

Q. Okay. Now, he was in the Housing Department prior to being put in that position, is that correct?

A. That is correct.

Q. Were you in the Housing Department in May of 2002?

A. No, I wasn't.

Q. You were in Public Works, is that right?

A. That is correct.

Q. And Public Works was undergoing a study for possible reorganization at that time, wasn't it?

A. That is correct.

Q. Now, did you ask for that job?

A. That job was given to him from when he was transferred but what I did was we did notify

Captain Cooper of the position being open.

Q. When you say you notified Captain Cooper, how did you do that?

A. Through a letter, I believe, and also a phone call.

Q. And did you tell her that you wanted that position?

A. That is correct.

Q. And what did she say?

A. She didn't want to place me in that type of position.

Q. Did she tell you why she felt she couldn't place you in that position?

A. She was worried more about me losing a job in the Public Works Department.

Q. Well, I'm not asking you what she was worried about, but did she tell you anything about why she didn't want to put you in that position?

A. No. She didn't, that I remember.

Q. Did she tell you anything about if they vacated your position in Public Works, they moved you out of it during that study, that you might not get a job in Housing if that position was abolished and they might not be able to send you back to your old position in Public Works?



A2

A. She stated that if I took that position on a temporary basis, I may lose my job in Public Works.

Q. So she told you that you might not be able to go back to that job in Public Works?

A. That is correct.

Q. Okay. And she told you that if that -- if your position in Public Works was vacant during this study, they might not be able to fill that position, is that right?

A. That was what she stated, that the Navy might not be able to fill it because there was a vacancy, yes.

Q. It wasn't just a question that it might hurt you; it would mean that they couldn't fill the position that they now had in Public Works, is that correct?

A. That's correct.

Q. Thus hurting the Public Works Department and the Navy, is that correct?

A. That's correct. But since that remark of her stating that position being vacant and I stated I would take the chances, that did not go through with her and now that actual position has been abolished anyway in Public Works. That was the

that position so that they wouldn't have to hire you?

A. Victor Ramsey.

Q. Has he testified to that?

A. He has noted it, yes.

Q. You say he's noted it?

A. He's talked to my lawyer.

Q. Anyone else?

THE WITNESS: For that position?

MR. DiGIOIA: Yes.

A. No.

Q. So Victor Ramsey is the only person who told you that, that he was put in that position so they wouldn't have to give it to you?

A. That is correct.

Q. Now, Mr. Ramsey was, in fact, released from that position in the fall of 2002, wasn't he?

A. That is correct.

Q. So he was in there for about six months?

A. That is correct. After we sent a letter to them stating that I wanted to be in that position for the amount of days as well.

Q. Do you know where he went after he was released from that position?

A. He went back to work for, I believe,



A4

A. It was typos.
Q. My point is after he read it over the first time, there were some things that had to be changed?
A. Yes.
Q. And then you went back and retyped it and saw him on another day?
A. Yeah. I did it right there. It was on computer.
Q. At work?
A. Yes.
Q. I want to ask you a few questions about your various disabilities you've claimed.
First of all, would you describe the three -- there are three disabilities that you claim, is that right?
A. That's correct.
Q. Would you describe each of them for me?
A. Each of them? One of them I have the lazy eye which is from birth, my right eye. My right arm is partial paralysis, which is from a birth defect when I was being born. It's not a birth defect, it's actually a birth accident, and with the arm, as you can see, the shoulder is all not equal in the area, it's down. My elbow cannot

turn, it's frozen. My wrist as well is frozen, it cannot be turned and my fingers and hand cannot move as much as a normal hand.

Q. Okay. So lazy eye and the shoulder and what's the third one?

A. Epilepsy.

Q. The seizure disorder?

A. That's correct.

Q. Have there been any significant changes in your shoulder condition over the last 25 years?

A. No, there hasn't.

Q. And what does that limit you from doing?

A. As I stated before, it limits me from lifting, pushing, lifting things over my head, and I can climb but I can't climb with my left arm. The only arm I got to hold like boxes or something like that, with my right arm. I can do it but it's just not -- I can't do it fast.

Q. Okay. And do you have to do that as part of your current job?

A. My current job, no. At supply I did.

Q. And we've already talked about that. You were able to do it --

A. That's correct.

Q. -- what was required of you, is that



A6

well.

Q. And what did you do there?

A. I was what you'd call a person who would set up the motorcycles, assemble.

Q. And did you go directly from there to your job with the Navy, your first job with the Navy?

A. I worked there. After college I graduated. It wasn't until 1985 when I got -- when I got the opportunity to work for the Navy in 1985. It was May 9th, 1985.

Q. When did you graduate from college again?

A. It was -- I graduated in 1983.

Q. Okay. So there were roughly 12 years between college?

A. 1983, 1985.

Q. Oh, '85. You said '85. I wrote it down wrong. In those two years, that entire time you worked at Newport Yamaha Honda?

A. That's correct.

Q. And no other jobs after college before you started with the Navy in May of 1985?

A. I had a part-time job in NUWC at that time.

Q. When you say NUWC, not the city?

A. At that time the lady was Jean, J-E-A-N, Peck, P-E-C-K.

Q. And where did you go in May of '88?

A. May of '88 I reported back to the Housing Office.

Q. And what job there?

A. As a GS-5 Housing Manager Assistant.

Q. And what were your duties as a GS-5 Housing Manager Assistant?

A. In that area my job duties was to -- first, I was the one who would schedule all the work that was performed in all Navy housing by the Public Works Department or I -- I would also oversee what's called the MRP program, which is a maintenance repair program that was taken on by contractors on the outside.

I would work with the housing assignment person as to when houses were going to be turned over and that way I would get an idea of -- if a house was to be turned over on say June 1st, I had to have it scheduled so that June 1st that house would go out, June 2nd it would go to the maintenance people in Public Works, then I would schedule for the painter on the following day, clean it the next day, and return it back to the

Q. -- it was just something that you did from time to time just like I might have got up a minute ago to go copy a piece of paper?

A. Exactly.

Q. Did you actually go out and do inspections of the apartments at that time?

A. Yes, I did.

Q. And how did you -- how did you get to the various housing?

A. At that time I was -- when I first started work in there, I did go out -- I did go out to the houses to inspect. I would also -- every morning I would take a car, I'd drive down to the Public Works Department to deliver their work in the morning as well as work to people in the facility support area in Building 1.

Q. So did you have a government car assigned to you?

A. Yes. I would take a government car. It wasn't assigned directly to me.

Q. But you had a government car available to you?

A. Yes.

Q. And you used one almost every day?

A. Yes. When I did that, yes.

Q. Okay. Go ahead.
A. Then I had the accident.
Q. Okay. Before we talk about the accident --
A. Okay.
Q. -- so you drove to the Public Works Department and you also went to various housing units?
A. Uh-hum.
Q. What was your purpose in going to the housing units?
A. Housing units was I was supposed to -- I was going out to see how the housing was done, whether the work was completed by the Public Works Department, if it was completed by the painters, cleaners. I was responsible for making sure those houses were done as well.
Q. Okay. Is that kind of an inspection?
A. Exactly, house inspection.
Q. And did you actually have, you know, checklists --
A. Yes, I did.
Q. -- that you would go through?
A. Yes, I did.
Q. And did you typically drive several times



A10

a day in -- when you were in that job?
A. Yes.
Q. Almost every day?
A. Yes.
Q. And you mentioned a moment ago then you had the accident?
A. Yes.
Q. When did that occur?
A. As of right now, I could not actually say a date but it could have been, I think, like two or three months after I was in that position.
Q. Okay. Do you have any records about that accident?
A. No, I don't.
Q. Now, that was an accident in a government car?
A. That's correct.
Q. Were you hurt?
A. I was not hurt but I was taken to Newport Hospital to be observed.
Q. Okay. We're going to talk more about that accident a little later. Is that the only accident you've had in a government vehicle?
A. That's correct.
Q. Now, did that accident have any impact on



A11

your job?

A. Yes, it did.

Q. Tell me about that.

A. Well, with the accident, they wanted me to stop -- they wanted me to keep going on with my job duties and -- but I was told not to drive a government vehicle.

Q. Okay.

A. And what happened was they would set up where someone came in, one of the workers who came in, a maintenance worker, he would come in in the morning, him and I would go out and do the same exact job I was doing, taking things to different areas in the morning and coming back and performing my job as a Housing -- Housing Manager Assistant doing all the scheduling within the office.

Then if there was a need for me to go out and inspect the units with any type of Public Works, contractors, painters, any of that stuff, someone would come from the Public Works Department or a contractor would come down to the office and pick me up and we would go out to the units and inspect the units.

Q. Okay. Now, I want to make sure I understood you correctly. Did your duties change



A12

somewhat and focus more on inside the office work after this car accident? Not exclusively, just more?

A. More, but it was still more in the area of going out and making sure these units were repaired because I still, like I said, would have to get in touch with people in Public Works and one of their work leaders or someone like that would come down with me and we would go out and look at the actual buildings to make sure the work was completed.

Q. Now, you described for me before, a few minutes ago, that prior to this accident you would drive several times a day almost every day on the job?

A. That's correct.

Q. After this accident, and after the slight changing of your duties --

A. Right.

Q. -- how often did you drive?

A. I did not drive.

Q. How often did you leave the office, were you driven somewhere by another employee or a contractor or anyone else?

A. It could have been done like two, three

times a day. One to three times a day. I'm not sure.

Q. And you think that's still every day?

A. It could have been every day to a week or it could have been -- some weeks I'd only do like three times.

Q. Okay.

A. Depends on the size and everything of the work.

Q. Okay. So was there any change in the amount of work you had outside the office and the amount of time or occasions where you had to leave the office and go to some other facility?

A. Yes, there was.

Q. Was there a reduction?

A. It was reduction in inspections is all it was.

Q. And when they reduced the number of inspections that you would -- that you did, did they increase the amount of other kind of -- I'll call the in-house work?

A. Yes, they did.

Q. Okay. So they kind of came up with a -- with some job modifications to make it so that you could still perform your job as a Housing Manager



A14

Assistant in the Housing Department?

A. That's correct.

Q. Okay. And the way they did that was by changing the duties so that you had more inside duties and by making arrangements to have someone else drive you around instead of you driving yourself?

A. That's correct.

Q. Okay. Now, did you want to drive at that time?

A. I was told by Bob Corey at the time they did not want me to drive a motor vehicle.

Q. By the way, I mentioned we're going to talk more about the accident in a few minutes and we will. I don't mean to get hung up on it now --

A. Okay.

Q. -- but was there anything in particular that caused that accident?

A. It was the possibility that I had a seizure.

Q. An epileptic seizure?

A. That's correct.

Q. And we're going to talk about your epilepsy in a few minutes as well. When you said there was a possibility, do you know whether or not

you had a seizure?

A. When I have one sometimes I -- I sometimes don't know when I had one or like, at that time, the way it happened so fast, I didn't know what was going on. I don't know if it could have been a car coming by me or whatever or just the accident occurred and that was it.

Q. But, in essence, is it fair to say that you were driving along and then all of a sudden found yourself behind the wheel but you were no longer driving, you had had an accident?

A. That's correct.

Q. And you assumed at that time that you had probably had a seizure, is that right?

A. That's correct.

Q. And, in fact, that's what you reported to the Navy, right?

A. That's correct.

Q. Okay. Now, did you continue to drive after that accident?

A. After the accident, I did not continue to drive. I would maybe once go down to Building 36, if there was not somebody there that early in the morning, but as for my other duties as to doing that, I was not driving a government vehicle off



A16

Q. Well, then let me ask the question a different way.
A. I'm sorry.
Q. We'll see if we can get there. Did you drive to work before you had this accident?
A. No, I didn't.
Q. Did you drive otherwise your own personal vehicle? If you needed to go to the store or whatever you needed to do, did you drive a vehicle of your own?
A. Very seldom.
Q. Did you own a vehicle?
A. No, I didn't.
Q. Why didn't you drive?
A. One of the reasons was I was at home and my father would take me to work at the time.
Q. Isn't it true that you felt getting behind the wheel put you and others at risk and so you wanted to minimize --
A. Yes.
Q. -- the amount of time you were behind the wheel?
A. Yes.
Q. So after having this car accident, you weren't unhappy about having your job duties change

so that you didn't have to drive the government car anymore, is that right?

A. The reason I wasn't unhappy was I tried to work with them as to my job. I was trying to perform my job the best that I could. I didn't want to just have my driving -- driving or whatever hold me back from doing anything.

Q. I understand but my point is you didn't feel that the Navy was unfairly restricting you at that time when they made arrangements for you not to have to drive a government vehicle?

A. No.

Q. You thought that was fair?

A. Yes.

Q. Okay. And, in fact, you've just told me that you didn't drive much on your own outside of work because you felt it put you and others at danger, in a way that was kind of a relief, wasn't it, you didn't have to drive anymore on the job?

A. That's correct.

Q. Okay. Now, are you familiar with the process for pursuing employment discrimination complaints?

A. Yes, I am.

Q. And how did you first become familiar

with that?
A. I can't remember when -- what time it was but I filed a grievance about a position within the Housing Department.
Q. Okay. Had you ever heard anything about how -- about discrimination complaints prior to the time that you filed that first EEO complaint that you just described?
A. I can't recall. I just know when it came about -- I knew you could go out to the HRO and file a complaint about it.
Q. Did you ever have any training?
A. No.
Q. They never came around and trained in the Housing Office about your rights under various EEO laws?
A. I don't believe they ever trained anybody. There were pieces of paper on the wall is about all it was.
Q. So there were signs posted --
A. Yes.
Q. -- correct?
A. Yes.
Q. And those signs were posted back before the time you filed or -- or first contacted an EEO

counselor that very first time?
A. That's correct.
Q. Okay. And you had seen those signs?
A. That's correct.
Q. And you read them?
A. That's correct.
Q. And so you knew what your rights and obligations were?
A. That's correct.
Q. Okay. And those signs specifically indicated how many days you had to contact an EEO counselor, correct?
A. That's correct.
Q. Okay. And, at that time, do you recall if it was 30 days or 45 days?
A. I --
Q. You don't know?
A. I don't know.
Q. But it was one of those time frames --
A. Uh-hum.
Q. -- that you had either 30 days to contact an EEO counselor or 45?
A. I don't remember.
Q. So you remember that there was a notice?
A. Yes.

Q. You don't remember how many days?
A. Exactly.
Q. Okay. So you knew of the procedures, including the time frame within which you had to contact the EEO, prior to the first EEO contact you made to complain about a job assignment at Housing?
A. That's correct.
Q. Describe for me briefly what's involved in the EEO process, what the various steps are as you understand it.
A. The first thing you would do is go over and contact a counselor, you would tell them what -- what it was that you wanted looked into. Then they would go through and check it off, check into it, then they'd come back with a -- I can't remember what the actual slip was that you would actually initial and sign off stating that you want to start a preliminary investigation and they would go from there and if it didn't get resolved, you have what's called -- it's the next step into the investigation. I can't remember. Formal.
Q. A formal complaint?
A. Formal investigation, yes.
Q. And would you, is that -- between the contact with the EEO counselor and a formal

And we started this whole thing between going on and eventually Captain Cooper came down and met me in Building 15 to discuss the matter and everything about what was going on and --

Q. Sorry. Did you say Building 15?

A. Yes.

Q. Is that where the new office was or the new space?

A. Building 15 was where I had worked prior to. See, I only worked, once we mentioned, I only worked in Building 47 for about three months.

Q. Okay.

A. So there was really nothing that I did anything, but on 15 she met us there, talked to us and that's when we went through the whole deal and got in touch with what we were supposed to do.

I mean what I thought was better for me and that's when they relocated me into A-63, an office up front in A-63.

Q. Okay. So in dealing with her, your job was moved to A-63?

A. That's correct.

Q. Okay. And that was an accommodation of your requests?

A. Yes.

Q. I may have neglected to tell you at the outset that every answer you give here today has to be oral. You can't nod your head because she can't take that down. So your answer to that was yes, that was an accommodation, is that correct?
A. Yes.
Q. You had requested a change in space, she came down and actually investigated the space that they were going to put you in and decided to give you another office?
A. That's correct.
Q. And it was a work space or an office that you felt was adequate?
A. That's correct.
Q. By the way, is this the first time you had any direct dealings with Captain Cooper?
A. Yes, it was.
Q. She was relatively new at that time?
A. Brand new. Brand new.
Q. Now, at the time that she offered to make these changes in your job location, is it correct that your position was, well, you can make the changes but I'm not going to sign any agreement based on this?
A. I don't believe there was any real

agreement to it.

Q. It was just that she would do it irrespective of a settlement of your complaint, is that right?

A. She would just place me in that building is all it was, that place.

Q. She didn't ask you to waive any EEO claims that you had filed?

A. I don't think so.

Q. Okay. She was just, hey, here's an employee who has a problem, let me get him into a better work environment?

A. I believe so.

Q. Okay. So that was part of that complaint --

A. Yes.

Q. -- that you first contacted an EEO officer on March 25th of 2000 and the other part of it you said concerned the non-selection for the '99 jobs?

A. That's correct.

Q. Okay. And that matter was settled in approximately January of 2001, is that right?

A. That's correct.

Q. Describe the settlement for me.

A. The settlement of that, that came about that was, we were supposed to be -- the job was going to be now -- what had happened was we knew of positions that were available that were going to be in the Housing Management area.

Q. Who is "we"?

A. I, I should say. I knew there were two positions that were going to be opening up because of a retirement that was going to be taking place, so we agreed to settle this with the area of the GS-7, the position being advertised as GS-7/9s and I would have priority placement for that position.

Q. Now, was it priority placement or was the term in the settlement agreement priority consideration?

A. I don't recall.

Q. Now, was it significant to you that the positions be advertised at both the GS-7 and 9 level?

A. The reason for that being was I was working for Housing at the time. During that time all the way up to December of 1999, there were GS-7 Housing Manager Assistants' positions but in December of 1999, everything got taken right across the board, everybody were made GS-9s, which meant

that I was taken right out of Housing altogether. I was no longer ever going to be able to or capable to apply for any of those positions any longer.

Q. And why was it that you wouldn't be able to apply for those positions?

A. Because I was only a GS-6.

Q. And you have to be in the -- let me state the question -- you have to be in the grade below the grade you are applying for for at least 12 months in order to qualify for the job, is that right?

A. You have to be two grades. You have to be at least a 7 in order to apply for a 9.

Q. Right. Correct. And so you were a 6?

A. That's correct.

Q. And so you could not -- you could apply for a 7?

A. Right.

Q. But you could not apply for a 9?

A. Right.

Q. So it was important to you that these positions be advertised as GS-7s?

A. Yes.

Q. And also it was important to you to get priority consideration, right?



A26

these particular jobs?

A. As the job application, there was management position -- management jobs and referral jobs in those, I believe.

Q. Okay. Am I correct that there are several different jobs that go under the title Management Assistant?

A. There are only the ones in the Housing Management at the time.

Q. But I mean the duties can be different. Some can be Housing assignment, others can be Housing inspection --

A. Right.

Q. -- others can be Housing referral, is that right?

A. That's correct.

Q. What were these jobs that were --

A. These jobs --

Q. -- were advertised in June of '99?

A. These jobs that were advertised were GS-7 Housing Management Assistant, an 1173 series position.

Q. And what work did that involve? Was that referral work? Was that Housing inspection work or don't you know?

A. It did both.
Q. And did you apply?
A. Yes, I did.
Q. Were you given one of those jobs?
A. No, I wasn't.
Q. I believe you've told me that you were rated as highly qualified, is that right?
A. That's correct.
MR. DiGIOIA: I want to show you a document. If we can have this marked as Exhibit 2 for today's deposition.
(Whereupon, Defendant's Exhibit No. 2 was marked.)

**BY MR. DiGIOIA:**

Q. I want to hand you what's been marked as Defendant's Exhibit 2 and ask you if you have seen that before.
A. I believe I have not seen this at all. I have seen -- I've never seen a Rating Sheet. All I ever got back from them was a letter from Mary Thompson stating that you did not get the job.
MR. DiGIOIA: Okay. Can we have this marked as Exhibit 3?
(Whereupon, Defendant's Exhibit No. 3 was marked.)

BY MR. DiGIOIA:

Q. Handing you what's been marked as Defendant's Exhibit 3 --

A. Uh-hum.

Q. -- have you seen that before?

A. Yes. That's the type of letter that I would receive.

Q. Is that a copy of the letter you received?

A. Yes.

Q. And may I see that for a moment, please? Is it correct that this is a form letter that's addressed to you dated September 29th, 1999, and it states that you were considered, however you were not selected for this position?

A. That's correct.

Q. And these are the positions that were, in fact, awarded to Jamie Thiebault and Mary Beth Oliveira, is that right?

A. That's correct.

Q. And they were awarded to them in about August of 1999, is that correct?

A. That's correct.

Q. And you learned about it shortly after they got the jobs, is that right?

Q. So you were on paternity leave at the time you learned about this, at the time you received this letter?

A. That's correct.

Q. And you received it at home?

A. That is correct.

Q. It's addressed to you at home?

A. That's correct.

Q. So you received it very shortly after the 29th, maybe early October?

A. Right. That's correct.

Q. Okay. Now, you didn't contact an EEO counselor about this non-selection until March 25th of 2000, is that correct?

A. That's correct.

Q. Now, by the time you received that letter --

A. Uh-hum.

Q. -- Exhibit 3 you already thought that the Navy was discriminating against you in job selections, didn't you?

A. That's correct.

Q. Yet you didn't raise this with an EEO counselor until March of 2000?

A. Yes.

Q. March 25th?
A. That's correct.
Q. Why didn't you contact an EEO counselor about this?
A. As I explained earlier, it was because when the -- this thing took place, I was on paternity leave for one, but there were still four or five GS-7 positions available for me to fill later on. There were still openings going on at the time.
There was Bob Correale, Tom Wilson and Fran Donnelly and I believe Darlene Gammon -- I'm not sure on her -- four people were still GS-7s still, so in my case I felt I didn't make it at the time, I didn't file a complaint; okay?
Then came along December of 1999 when everybody who was in the office who were GS-7s in the office were upgraded to GS-9s, okay? And in that area I was still on the assumption -- still in the area that I was still working with Housing and then it came along the area, as you see in the reports here that I have, I was trying to deal with Commander Freitag or Schwind and nothing went there and came March of 2000, they told me you report to work. In fact, I received a letter from Buzz Evans

telling me to report to A-63.

Q. Okay. You knew you didn't get the job at the latest by early October of 1999, correct?

A. That's correct.

Q. All right. And it was approximately almost 90 days between 60 and 90 days later when you learned in December of '99 that the Housing positions had been upgraded from sevens to nines?

A. That's correct.

Q. You still didn't contact an EEO counselor then, did you?

A. No, I didn't.

Q. You didn't contact an EEO counselor until March 25th, almost 180 days after?

A. That's correct.

Q. By the way, do you know why the positions were upgraded from sevens to nines?

A. I was told they were just -- it was a new reorg that they had, that they had -- everybody was upgraded to GS-9s.

Q. Had you ever heard of a desk audit?

A. A desk audit? Yes, I have.

Q. And what is a desk audit?

A. Desk audit is when they go through the person's position and they go out and see what the

Q. No, I didn't explain that there was a desk audit.

A. Okay.

Q. We discussed what a desk audit was and you agreed that that's essentially what happened here in '99.

A. Right.

Q. My question is, do you think that the decision to change those grades from a 7 to a 9 was done to discriminate or retaliate against you?

A. No.

Q. And you didn't think that at the time, right?

A. That is correct.

Q. Okay. Now, was -- your son Nicholas had been born, right?

A. That's correct.

Q. Was Nicholas your first child?

A. Second.

Q. Second. And you were home at that point taking care of both children?

A. That's correct.

Q. And that was pretty significant for you at the time?

A. That's correct.

Q. In fact, frankly when you were home in September or October on the paternity leave, you were more concerned about that than about this letter that you got?

A. That's correct. In fact, I came -- when I came to my interview, I think my son Nicholas or something was in the car with my mother at the time.

Q. And that's part of the reason that you didn't immediately see a counselor, right? Because you were busy with something that you felt was very important and was taking your attention?

A. That's correct.

Q. Okay. All right. Now, you told me earlier -- and I just want to refer to your earlier testimony -- did you -- after you filed or contacted an EEO counselor in March of 2000 concerning these jobs, did you settle that complaint?

A. Yes. We eventually settled that complaint, yes.

Q. And that was the settlement -- tell me the terms of the settlement.

A. The settlement would be that the next job, Housing Manager positions would be -- become

available would be opened up as 7/9s and I would have been priority -- I don't know if you say consideration or placement which you said earlier.

Q. Okay. And did there come a time that they, in fact, advertised two positions?

A. Yes, they did.

Q. Okay. And when was that?

A. Was it June?

MR. DiGIOIA: Hang on for just one second.

THE WITNESS: Sure.

MR. DiGIOIA: Could we have this marked as No. 5.

(Whereupon, Defendant's Exhibit No. 5 was marked.)

**BY MR. DiGIOIA:**

Q. I'm handing you what has been marked as Defendant's Exhibit 5 for purposes of today's deposition.

A. Uh-hum.

Q. Let me ask you to take a moment and take a look at that. I want to -- I want you to be able to tell me whether or not that is the job advertisement for the positions that were advertised in 2001.

notice of the job announcement?
A. That's correct.
Q. And these were the two jobs that were announced in May of 2001, is that right?
A. That's correct.
Q. So this was approximately three or four months after your settlement, is that correct?
A. That's correct.
Q. And I believe you testified that you understood that these job positions were going to open up, is that correct?
A. That's correct.
Q. And what happened? Did you apply for this?
A. Yes, I did.
Q. And what happened after you applied for this?
A. After I applied for this, it was a thing that went on. We had a meeting. Captain Cooper pulled a meeting in A-63. I don't know if it was A-63 but a building. Everybody went to that meeting and that is where she announced that these positions had been cancelled.
Q. So what happened is the positions were cancelled, is that right?

A. That is correct.
Q. And did you first hear of it at this meeting that you just described?
A. That is correct.
Q. Did you know that they had been cancelled before she said it at the meeting or was that the very first second you heard of it?
A. There might have been a couple of days or so that she might have made a comment about it but she wanted to get everybody together. In fact, I believe there were almost like 13 people there at the time that she wanted to announce it formally. She didn't want to say it unless everybody was there. In fact, Jimmy Allen was present at the time.
Q. Okay. Do you remember anybody else who was present at that meeting?
A. I believe it was Charles Silvia was present and as well as I believe Richard Evans was present.
Q. Charles Silvia, Richard Evans. Anyone else?
A. Karen Peckham I believe might have been there too along with Captain Cooper announcing it.
Q. Yes. Do you remember any of the other

job candidates who were there?

A. As of right now, I -- I don't know of what names they were who were actually there. I know there were other candidates and it's in this area here.

Q. Now, was this meeting around July 10 or 12 of 2001? Does that sound about right to you?

A. Sounds about right, yes.

Q. What did Captain Cooper say at this meeting as to why the jobs were cancelled?

A. In that meeting, she stated that the jobs were cancelled. I was listening to what she was saying and there were just that -- she's just sorry about everything that happened and that the jobs had been cancelled. I don't recall a reasoning why they were cancelled.

Q. You don't recall her stating that the entire Housing Department or a large part of the Housing Department was coming under study to either go into privatization or some other reorganization and that, as a result of that, they didn't want to go forward and fill these positions?

A. That is correct, she did.

Q. So she did give a reason something to that effect at this meeting?

she announced the positions were being cancelled, do you recall the building that that was in?

A. I'm trying to say 690. I'm not sure.

Q. Was it the building that the Captain's -- that Captain Cooper's office was in?

A. I believe so.

Q. Was it in the conference room in that building?

A. I believe so.

Q. Okay. And did you not meet with her either just before or just after that meeting with Jim Allen and discuss your issues?

A. I believe it was at a later date.

Q. Okay. Whether it was either a later date --

A. Yes.

Q. -- or right afterwards, at some point you had a meeting with the captain?

A. That's correct.

Q. Was there anybody else present for this meeting?

A. I know Jim Allen was there with me.

Q. Anybody else?

A. Charlie Silvia.

Q. Okay.

A. And Captain Cooper.

Q. All right. Now, what happened at that meeting?

A. She sat there and explained to me that what happened here was the job was -- how should I say it -- had been cancelled. She -- she was the one who cancelled the job because she was afraid of a -- that she couldn't fill the position anymore, and it was her priority or -- priority to cancel the position. I asked, what's this got to do with my settlement? And as if she could not even do anything for my settlement at the time.

Q. Okay. Let me back you up. Did she tell you at this meeting that the cancellation of these jobs had nothing to do with you or your settlement?

A. That's correct.

Q. Okay. In fact, she told you that someone from higher up in the Navy, someone named Janet Huber or Hubner, had come down to Newport and advised them that the Navy was considering contracting out its Housing, isn't that correct?

A. That's correct.

Q. Okay. And, in fact, the Navy later did contract out Housing, correct?

A. Only a year and a half ago.

Q. Okay. But they did?
A. Yes.
Q. Okay. Did you think she was lying when she said to you that Janet Hubner came down and that there was a a study going on about reorganizing Housing and doing it a different way?
A. No, I didn't.
Q. Okay. You thought that was the truth?
A. Yes.
Q. Did you think this was all trumped up to discriminate against you?
A. No.
Q. Okay. Do you think there were legitimate business reasons for what they were -- for what Janet Hubner had suggested?
A. As I was told, they were legitimate reasons.
Q. Do you have any reason -- do you have any evidence that they were not legitimate reasons?
A. No, I do not.
Q. You didn't know Janet Hubner?
A. No, I did not.
Q. As far as you know, she didn't know you?
A. No.
Q. By the way, did she make any offers to

you either at this meeting or subsequently concerning your settlement?

A. She did. And what she did was she stated to me that she would extend my settlement agreement for two more years.

Q. And what did you say?

A. And myself right then says -- said, I don't think I would want to settle, you know, extend it for two more years, and she told me that she would do that anyways.

Q. Okay. So she offered to extend it for two years and you said you didn't want to, is that correct?

A. Yes.

Q. You never got another agreement to extend it for two years, did you?

A. No.

Q. Because the first agreement, the one that you entered into on January 24th of 2001 specifically had a date for the next two years we will offer these positions, is that correct?

A. That's correct.

Q. And you never got a modified agreement that said that was going to happen for the next four years?

Item 7

# Job Opportunity Announcement

DEFENDANT'S EXHIBIT NO. 6 FOR IDENTIFICATION
DATE: 5-26-06 RPTR:
PENGAD 800-631-6989

| | |
|---|---|
| Announcement Number: | GRO-01-0099 |
| Announcement Date: | 05/03/2001 |
| Title: | **HOUSING MANAGER, GS-1173-09, OR HOUSING MANAGEMENT ASSISTANT, GS-1173-07 WITH PROMOTION POTENTIAL TO HOUSING MANAGER, GS-1173-09 (TWO POSITIONS)** |
| Pay Plan: | GS |
| Series: | 1173 |
| Grade: | 09 |
| Opening Date: | 05/04/2001 |
| Closing Date: | 05/18/2001 |
| Location: | Housing Department, Facilities Management Division, Naval Station Newport, Newport, RI |
| Area of Consideration: | Department of Navy Activities, New England |
| Who May Apply: | Appointable candidates within the area of consideration who meet all requirements for this position as of the announcement's closing date. Appointable means career or career-conditional employees, employees serving under permanent VRA appointments. |
| Duties: | This position is located in the Facilities Management Division, Housing Department, Naval Station Newport, Newport, RI. Formulates tenant directives and instructions for a housing project area within the framework of field activity management requirements, concerning occupancy and similar inspections maintenance, cleanliness, conservation of utilities, and other housing activities. Conducts studies, inspections, audits, and management reviews of a housing project area. Analyze and authorize daily maintenance/equipment requisitions and set priorities for work accomplishment. Develops short/long range maintenance plan for respective housing area and include input in Maintenance Repair Inspection Program. Controls and issues work items to contractors, and assures work is acceptable to Housing standards. Develops current and projected years budget requirements for operation and maintenance cost for a specific housing area. Administer and maintain the community associations within the housing areas and encourages occupant participation in activities for the benefit of the community. Mediate any tenant problems and complaints not resolved at lower levels. |
| How to Apply: | You must submit a TYPED RESUME and the HRSC Northeast Additional Data Sheet.<br><br>To prepare your resume, follow the guidelines provided in the Job Application Information for Civilian Positions (Job Kit). To obtain the Job Kit, you may access our website at www.donhr.navy.mil or contact your local personnel office. Faxed resumes will not be accepted. Failure to submit all information, any required forms and the Additional Data Sheet may result in loss of consideration for this vacancy and could prevent your resume from being placed in our database for future vacancies. Resumes will expire one (1) year from the date of receipt in the HRSC-NE office. Resumes and Application Express Requests (Self-Nomination) must be received no later than the closing date of this announcement.<br><br>TO USE THE NAVY ONLINE RESUME BUILDER (preferred method): Access our website at www.donhr.navy.mil click on "TAKE ME TO THE RESUME BUILDER" button located at the bottom of this announcement. Using this method will ensure that your resume is submitted in the proper format.<br><br>TO REUSE YOUR CURRENT RESUME: Be sure that you have a (Resumix) resume on file with the HRSC-NE. Access our website at www.donhr.navy.mil Click on "APPLICATION EXPRESS" button located at the bottom of this announcement; OR obtain an Application Express form from your local personnel office or the HRSC-NE.<br><br>TO E-MAIL RESUME: Email to wantajob@ne.hroc.navy.mil . Do not send the resume as an attachment in your e-mail. Follow these instructions: (1) Prepare your resume and save as a |

62

A43

| | |
|---|---|
| | ".txt" then cut and paste your resume into the body of the e-mail message. (2) Answer the questions provided on the Additional Data Sheet and include them as the last page of your resume (this will not count toward the 5-page limit). Be sure to identify the announcement number(s) on the first line of your resume (3) Type "RESUME- (your first and last name" in the subject line of your e-mail. Only upon request, send any required supporting documentation to the HRSC-NE.<br><br>TO MAIL RESUME & ADDITIONAL DATA SHEET: Mail to: HRSC-NE, Customer Focus Division, Attn: RESUMIX, 111 South Independence Mall East, Philadelphia, PA 19106-2598. Only upon request, send any required supporting documentation to the HRSC-NE.<br><br>NOTE: Resumes and all supporting documentation become the property of the Department of the Navy and will not be returned or copied. All extraneous documents not specifically requested will not be used. The filing of job applications is considered to be a personal matter by OPM, not official government business. Use of postage paid official envelopes is a violation of OPM and postal regulations.<br><br>NON-MERIT FACTORS: Consideration will be given to all candidates without regard to race, color, creed, sex, sexual orientation, age, national origin, religion, marital status, political affiliation, physical disability, or membership or non-membership in employee organizations and shall not be based on any criteria not job related, including favoritism or personal relationship. |
| **Qualifications:** | Applicants must meet the following qualification requirements and all regulatory requirements of the Office of Personnel Management (OPM) Qualifications Standards Operating Manual; one year of specialized experience equivalent to the next lower grade for which applying. Specialized experience is experience that equipped the candidate with the particular knowledge, skills and abilities to successfully perform the duties of the position. Qualifying specialized experience is work performed that involved direct onsite responsibility for the management and administration of one or more permanent or transient housing projects, facilities, or complexes, which may consist of a number of military or public family dwelling units, individual rooming accommodations, billeting facilities, guest quarters, dormitories, special status residents (BOQ, BAQ, Senior Officers, etc), or combinations of the above including the surrounding grounds and service facilities, that requires a variety of housing management and administrative knowledge and related practical skills and abilities in such housing activities. |
| **Evaluation Method:** | Resumes will be rated by an automated system (Resumix) that matches the skills extracted from the candidate's resume to the skills identified by the Selecting Official for the position. In addition, basic qualification requirements (i.e., time in grade, education, area of consideration, specialized experience, etc.) must be met to determine the qualified candidates referred to the Selecting Official. Your experience, training and education will be evaluated accordingly based upon the specific requirements of the position to be filled and identified under this announcement.<br><br>Candidates whose current or previous permanent position is at the same grade level, or a higher grade level than, the announced position (or its target), and who meet the qualification requirements will be referred to the Selecting Official as Non-competitive candidates. |
| **Substitute Education for Experience:** | FOR GS-07: One full year of graduate level education or Superior Academic Achievement. For GS-09: Master's or equivalent graduate degree or two full years of progressively higher level graduate education leading to such a degree or LL.B. or J.D., if related. Graduate level education must have been obtained in an accredited college or university in any field, in the amounts shown above. Such education must demonstrate the knowledge, skills and abilities necessary to do the work. One year of full-time graduate education is considered to be the number of credit hours that the school attended has determined to represent 1 year of full-time study. If that information cannot be obtained from the school, 18 semester hours should be considered as satisfying the 1 year full-time study requirement. Superior Academic Achievement is based on (1) class standing, (2) grade-point average, or (3) honor society membership. (1) Class standing--Applicants must be in the upper third of the graduating class in the college, university, or major subdivision, such as the College of Liberal Arts or the School of Business Administration, based on completed courses. (2) Grade-point average (G.P.A.)--Applicants must have a grade-point average of: (a) 3.0 or higher out of a possible 4.0 ("B" or better) as recorded on their official transcript, or as computed based on 4 years of education, or as computed based on courses completed during the final 2 years of the curriculum; or (b) 3.5 or higher out of a possible 4.0 ("B+" or better) based on the average of the required courses completed in the major field or the required courses in the major field completed during the final 2 years of the curriculum. (3) Election to membership in a national scholastic honor society--Applicants can be considered eligible based on membership in one of the national scholastic honor societies. These honor societies are listed in the Association of College Honor Societies: Booklet of Information (1992-95) and/or Baird's Manual of American College Fraternities (1991). |

63

A44

| | |
|---|---|
| Other Pertinent Information | SALARY: GS-07: $30,483 - 39,626 per annum<br><br>GS-09: $37,288 - 48,469 per annum<br><br>TIME IN GRADE: Applicants must meet the Time in Grade requirements as stated in 5 CFR 300.601. |
| Displaced Federal Employees: | Priority Placement/Consideration Programs (i.e, PPP, RPL) This position is subject to mandatory consideration and placement programs. |
| Direct Inquires to: | Mary Thompson, DSN 243-5121, Comm (215) 408-5121 |
| Special Requirements: | Selectee must possess and maintain a valid driver's license.<br><br>Sective Service Registration: Males born after December 31, 1959 will be required to certify that they have registered with the Selective Service System. If you failed to do so, you will be required to certify that you did not knowingly and willfully fail to register. This requirement must be met before you can be appointed to this position. Selectee will be required to participate in the DOD Direct Deposit Electronic Fund Transfer which is the standard method of payment within DOD for pay of personnel. |
| Notes: | Relocation/PCS costs are NOT authorized. Position may be filled as a Housing Management Assistant, GS-07 or as Housing Manager, GS-09. If filled at the 07 level, the incumbent may be promoted without further competition to the full performance level of GS-09 upon satisfactory completion of time in grade and other regulatory requirements. However, there is no implied guarantee or promise of promotion. Selectee will be required to participate in the DOD Direct Deposit Electronic Fund Transfer which is the standard method of payment within DOD for pay of personnel. |

Take Me to the Resume Builder

Application Express

**The Department of Navy is an Equal Employment Opportunity Employer. All qualified candidates will receive consideration without regard to race, color, religion, sex, national origin, age, disability, marital status, political affiliation, sexual orientation, or any other non-merit factor.**

**The Department of the Navy provides reasonable accommodation to applicants with disabilities. Applicants with disabilities who believe they require reasonable accommodation should contact the Equal Employment Opportunity staff at HRSC Northeast (215) 408-5251, DSN: 243-5251 to ensure that the Department of the Navy can consider such requests. The decision to grant an accommodation will be made on a case-by-case basis.**

64

D-00083

A45

# SETTLEMENT AGREEMENT

I. This settlement agreement is entered into as resolution of the discrimination complaint of Alan Bradley, EEO Activity Number 00-32411-003. This Settlement Agreement and General Release shall not in any way be construed as an admission by the Agency of any wrongdoing against complainant, or any other person, and the Agency specifically disclaims and the complainant specifically releases the Agency for any liability to, or wrongdoing against the complainant or any other person, by the Agency or any other person, its officers and employees, or its agents.

II. The Naval Station Newport, hereinafter the Agency, and Alan Bradley, hereinafter complainant, hereby voluntarily enter into the following agreement in settlement of the complainant's Equal Employment Opportunity (EEO) complaint activity number 00-32411-003, filed on 12 July 2000, a copy of which is attached as Exhibit A. This Settlement Agreement shall be effective upon the signature of both parties. Complainant has filed a complaint of discrimination against the Secretary of the Navy alleging discrimination based on disabilities (epilepsy, partial paralysis, and blindness in one eye). Complainant and the Agency desire to settle fully and finally all employment-related claims between them, including, but in no way limited to, the differences embodied in the attached complaint of discrimination. The complainant and the Agency represent that they understand and have thoroughly discussed all aspects of this Settlement Agreement with their representatives and that they are voluntarily entering into this Settlement Agreement, which represents the entire agreement between the complainant and the Agency and a complete and exclusive statement of the terms thereof. The complainant and the Agency agree that neither party is bound by any representation, promise or inducement not set forth in this Settlement Agreement. This Settlement Agreement is the joint product of the complainant and the Agency, and it shall not be construed against any party on the grounds of sole authorship.

III. The Agency agrees to the following for a period of two years:

a. to announce Housing Management Specialist positions, GS-1173-9 located at the Naval Station Newport, at both the GS-7 and GS-9 level.

b.to afford the complainant priority consideration for such positions as noted above.

IV. The complainant withdraws his complaint of discrimination, Exhibit A, against the Secretary of the Navy, its officials, and employees. The complainant represents that, after withdrawal of his complaint of discrimination, Exhibit A, he will not file any other complaints or charges with respect to matters occurring prior to the date of this Settlement Agreement at any time hereafter, and that if any agency, representative, or court assumes jurisdiction of any complaint or charge against the Secretary of the Navy, its officials, or employees, the complainant will request such agency, representative, or court to withdraw from the matter.

V. Complainant irrevocably and unconditionally releases the Department of the Navy its employees, and all persons connected with the Department of the Navy, (collectively "Releases") from any and all charges, complaints, grievances, liabilities, damages, suits, costs, debts, and expenses which complainant had in the past, now has currently, or will have in the future under the Civil Rights Act of 1964, as amended, the Rehabilitation Act of 1973, as amended, or the Age Discrimination in Employment Act of 1967, as amended, or any other Federal or State statute or regulation related to the issues raised in this complaint.

VI. The complainant and the Agency agree that they will keep the terms, amount, and fact of this Settlement Agreement completely confidential, except to the extent disclosure may be required by law, regulation, or court order. In addition, complainant agrees that he and his representative will not hereafter disclose any information concerning this Settlement Agreement or his discrimination complaint of Exhibit A to anyone employed by or connected with the Department of the Navy, including, but not limited to, any past, present, or prospective employee or applicant for employment with the Department of the Navy.

VII. Complainant understands and agrees that any claimed violation, breach, or failure to perform any of the commitments described in this agreement by (e.g., name of activity or command) shall be raised in writing within 30 calendar days of the date the complainant knew or should have known of the alleged noncompliance, and processed as described in Appendix B to Department of the Navy Discrimination Complaints Processing Manual. If the Agency has not responded to the complainant in writing, or if the complainant is not satisfied with the attempts to resolve the matter, the complainant may appeal to the (EEOC OFO) for a determination as to whether the Agency has complied with the terms of this settlement agreement. The complainant may file such an appeal 35 calendar days after service of the allegation of noncompliance on the Agency but no later than 30 calendar days after receipt of the Agency determination.

VIII. Should any part, term, or provision of this Settlement Agreement be declared or determined by any court, administrative tribunal, or agency to be illegal or invalid, the validity of the remaining parts, terms, or provisions shall not be affected thereby, and said illegal or invalid part, term, or provision shall be deemed not to be a part of this Settlement Agreement.

| | | | |
|---|---|---|---|
| 24 Jan 2001 | | 24 Jan 2001 | |
| ALAN BRADLEY<br>Complainant | Date | R. A. COOPER<br>Commanding Officer<br>Naval Station Newport | Date |

1/24/01

JOSEPH F. HOOK — Date
Attorney for the Complainant



01/24/2001 09:23 4018414395 HRO GROTON PAGE 02

**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
**Office of Federal Operations**
**P.O. Box 19848**
**Washington, D.C. 20036**

Alan Bradley,
Complainant,

v.

Gordon R. England,
Secretary,
Department of the Navy,
Agency.

Appeal No. 01A34814

Agency No. 01-32411-003
Hearing No. 160-A3-8157x

DECISION

On August 7, 2003, Alan Bradley (complainant) filed an appeal from the agency's final decision (revised) of July 10, 2003, finding that it did not discriminate against him with regard to his complaint of unlawful employment discrimination in violation of the Rehabilitation Act of 1973, as amended, 29 U.S.C. §§ 791, 794(c). The appeal is timely filed (*see* 29 C.F.R. § 1614.402(a)) and is accepted in accordance with 29 C.F.R. § 1614.405.

The agency's final order agreed to implement the summary judgment decision of the Administrative Judge (AJ) that the agency did not discriminate against complainant based on disability (epilepsy, blind right eye, and deformed right arm) or in reprisal for prior EEO activity when it canceled a vacancy announcement in June 2001. On the appeal form (EEOC Form 573), complainant noted that no agency final decision had yet been issued on his claim of breach of the settlement agreement (SA) dated January 24, 2001.[1] On September 20, 2004, the agency issued a final decision regarding complainant's allegation of breach, finding no breach of the SA.

---

[1]Complainant and the agency entered into the SA on January 24, 2001, providing, *inter alia*, that the agency would announce Housing Management (Housing) positions and afford the complainant priority consideration for such positions. On June 27, 2001, the agency cancelled a vacancy announcement for such a position. Complainant contacted an EEO counselor and filed a formal complaint in September 2001, alleging a breach of the SA and claiming a new act of discrimination when the agency cancelled the vacancy announcement. *See* EEOC Appeal No. 01A21057 (April 3, 2002), ordering the agency to process his new allegation and his claim of breach.

Although complainant has not filed an appeal from this decision, he did raise arguments regarding the SA in his appeal of August 7, 2003. Therefore, we consider both prongs of the instant matter.

*Claim of Discrimination*

After a review of the record in its entirety, including consideration of all statements submitted on appeal, it is the decision of the Equal Employment Opportunity Commission to affirm the agency's final decision. First, we find that the AJ's issuance of a decision without a hearing was appropriate, and the preponderance of the evidence of record does not establish that discrimination occurred.[2] In the decision, the AJ found that the agency articulated legitimate, nondiscriminatory reasons for its actions, *i.e.*, the agency canceled the vacancy announcement, because it was considering 'contracting out' operation of the agency's housing operations nationwide. Further, the AJ found that complainant's claim that the agency acted based on his disabilities and in reprisal was without merit. He also found that, had the agency placed him in a Housing position on a temporary basis, it was possible that he would lose either the temporary job in Housing when the operations were contracted for or his current job slot in the Public Works Department. Finally, the AJ noted that when a housing manager resigned, the agency placed an employee incumbent to Housing operations in the position on a temporary basis. On appeal, complainant stated his disagreement with the AJ's findings and contested the agency's reasons; however, complainant's arguments did not establish that the agency's reasons for its actions were untrue or taken based on discriminatory animus. We find that the record before us does not establish that discrimination occurred.

*Claim of Breach*

In general, a settlement agreement is considered adequate or fair as long as each party incurs some legal detriment; however, when one party does not incur that legal detriment, a settlement agreement will be set aside for lack of consideration. With regard to complainant's claim of breach, we find that, upon cancellation of the vacancy announcement and the likelihood that such positions would be 'contracted out,' the agency effectively abolished its ability to give complainant priority consideration for a position in Housing, thus rendering the agency unable to provide complainant the promised consideration in exchange for withdrawal of his complaint. The Commission finds, therefore, that the SA is void for lack of consideration. In remedy, the agency must reinstate complainant's complaint at the point at which processing ceased. *See* 29 C.F.R. § 1614.504(c).

---

[2]For purposes of analysis, we assume, *arguendo*, without finding, that complainant established that complainant is an individual with a disability.

## CONCLUSION

Accordingly, the agency's decision with regard to the claim of discrimination is AFFIRMED, and the agency's decision with regard to the claim of breach is REVERSED. The agency is directed to comply with the Order, below.

## ORDER

A. The agency is ordered to resume processing of complainant's underlying complaint that was resolved pursuant to the SA, from the point where processing ceased. The agency shall acknowledge to complainant that it has reinstated and resumed processing of complainant's complaint.

B. A copy of the agency letter of acknowledgment must be sent to the Compliance Officer as referenced below. Copies of all filing should be sent to complainant and his representative, if any.

## IMPLEMENTATION OF THE COMMISSION'S DECISION (K0501)

Compliance with the Commission's corrective action is mandatory. The agency shall submit its compliance report within thirty (30) calendar days of the completion of all ordered corrective action. The report shall be submitted to the Compliance Officer, Office of Federal Operations, Equal Employment Opportunity Commission, P.O. Box 19848, Washington, D.C. 20036. The agency's report must contain supporting documentation, and the agency must send a copy of all submissions to the complainant. If the agency does not comply with the Commission's order, the complainant may petition the Commission for enforcement of the order. 29 C.F.R. § 1614.503(a). The complainant also has the right to file a civil action to enforce compliance with the Commission's order prior to or following an administrative petition for enforcement. *See* 29 C.F.R. §§ 1614.407, 1614.408, and 29 C.F.R. § 1614.503(g). Alternatively, the complainant has the right to file a civil action on the underlying complaint in accordance with the paragraph below entitled "Right to File A Civil Action." 29 C.F.R. §§ 1614.407 and 1614.408. A civil action for enforcement or a civil action on the underlying complaint is subject to the deadline stated in 42 U.S.C. 2000e-16(c) (1994 & Supp. IV 1999). If the complainant files a civil action, the administrative processing of the complaint, including any petition for enforcement, will be terminated. *See* 29 C.F.R. § 1614.409.

## STATEMENT OF RIGHTS - ON APPEAL

### RECONSIDERATION (M0701)

The Commission may, in its discretion, reconsider the decision in this case if the complainant or the agency submits a written request containing arguments or evidence which tend to establish that:

1. The appellate decision involved a clearly erroneous interpretation of material fact or law; or

2. The appellate decision will have a substantial impact on the policies, practices, or operations of the agency.

Requests to reconsider, with supporting statement or brief, must be filed with the Office of Federal Operations (OFO) within thirty (30) calendar days of receipt of this decision or within twenty (20) calendar days of receipt of another party's timely request for reconsideration. *See* 29 C.F.R. § 1614.405; Equal Employment Opportunity Management Directive for 29 C.F.R. Part 1614 (EEO MD-110), 9-18 (November 9, 1999). All requests and arguments must be submitted to the Director, Office of Federal Operations, Equal Employment Opportunity Commission, P.O. Box 19848, Washington, D.C. 20036. In the absence of a legible postmark, the request to reconsider shall be deemed timely filed if it is received by mail within five days of the expiration of the applicable filing period. *See* 29 C.F.R. § 1614.604. The request or opposition must also include proof of service on the other party.

Failure to file within the time period will result in dismissal of your request for reconsideration as untimely, unless extenuating circumstances prevented the timely filing of the request. Any supporting documentation must be submitted with your request for reconsideration. The Commission will consider requests for reconsideration filed after the deadline only in very limited circumstances. *See* 29 C.F.R. § 1614.604(c).

<u>COMPLAINANT'S RIGHT TO FILE A CIVIL ACTION</u> (R0900)

This is a decision requiring the agency to continue its administrative processing of your complaint. However, if you wish to file a civil action, you have the right to file such action in an appropriate United States District Court within ninety (90) calendar days from the date that you receive this decision. In the alternative, you may file a civil action after one hundred and eighty (180) calendar days of the date you filed your complaint with the agency, or filed your appeal with the Commission. If you file a civil action, you must name as the defendant in the complaint the person who is the official agency head or department head, identifying that person by his or her full name and official title. Failure to do so may result in the dismissal of your case in court. "Agency" or "department" means the national organization, and not the local office, facility or department in which you work. Filing a civil action will terminate the administrative processing of your complaint.

<u>RIGHT TO REQUEST COUNSEL</u> (Z1199)

If you decide to file a civil action, and if you do not have or cannot afford the services of an attorney, you may request that the Court appoint an attorney to represent you and that the Court permit you to file the action without payment of fees, costs, or other security. *See* Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*; the Rehabilitation Act of 1973,

as amended, 29 U.S.C. §§ 791, 794(c). The grant or denial of the request is within the sole discretion of the Court. Filing a request for an attorney does not extend your time in which to file a civil action. Both the request and the civil action must be filed within the time limits as stated in the paragraph above ("Right to File A Civil Action").

FOR THE COMMISSION:

Carlton M. Hadden

Carlton M. Hadden, Director
Office of Federal Operations

DEC 2 1 2004
Date

CERTIFICATE OF MAILING

For timeliness purposes, the Commission will presume that this decision was received within five (5) calendar days after it was mailed. I certify that this decision was mailed to complainant, complainant's representative (if applicable), and the agency on:

DEC 2 1 2004
Date

Equal Opportunity Assistant

Q When you were captain in the United States Navy, were you at one point in time stationed at Newport, Rhode Island? Yes?
A Yes.
Q When?
A June 2000 through February 2004.
Q And what position did you hold at Naval Station Newport?
A I was the commanding officer until August 2003. I was also the program manager for Community Services for Navy Region Northeast from April, and I'm not sure of the year. I think it was 2001 until August 2003.
Q And when were you transferred out of Newport, Rhode Island?
A February of 2004.
Q And you previously had provided testimony in an equal employment opportunity investigation concerning Alan Bradley. Is that correct?
A I believe that's correct. Yes.
Q I am going to ask you to take a look at a document which purports to be an affidavit signed by

do not remember conversations that I had that long ago as to what people said.

Q Why did you cancel the positions?

A Because of a debrief I had had from Jana Hubner who is from Naval facility in Engineering Command who had the overall responsibilities for family housing in the Navy.

And she discussed that there -- family housing positions were going under functionality assessment which would require them to create a most efficient organization which basically means you have to look at eliminating up to a third, if not more, of your manpower billets.

She advised as we were currently positioned with personnel at that time we would not have to RIF or retire in force anybody that we currently had as long as we didn't hire anybody new but that if we did hire new people into the vacant positions we would be looking at having to fire people within one year.

She advised that the prudent course would be not to hire any additional personnel into housing.

Q What's a functionality assessment?
A I thought I did that, but I will go again. A functionality assessment is when you have to do an organizational and management review and create a most efficient organization or MEO.
Basically, you have to show that you can continue to perform the same function at the same level of service with about a third less people and about a third less budget.
Now, a functionality -- I am sorry. And that does not get competed like a A76 study does.
Q Is there any regulation that is say when you do a functionality assessment that you need to, that you are aware of, that you need to be able to perform at one-third of the level that you were previously performing?
A No. There would be no regulation that would say that because I said -- and I hope I said that was a for instance that you will need to do this one-third less.
There is no requirement, and no -- I mean do not have functionality assessments memorized. So,

assessment is in a CA study you actually as the government create a contract bid proposal that you submit and any private company, organization, can also submit a bid proposal. And the government competes with private organizations to perform that function.

If the private organization has the best proposal, they win the bid and the contract, and then all of those billets become eliminated. The people in them are fired basically in one form or another, and the contractor then takes over performing those functions.

So, the government loses those jobs as government positions.

Q So, a CA study would be the government puts up a bid and competes against a private bid?

A That's correct.

Q And in this case, did Mr. Hubner advise you that there was an FA study, functionality assessment study being proposed for a MEO or was she advising you that there was a CA study coming down?

A No. An FA.

Q Later on, there was a hiring freeze approximately a year later?

A There was a subsequent hiring freeze. I would not be able to tell you the time frame except that it happened afterwards.

Q Okay. Now, the person who would have made the request to full the housing manager positions would have been Charlie Silvia. Is that correct?

A That would be the most likely person who would have requested that.

Q I am going to ask you to turn to page four of you have affidavit, 147 of the investigative report. The last paragraph there you testified that Mr. Silvia contacted me and said he wanted to advertise the position.

So, at that time that was the information that you had, correct?

A Contact me and wanted to advertise the position. Yes.

Q You told him to make sure that the positions were advertised at the GS-7 and 9 level.

Is that correct?
A Yes.
Q And that was because of the settlement agreement, correct?
A Correct.
Q You go on to say I did not specifically tell him there was an EEO settlement agreement and did not show him the agreement. Is that correct?
A That's what I said at that time. Yes.
Q Then you go on to say I did discuss our agreement with Mr. Bradley to advertise the position at the GS-7, 9 level and that Mr. Bradley would be afforded priority consideration.
A Uh-huh.
Q So, did you tell Mr. Silvia that you had an agreement with Mr. Bradley that the positions were to be advertised at the 7, 8 level and that he, Mr. Bradley, would be afforded priority consideration?
A I don't remember anything in addition to what's there. I just don't remember things back that far.
Q Okay. Do you recall having any

conversations with Mr. Silvia concerning ways to accommodate Alan Bradley's inability to drive a motor vehicle?

A Yes, I do because I wanted there to be a positive feel for going on to this.

Q So, you had a conversation with Mr. Silvia in terms of ways to make the settlement agreement work?

A That if this were to be one of the employees that we were to select and we would need to be thinking along those lines.

I always said he might be, he could be, this might be somebody. We need to start thinking along these lines.

Q Where did it come to your attention or how did you get information that Alan Bradley had a problem with driving a motor vehicle?

A The most likely source that I can remember would have been Charlie Silvia.

Q Okay. And that would have caused you to think about having ways to accommodate his driving issue so he could work as a housing manager?

A That's correct.
Q At the time that you chose not to fill the housing manager positions, were you aware that there were also -- there was a vacant housing manager supervisor position in the 1173 series at that time?
A I don't really recall whether I knew that or not.
Q Do you know whether or not Mr. William Murphy was subsequent to the briefing that you had with Jana Hubner that he was subsequently hired as a housing manager supervisor in the 1173 series?
A I really -- I believe that may have happened, but to tell you what position it was, what level it was, I don't have those kinds of details at my recall.
Q Do you remember a Victor Ramsey?
A I remember the name.
Q What is it about the name that you remember or is it just the name that you remember?
A Just the name.
Q Do you recall Charlie Silvia requesting that he be assigned as a housing manager in May of

the positions either temporarily.

And on page 150, you responded that I looked into that and had discussions with Karen Peckham about that. Mr. Bradley is in Public Works which is undergoing an A76 study for contracting out.

If we move Mr. Bradley out of that billet, we lose that billet for Public Works. If Mr. Bradley were placed in housing on a temporary hire and his permanent billet were either eliminated by the A76 study, he could be left without a billet.?

A That is what it says. Yes.

Q At the time you provided that information, that was accurate information as you knew it at that time?

A Correct.

Q So, you did look in to see whether you could fill that housing position at least on a temporary basis and you contacted Karen Peckham to discuss that.

A Uh-huh. Specifically for being able to detail Mr. Bradley.

Q All right. So, you made a specific

inquiry as to whether you could detail Mr. Bradley into housing, and you contacted Karen Peckham?

A Uh-huh. Correct.

Q And you made a determination that that wasn't a good idea because Public Works was undergoing an A76 study?

A Yes.

Q Which A76 study that is the CA study?

A That's correct.

Q And he could lose his billet in Public Works.

A Correct.

Q Do you recall whether Mr. Bradley told you that at that time he didn't care whether he was on -- could lose his jobs in Public Works, that he was willing to take that risk?

A Well, I don't recall that specific statement, but it's Public Works that would lose the billet. So, you have to understand there's two parts of that equation.

While that billet could be eliminating Mr. Bradley to lose his jobs, Public Works now has

lost that billet and that person who had performed the work in that position.

So it does not really matter whether that person had Mr. Bradley in it or not. If that billet was empty because Mr. Bradley was working somewhere else, Public Works would lose the manhours that would be assigned to that billet to get work done.

So, it's not just Mr. Bradley that had something to sacrifice, but Public Works would have also had to sacrifice the ability to have a person working in that job.

Q So after speaking with Karen Peckham, you made -- concerning whether you could detail Mr. Bradley to housing on a temporary basis, you made a decision that it wasn't in the best interest of Public Works and perhaps Mr. Bradley? Is that a fair statement?

A That's correct. Yes. That was a good way of saying it. It was not in the best interest of Mr. Bradley nor in the best interest of the Navy.

Q All right. Do you recall, however, Mr. Bradley indicating to you at that time from his

A Yes, I have.

Q And that document marked as Exhibit 8, does that in fact reflect a freeze in hiring 1173 positions?

A It does state that in subparagraph one. Effective immediately hiring controls are in place for all 1173 series personnel.

Q That's on page 72 in the black numbers at the bottom center. Is that correct?

A That's correct.

Q Now, can you tell from the first two pages, 69 and '70, the date of that notification?

A That would have been 30 April 2002. The date of the message.

Q And that was actually received at some later time in Newport. Is that right?

A Correct. This is the trail of e-mails as being forwarded around the e-mail system, but the actual effective date of the message is reflected in the date.

Q Back in Exhibit 4, your memo or letter of August 28, 2002, at the time this letter was sent and

signed by you there was in fact a freeze on the hiring of 1173 positions as reflected in this exhibit. Is that right?

A It would appear to be put in the time line together between those two documents.

Q All right. Now at the meeting where Jana Hubner briefed you on the FA, the functionality assessment, there was no freeze imposed at the time, was there?

A Not that I recall. I don't believe there was one.

Q If you could refer to page 148 roughly two-thirds of the way down, you were asked did the headquarters mandate that you not file the 1173 positions, referring to the meeting of June 14. And what did you answer?

A I replied that it was not a mandate but it was strongly recommended and strongly encouraged statement.

Q And is that a fair characterization of the impression you were left with by Jana Hubner following that meeting that we discussed?

A65

A Yes. There was the brief at the meeting and then there was the talk. Basically her giving her strong, very, very, strongly put recommendation that we would be putting employees at risk if we proceeded and hired into it.

And since she was from a higher headquarters level, hirer echelon in the Navy than I was at, that was certainly something that I listened to.

Q You didn't have a tin ear with response to that message?

A No. When someone from headquarters gives you a very strongly worded encouragement, you listen to it.

Q All right. And you went ahead and canceled the announcement for the GS-7-9 positions approximately a week after your meeting with Jana Hubner?

A I don't know. It would make sense, but I couldn't tell you that.

Q Let's take a look. I am directing you to Exhibit Number 6. Is this the agenda for the June

14th meeting?

A As it's been shown to me.

Q Okay. And please bear with me.

MR. DIGIOIA: Can I have 58 marked as Exhibit Number 9, I believe, in sequence.

(Cooper Exhibit No. 9 was marked for identification.)

BY MR. DIGIOIA:

Q I'm handing you what's marked as Exhibit Number 9 for purposes of this deposition. It's page 58 from the investigative report and ask you if you can take a look at that, please.

A Okay.

Q Have you seen it before?

A Yes.

Q Is it correct that that's a series of e-mails dated June 21, 2001?

A That's correct. They're all dated June 21, 2001.

Q And was it these e-mails which canceled the announcement of the GS-7-9 housing manager positions?

A This would have started the procedure. Karen Peckham would have had to contact somebody at HRSC because they're the organization that handles the announcement and the mechanics of hiring. So, it would have had to have gone outside of the Command to actually cancel them.

Q So, it would have had to go outside of Newport, but this is initiating the process through which they would be canceled?

A Correct.

Q Those are all dated on the 21st?

A That is correct.

Q That is you would agree a week after the meeting that's referenced in the agenda?

A It is. That's seven days.

Q Okay. Now, the cancellation of those positions was not based on the freeze which did not occur until almost a year later in 2002. Is that right?

A Is that when the freeze was?

Q We need Exhibit 8.

A Yes. April 2002.

training. To help train him back into going into engineering, for which he had a degree for and something else.

Q. Did she offer to have the job that he currently held at that time to be rewritten, so that he could be promoted to have enough duty, so he could be promoted to a GS-7 or 8 at that time?

A. I don't recall that at all.

Q. Did Captain Cooper state anything to you concerning Alan's ability to operate a motor vehicle?

A. We discussed, when the job opened up, she was discussing ways she could accommodate him. So that he could be placed in that job. And she did talk about possibly like an electronic car, electric car, golf cart to get him back and forth to the housing areas.

Q. To your knowledge, Captain Cooper was aware that Alan had a disability of epilepsy?

A. I'd never spoke about that with her. It was the driving.

Q. Do you know why there was an issue concerning his ability to drive?

A. I didn't know until I sat in on the mediation. I didn't know he was epileptic before that.

correct?
A That is correct.
Q And who is your current employer?
A My current employer is NAVFAC Atlantic.
Q What is the acronym for NAVFAC for?
A Naval Facilities Engineering Command.
Q Is that under the Department of the United States Navy?
A It is.
Q How long have you been employed by NAVFAC?
A Sixteen years.
Q What is your job there?
A I am the director of public private ventures.
Q Okay. What was your job in June of 2001?
A I was the deputy director of Navy housing at NAVFAC Atlantic. At that time, it was called something different. They just retitled it and I oversaw Navy housing operations across 50 naval installations in the Eastern United States, Caribbean, Mediterranean, Europe.
Q So did that include the -- in the summer of 2001, did your job of overseeing Navy housing include Navy housing in Newport, Rhode Island?
A That did. I oversaw it at a programmatic


A70

present at that meeting, as well?
A To my best recollection, she was. We are going back four years and I handle many, many meetings. But my recollection was she was. I am not sure whether she was there the whole time.
Q Do you know who Charlie Silvia is?
A Yes, I do.
Q Do you remember whether he was at that meeting?
A I do not remember.
Q What was the purpose of that meeting?
A We were coming to discuss using a property management pilot at Newport. We had executed one in Portsmouth and another installation. It was an initiative out of NAVFAC headquarters.
Bill Pearson, who is on the to list, was from NAVFAC headquarters in D.C. We wanted to talk with Newport about pursuing a pilot for property management of Navy housing.
Q So you are considering pursuing a private property management pilot of Navy housing in Newport at that time?
A Correct. Contracting out for a private sector entity to perform property management.
Q Turning to the third line -- the fourth

housing staff. What the intent of that statement was was to minimize any impact, and that was the thought of if you have any existing vacancies, perhaps you want to consider filling them with contract hires and that you look at bringing the staff down through attrition.

Q And was that because of the possible pilot program, or was that because there was a potential riff out in the future?

A No. That particular comment is only in reference to the property management pilot.

Q In the meeting that took place on June 14, 2001, was there -- do you recall whether you had any discussions concerning functionality assessments being conducted at the Naval station in Newport and a potential riff of the housing staff in Newport?

A Not in that regard, no. We may have mentioned it briefly at that point in time. The assessment was being done at the highest levels. And up in Washington, no one really had an idea of the impact.

Q Okay. So if I could turn your attention to the exhibit that was marked in the fax. I believe it's Exhibit 2. I may have mixed up mine, but it starts out, "S.W. family housing functionality assessment," pages 59 through 73.

levels; is that right?

A Correct. And there was also something else that was happening to the housing organization at the time.

Q What was that?

A That was housing privatization.

Q Is that something that, in fact, subsequently led to what is referred to as a PPV?

A Correct. In fact, all of Newport has been privatized as of October of '04, which did result in a reduction of staff that are required up in that area.

Q Can you tell me what a PPV is, what those initials stand for?

A Public private venture. In 1996, congress passed some very powerful authorities that basically -- for the Department of Defense, including the Navy, the intent was to say, what does the private sector do well? What kind of business can I pass to the private sector for them to operate so that I, in the Navy, can focus my limited resources on ships and planes and the core requirements for my mission.

Every housing division and every installation knew that privatization loomed out there. It got a slow start, but the potential to impact the staff was out there from '96 on.

Q And it was increasing in the spring of 2001; is that correct?

A That is correct. The program was getting more and more momentum. The privatization had already started on the west coast.

So all of your housing divisions knew that there was multiple things and potential impact to staff. One was housing privatization, another was functionality assessment, another one was the CA studies. And for the particular one that we discussed, it was the Newport property management contract, i.e., the Department of the Navy was looking to basically get out of the day-to-day operations of Navy housing and transfer it.

Q And they were looking at that goal and satisfying that goal through all the different acronyms you just used?

A Correct.

Q Functionality assessment, a PPV, and you also used another one, CA?

A Yes. A commercial activity study.

Q Is that some sort of -- is that privatization in a different form?

A That is correct. It's turning the work over to a private sector entity, instead of having



A74

federal civil service employees do it.

Q So under any of those scenarios -- under any of those acronyms, a privatization of Navy housing was expected to lead to a smaller work force at the various installations in the 1173 position; is that right?

A That is correct, and it has done so.

Q That was expected in the spring of 2001; is that correct?

A Everyone in the Navy had been apprised of it and that the studies were ongoing, yes. Now, I can't tell you if they knew in '01 when the date would be that it would happen to their installation. I don't believe we had that then, but they knew it was coming down the pike.

Q In fact, I want to direct your attention -- I believe it is in Exhibit 1. But the page I am referring to specifically is Page 51. Is that, in fact, in Exhibit 1?

A Correct.

Q At the bottom of that page, directing your attention to Exhibit 1, Page 51, at the bottom of that page, there is a message that is from Al Shannon dated Wednesday, August 15, 2001, 8:59 a.m.

Do you see that?

oversaw 50 installations. Some of them had contract hires. I don't recollect whether Newport had contract hires onboard or not at that time.

Q I understand. I am not trying to tax your memory too much. I know this is four years ago.

But that was one of the things you suggested to them in June of '01, to consider the possibility of filling open positions with contract employees?

A Correct. That was also a tool that was being used in regards to privatization. The goal was that we wanted to minimize impact to the staff as Navy housing transitioned from government-owned and operated to privatized.

Q Okay. Now, to refer you back to Exhibit 3 -- please tell me if I am wrong -- it is Page 255.

A I have it. The letter?

Q Yeah. And Mr. Hook referred you to Paragraph 3, the second sentence of that paragraph. Do you recall that?

A I do.

Q And that mentions, I also offer -- in fact, bear with me. Since we are over the phone, I am going to read it into the record. "I also offer to



A76

states that at a meeting with Mr. Bradley, the person to whom this memo was sent, a meeting with you and your union representative, "I met in person with you to outline the actions of the command in canceling the vacancy announcement."

Now, presumably that refers to the one in June of 2001, correct?

A Correct. But I don't know when the meeting took place.

Q Okay. That is fine. What I want to ask you is if the next sentence of Paragraph 3 is referring to a meeting that took place in July of '01, then the statement that there was a required freeze on GS-1173 positions would have been incorrect; is that right?

A There was no freeze in July of '01.

Q Very good. That is where I am going.

But even though there was no freeze, all of these other factors that you have just testified about, the potential impact of the functionality assessment, the A-76 study, and the PPV, they all have the potential to reduce the needed staff in 1173 positions, correct?

A They had the potential, and the action actually has happened since then.

Q So even though there was not a freeze in

privatization studies, correct?

A Correct. It was common knowledge throughout Navy housing that the program was changing and that the potential existed for a reduction of 1173 Series.

Q Now, just a question or two more.

Is it correct that some of the positions in the 1173 Series were more vulnerable than others?

MR. HOOK: Objection.

BY MR. DiGIOLA:

Q You can answer.

A Okay. There are two areas within the housing divisions. One was a group of people that did housing referral, and the other would be your facilities maintenance staff. With either the property management pilot or A-76 or PPV, it would likely have affected more of the facilities maintenance side than the referral side. However, they could have moved staff around if they were qualified.

Q All right. But so in June of 2001, some of the positions in the 1173 Series were more likely to be reduced than other positions in that 1173 Series?

A Correct.

Q All right. What you just said is that

pilot project specifically because of doubts about the functionality assessment and the A-76; is that correct?

A Correct. Because no one was certain what direction housing was going in.

Q But it was clear that any of those directions were going to result in a reduction of the maintenance staff needed at facilities like Newport?

MR. HOOK: Objection.

THE WITNESS: It was clear and subsequently already happened.

BY MR. DiGIOLA:

Q But it was clear then?

A It was clear that, yes, the Department of the Navy was looking to change the way that we ran housing and to turn it over to private sector entities.

Q And that if they did that, there would be a reduction in maintenance staff?

A Correct. And all three of those things that we were talking about, whether it was a property management pilot, an A-76, or privatization initiative, would have resulted in the reduction of 1173 staff.

MR. DiGIOLA: Thank you very much. I have nothing further.

MR. HOOK: One follow-up.

did you make the decision to cancel all the 1173 positions?
A. Yes.
Q. Did you consult with Captain Cooper concerning that?
A. I'm sure I talked to her. Yes. I did. She had the job as the base commander at the same time too. So the program stuff was left mostly to me. She was my boss.
Q. She was, in terms of chain of command, she was your boss?
A. That is correct. Not as the commanding officer, but as the program director.
Q. Can you tell me why you canceled those 1173 positions?
A. The housing program within the whole region was undergoing a lot of change. And I recollect from this meeting most of the substance of this meeting was more about what choices we would possibly have for this change. We would, basically, have one of three options. We would have a commercial assessment study done, which is a A-76 study; that's where the government competes with commercial enterprise for a certain -- running a

certain section of the government in this piece of housing. That was one choice.

The other choice was a functionality assessment in which the government self-assesses itself to establish a most effective organization. And the third thing that was brought up at the meeting was the possibility of undergoing a public private venture. Those things are important to know because, regardless of what happens in any one of those three, there is going to be less people to do the work, or no people. If it was a CA, it could be no people. So based on that knowledge, you know, to hire someone knowing this is coming down the train track would put that person hired in jeopardy, because I would have to turn on the fire time or lay him off, because the position would probably go away.

Q. At the time did you know, could you see into the future whether, in fact, if you did hire that person you would have to fire that --

A. Pretty much. I had that sense it would be definitely they would have to go away.

Q. Did you know that for a certainty? You didn't know what was going to happen in the future?

A. I knew there was going to be change. I did know that. And in fact change did come about.
Q. What option of those three options was selected, sir?
A. We didn't have a choice. It was not the best of the options. The ultimate choice or the ultimate decision that was made was that we privatized all of our family housing within the whole Navy region northeast.
Q. At this meeting did you come to a decision that you would contract out the job of managing the housing?
A. No. That was just one of the things that was being discussed. No.
Now that we're talking about it. Originally, I think the meeting was called because we were thinking about contracting out the maintenance portion. Like we had a pilot program going on up in Portsmouth, New Hampshire, at the Navy Shipyard there. They wanted to bring this pilot down to Newport. But, in the meantime the discussion of something going to happen, either a C-A or a F-A, or the PPB was going to happen. So we sort of terminated our conversations with bringing the pilot program down and just discussed

in generalities the future of housing as it exists now in the northeast.

Q. Is it your testimony that the meeting in June, the original intent of the meeting, was to discuss this pilot program that was being considered?

A. Yes. That is correct.

Q. In that pilot program as part of that program was there contracting out of the housing needs or the housing management needs?

A. Property management primarily. Yes.

Q. After this meeting did you make a decision that you would contract out the property management of the housing needs in Newport?

A. No.

Q. There was no decision?

A. There was no decision made at that time.

Q. Subsequently thereto did Captain Cooper or at that time did Captain Cooper express an interest in pursuing the pilot of contracting out the property management needs?

A. No. She didn't. Specifically, to be honest, she didn't want it.

Q. Any contracting?

A. Any contracting out in her mind she felt she would

be better served with government employees in a job.
Q. All right. After this meeting occurred in June of 2001 did you have a decision as to how, pending this future that you portrayed, how the Navy would meet it's housing management needs?
A. It was I think some time in the springtime of 2001. That I went to a big Navy meeting down at Leesburg, Virginia at the Xerox conferencing center. It had representatives like myself from all walks of the Navy around the world. We were told at that time that we would have to go through a functionality assessment. And that there would be a significant number of "bill it's". Jobs that would be reduced from the funding lines within the Navy housing lines area. And that they were restructuring the whole housing organization from what it was to what they envisioned it would be like in the future. The numbers, I can't remember the exact numbers. Coming out of that meeting everybody knew that there was going to be a significant loss of jobs within the Navy housing arena.
Q. That meeting that you just referred to occurred before the June 14th meeting, which the agenda --

being discussed. That didn't seem like that it was going to be a reality, but so I knew that the A-76 or the C-A was coming.

Q. At least this time you deny thinking the PPV was going to be a reality?

A. Correct.

Q. The PPV again could you tell me what that stands for?

A. Public private venture.

Q. Is that what ultimately occurred where GMH took over the management of housing at Navy?

A. That is correct.

Q. That occurred approximately a year and a half ago?

A. That is correct.

Q. In 2001, June 2001 you weren't sure this PPV would happen, so the Navy was considering a pilot program that is discussed in what has been marked Plaintiff's Exhibit 3 and the e-mail communication you referred to?

A. That was one of the ones that we were considering.

Q. Ultimately on August 15, 2001 you requested that the Navy stop all actions to include Naval station Newport and any ongoing property management pilot study, is that correct?

you're looking at probably fifty-percent of the employees going.

Q. If any one of those three options were selected, it was your expectation that you would be facing a smaller work force?

A. Yes.

Q. You indicated earlier on direct examination that nobody ordered you at that meeting to cancel announcements and not to fill positions, is that correct?

A. That's correct.

Q. Did anybody make a recommendation?

A. Remember these people were from the program managers down in Norfolk. They're the ones that controlled the money. Their suggestion was that you probably don't want to hire anyone right away. You need to see what's going to happen.

Q. Let me show you what has been marked as Defendant's Exhibit No. 1 of today's date it has the black number 58 at the bottom, let me ask you to take a moment and take a look at that?

A. Okay.

Q. Can you tell me what Defendant's Exhibit 1 is?

A. It's a string of e-mails that started with

Charles Silvia to a local Newport management analyst that was in charge of appropriated fund personnel.

They had to go through her to get to the human resources office to a P. Martin. I know who that is. To Mary Thompson.

Q. Can you tell me the subject of these e-mails?

A. To cancel the recruitment action for 2 GS7/9 housing managers.

Q. Can you tell me the date of that first e-mail?

A. 21st, of June 2001.

Q. That is one week after the meeting we were just discussing where the Navy recommended you not fill positions?

A. That's correct.

Q. So one week after that meeting Charlie Silvia sends in a e-mail requesting Karen Peckham to cancel the two GS/79 housing manager's jobs as of now, is that correct?

A. That is correct.

Q. Do you know why that request was made to cancel the announcements?

A. I probably told them to do it.

Q. Because of the meeting that occurred on June 14?

little more than half the question was asked was there a hire headquarters freeze imposed on those positions, do you see that?

A. Yes.

Q. That's referring to the 1173 series position?

A. That is correct.

Q. You answered that yes there was a freeze imposed in April of 2002?

A. Like I said, the dates are fuzzy. I probably said that in the affidavits. Yes. I did.

Q. Is it consistent with you that it was about that time?

A. Yes.

Q. You were asked in the very next question has the agency made any permanent placements in the housing function since being informed of the functionality assessment, do you see that question?

A. Yes.

Q. Do you see your answer?

A. No.

Q. Do you now believe that, in fact, there were some positions filled after hearing of the functionality assessment?

A. Yes. The ones that we knew would be continued on.

kind of a hypothetical question. He asked you if Captain Cooper could have transferred Mr. Bradley from Public Works over to Housing on a temporary basis say, and then I'll use the word backfilled, put a new person in Mr. Bradley's job back in Public Works in his billet; do you remember being asked about that?

A. Correct.

Q. But if you do that, if Captain Cooper had done that and then the Housing positions were abolished, if Mr. Bradley were to go back to his old billet in Public Works, what do you do with the person who had been hired to take that job?

A. Technically Mr. Bradley would be in trouble at the time.

MR. DiGIOIA: Thank you very much. I have nothing further.

**EXAMINATION**

**BY MR. HOOK:**

Q. Mr. Bradley would have been in trouble at the time?

A. Correct.

Q. He would not be able to refill that position, correct?

A. Correct.