UNITED STATES DISTRICT COURT FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| ALAN BRADLEY<br>Plaintiff | : | |
| | : | CA 04-412ML |
| GORDON R. ENGLAND<br>Secretary of the US Navy<br>Defendant | : | |

PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

I. **Introduction**.

The Plaintiff brought this case alleging that he was discriminated in his employment because of his disabilities, including epilepsy and partial paralysis in his right arm. In addition, the Plaintiff alleges that the Defendant engaged in reprisal against the Plaintiff for his engaging in protected Equal Employment Opportunity Commission Activities. The Plaintiff alleges three separate incidents of discrimination. First he contends that the defendant engaged in disability discrimination, and reprisal in 1999, when it passed over the plaintiff for a promotion to a Housing Manager position at the GS 7 level. The Plaintiff also contends that in the summer of 2001, the Defendant engaged in disability discrimination and reprisal when it failed to afford the Plaintiff priority consideration for two vacant Housing Manager Assistant positions (as was required under a prior settlement agreement), but rather cancelled the recruitments, and filled the positions with temporary contractors. The Plaintiff, next contends that the

Defendant engaged disability discrimination and reprisal when it failed to afford the Plaintiff priority consideration for a third vacant Housing Manager Assistant position that opened up in the spring of 2001 (as was required under a prior settlement agreement), but rather filled the position with a temporary detail of a Victor Ramsey, then advertised the position, but then cancelled the recruitment immediately after the Plaintiff applied for the position in November of 2002.

The Defendant in its motion for summary judgment argues that the 1999 claims of discrimination are barred because Mr. Bradley did not contact an EEOC counselor with 45 days after learning that he was not selected for the job and suspected that it was the consequence of discrimination. The Defendant also argues that the Plaintiff cannot demonstrate that there was a disparate treatment with respect to any other similarly situated individual concerning the cancellation of the 2001 recruitments, thus the Defendant argues the Plaintiff has failed to establish a primae facie case that would give rise to a presumption of discrimination under the burden shifting analysis ser forth under McDonald Douglas. The Defendant also contends that the Plaintiff has failed to set forth sufficient facts that would demonstrate that the proffered reasons as to why the defendant refused to fill the vacant Housing Manager positions in 2001, and why it temporarily detailed Victor Ramsey to the position in 2002, was a pretext for actual discrimination based upon the Plaintiff's disabilities. (The Defendant does not offer an argument that addresses its cancellation of the recruitment for the position which Victor Ramsey held as a temporary detail, that was advertised in November 2002). Finally, the defendant argues that the Plaintiff cannot establish that he was the victim of retaliation for engaging in prior EEOC activities because according to the Defendant, the Plaintiff cannot establish a causal

connection between his prior EEOC activities and the adverse employment actions of cancelling the recruitments in 2001 and 2002.

Summary judgment is appropriate when the pleadings, affidavits and other summary judgment evidence show that no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56©; Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). The moving party bears the burden of identifying those portions of the record it believes demonstrate the absence of a genuine issue of material fact. Celotex, 477 U.S. at 322-25. Once a movant [*4] makes a properly supported motion, the burden shifts to the nonmovant to show that summary judgment should not be granted; the nonmovant may not rest upon allegations in the pleadings, but must support the response to the motion with summary judgment evidence showing the existence of a genuine fact issue for trial. *Id.* at 321-25; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255-57, 106 S. Ct. 2505, 91 L. Ed. 2d 202(1986). All evidence and reasonable inferences must be viewed in the light most favorable to the nonmovant. United States v. Diebold, Inc., 369 U.S. 654, 655, 82 S. Ct. 993, 8 L. Ed. 2d 176 (1962).

The Plaintiff concedes that it cannot establish that he filed an EEOC complaint within 45 days or that he has established sufficient reasons as to why the equitable tolling provisions under 29 C.F.R. § 1614.105(a)(1) (2002). should be invoked. Thus, the 1999 claims are barred. However, the prior acts of discrimination are pertinent background information, and are relevant to the issue of pretext.

The Plaintiff has, however, demonstrated that he was treated differently than similarly situated persons concerning the vacant Housing Manager positions in 2001 and 2002.

Specifically, Victor Ramsey was placed in the position as a Green Lane Housing Manger in 2002. Additionally, it is not legally necessary to establish that the exact positions that the Plaintiff applied for were filled by similar persons only that the Plaintiff only that those positions were not filled, and that a similarly situated person was treated more favorably. Here, James Murphy was hired as a Housing Manager Supervisor in the 1173 series (the same series as the positions that the Plaintiff sought) and thus was treated more favorably than the Plaintiff. The Plaintiff has also set forth sufficient facts to demonstrate that the Defendant's proffered reasons for failing to fill the recruitments in 2001 and 2002, and temporarily detailing Victor Ramsey to one of the positions, was a pretext for invidious employment discrimination. The Plaintiff has also established a causal connection between the his prior EEOC activity and the adverse employment action of refusing to fill the vacant GS 7/9 housing manager positions in 2001 and 2002.

Finally, the Plaintiff has presented enough direct evidence to establish that his disabilities were a motivating factor in the defendant's decision not to fill the GS 7/9 Housing Manager Assistant Vacancies in 2001 and 2002, that his claims should withstand summary judgment, even if he is not able to establish a circumstantial case, under the McDonald Douglas v. Green burden shifting framework.

II. Facts.

Alan Bradley has been employed by the Defendant since 1985. He has an BS in architectural engineering degree from Roger Williams University and received that degree in 1983. Alan Bradley also has a partially paralyzed right arm and epilepsy, a seizure disorder. In the late 1980s he was employed as an assistant Housing Manager at the GS-5 level. Corey

Depo. Page 5 lines 19-21. In the late 1980s he was involved in a motor vehicle accident on the base as a consequence of having an epileptic seizure. Corey Depo. Page 7 lines 2-3. Following this accident, Robert Corey who was the then Director of the Housing Department prohibited Alan Bradley from operating a motor vehicle on base because of safety concerns that he could have another accident as a result of an epileptic seizure. Charles Silvia who also worked in housing department as a Housing Manager at that time was aware that Alan Bradley was not driving because of his epilepsy. The Plaintiff continued to hold a drivers license but did not drive on base because of the danger that he could have a seizure while driving. Charles Silvia was the Housing Director at the Naval Station Newport in 2001 and 2002 at the time the decision to keep the vacancies open occurred. Corey Depo page 6 line 14, and page 7 line 20-23. Corey Depo. Page 9.

Mr. Bradley held the GS-5 Assistant Housing Manager career ladder position until the mid 1990s, at which time his position was abolished. Corey Deposition page 8 line 3. Mr. Bradley was changed from his position as a GS 5 Assistant Housing Manager and placed into the position of a Supply Technician, by the then Housing Director Robert Corey. Robert Corey created the position of Supply Technician for Alan Bradley to accommodate for his physical limitations. Corey Depo page 10 lines 23 and 24. Alan Bradley filed an EEOC complaint at that time as a consequence of this action. This complaint was settled and his position of supply technician was upgraded to that of a GS 6 level.

Thereafter, in the summer of 1999, the Plaintiff applied for two vacant housing manager assistant positions at the GS 7- level in the 1173 series. See Corey deposition page 30 lines 8-20 and exhibit 6 to Corey Depo. He was rated as qualified for the positions, along with Mary

Beth Oliviera and Jamie Thiebault. Corey Depo page 24 lines 2-3. However, Alan Bradley was not selected for the jobs. Robert Corey instead selected Mary Beth Oliviera and Jamie Thiebault. Corey Depo page 20 and 21. Mr. Corey testified that Alan Bradley could not fill the position Housing Manager at the GS-7 level positions because he could not drive. Corey deposition Page 61-63 [1].

Mr. Bradley received notice of his non selection by way of a letter dated September 29, 1999, which he received in early October 2001. In March of 2000, the Plaintiff's job as a Supply Technician was transferred out of Housing Department and moved to the Public Works department. Following this move, Mr. Bradley on March 25, 2000, contacted a EEOC counselor, and alleged that he was not provided a reasonable accommodation in that the environment in which he was placed in at Public Works and that the environment was more likely to cause ecliptic seizures. In addition, Mr. Bradley alleged that the selection of Mary Beth Oliviera and Jamie Thiebault over him was based upon his disabilities. This was EEOC Activity Number 00-32411-003.

During the processing of this EEOC complaint, Captain Ruth Cooper of the Navy worked with the Plaintiff to provide him an office setting in the Public Works Department to work out of

---

[1]However Mr. Corey testified that the positions that were filled by Mary Beth Oliviera were not GS 7 Housing Manager positions but were in fact Housing assignment positions. Corey depo at page 24 lines 6-11. In Defendant's answers to interrogatories number 9 (and 13 by reference) the Defendant stated that "the GS 7 Housing Management Assistant position at Naval Station Newport (for which plaintiff applied in 1999) required the employee to required to drive a vehicle to perform the necessary duties such as contacting property owners, real estate brokers and development housing authorities, and inspect housing units. Plaintiff had been in an on the job accident and requested not to drive, stating '. . . should I have a seizure, I could get in an accident and injure myself or someone else. . . . .In addition plaintiff had difficult communicating with others.'"

that would accommodate his disabilities of epilepsy and partial paralysis of his right arm. See Cooper dep. Page 21 line 8-20; also Evans depo page 9 lines 19-25 and page 10 line 1. Additionally, a settlement agreement was reached on January 24, 2001, between the Plaintiff and the Defendant resolving Mr. Bradley's complaint in EEOC Activity Number 00-32411-003. This settlement agreement was memorialized in writing, and agreement was executed by the Plaintiff and Captain Ruth Cooper on behalf of the Defendant. Pursuant to the terms of this agreement, the Defendant agreed to "(a) announce Housing Management Specialists positions GS 1173-9, at both the GS 7 and GS 9 level, and (b) afford the [plaintiff] priority consideration for such positions." Captain Cooper understood priority consideration to mean that "as long as the person that had priority consideration was qualified for that position that the person would be the first selected for the position. Cooper Depo page 23 lines 10-12.

In the Spring of 2001, two Housing Manager Assistant positions did in fact become vacant because of retirements. Charles Silvia who was recently selected as the Housing Director[2] in the 1173 series requested that advertisements go out to fill the positions. Cooper depo at page 24 lines 11-12 and page 34. Because of the settlement that had been reached with the Plaintiff in EEOC Activity No. 00-32411-003, Captain Cooper advised Charles Silvia that the advertisements had to go out at the GS 7 and GS 9 level. Cooper depo page 34, 21-22 and 35 page 1-5. Captain Cooper discussed with Charles Silvia the settlement agreement reached with the Plaintiff, including advising him that Mr. Bradley was to be afforded priority consideration for the positions and ways to accommodate his disabilities so that he could fill the vacant Housing Manager positions not withstanding his disability of epilepsy and inability to

[2]Charles Silvia became the housing director in April 2001.

drive. Cooper depo page 35 lines 10-15; Cooper affidavit page 148 of EEOC Investigation. According to Captain Cooper, Charles Silvia was the most likely person to advise her that Alan Bradley had a problem with driving a motor vehicle. Cooper depo page 36 line 18-19. Cooper page 36 line 20-22, and page 37 line 1. This caused her to start thinking about ways to accommodate Alan Bradley's driving issue so he could work a housing manager. Charles Silvia expressed his feeling to Captain Cooper that he did not want to hire Alan Bradley as a housing manager. See Cooper depo at page 66 lines 8-22 and page 67 line1

Prior to filling the housing manager vacancies, Alan Bradley's name had come back as from human resources in Groton as a referral for selection. Evans Depo. Page 1- lines 21-24; page 11 line 3-4. Captain Cooper told Richard Evans, the Plaintiff's then supervisor that: "looks like I'll be able to put Alan in one of those positions . . . I have three positions. He's a qualified candidate and we can reasonable put him in the job with no problem." Evans Depo. At page 11 lines 14-21.

On June 14, 2001 there was a meeting on the Naval Base in Newport with Jana Hubner, Captain Ruth Cooper and Charles Silvia and possible Alan Shannon. The accounts provided by the management officials of the Navy regarding what was discussed at the June 14, 2001 meeting with Jana Hubner vary and conflict with each other. Jana Hubner said she spoke about a pilot program that would consider contracting out the housing department. In addition she discussed the impact that this pilot program would have on the housing staff. According to Jana Hubner she recommended to Charles Silvia and Captain Cooper that all of the Housing positions in the 1173 series not be filled because of the housing manager pilot program only. Hubner Depo. Page 10 lines 9-10.

Captain Ruth Cooper said that she was advised by Jana Hubner to not to fill the vacant positions because a Functionality Assessment (FA) study. Cooper Depo at page 26 line 4-22. Captain Cooper was clear that a Commercial Activities was not discussed. Cooper Depo at page 30 line 22.

Alan Shannon said that he was advised at the meeting with Jana Hubner not to fill the vacancies because of a the discussion about a Commercial Activities (CA) study, or an Functionality Assessment (FA) or a Public Private Venture (PPV). He said that the conversation about the pilot program were general in nature only. Shannon Depo at page 13 line12-24 and page 14 line 1-2.

Charles Silvia cited a property management study as the reason that the housing manager positions were not filled in the summer of 2001. Page 61 line 1-5. He said that after the meeting with Jana Hubner he and Captain Cooper were under the impression that they had no choice but to go under property management. He said "it wasn't' until later that they found out that they did have a choice, and that when everything started changing. What we were told to the best of my recollection, what we were told is either go into the property management study or the funds would not be available the following year to pay our management people. . . . So we just assumed that we had to go into the property management study . . . . but when we found out that wasn't the case , that's when we decided we weren't going to participate. Silvia at page 61 lines 6-23. Charles Silvia was asked why he did not fill the GS 7/9 Housing Manager position either permanently or temporarily. Mr. Silvia said "I was very uncomfortable with the decision I was forced to make. I felt an obligation to the people who worked for me to try to protect their positions. However, I also wanted to fill the Housing manager positions with civil service

employees. I felt it was a loose/loose situation. Our concern about hiring an employee temporarily was that someone coming into the organization that has prior military or any other benefits might wipe someone out who had been with the organization for 20-30 years, if we had to do away with personnel. I don't think we had the option of filling the position temporarily." Silvia affidavit at page 157 and 158.

Captain Cooper, Alan Shannon, and Charles Silvia each said the decision not to fill the vacant Housing Manager Assistant positions was theirs. See EEOC affidavits of Cooper; Shannon; and Silvia.

By August 15, 2001, the Defendant had decided that it would not participate in the pilot program that was referred to by Jana Hubner at the June 14, 2001 meeting. Shannon Depo at page 22 lines 20-24, page 23 line 1 (also exhibit 3 to Shannon Depo)

On June 21, 2001 Charles Silvia advised Karen Peckham to cancel the recruitments for the two vacant housing manager positions that Alan Bradley had applied "for now.". Silvia Depo. Alan Shannon testified that after the June 14, 2001 meeting that they cancelled all of the GS -1173 positions. Shannon depo at page 11 lines 1-3.

However, contrary to the testimony of Alan Shannon, the Defendant proceeded to fill a Housing Manager Supervisor position in the 1173 series.[3] Silvia depo at page 39-42 and Exhibit 4 attached thereto. This Housing Manager Supervisor position was filled by a Mr. William

[3]Charles Silvia sent a memorandum for the week end June 15, 2001 advising that the Navy was preparing the necessary paperwork to contract 3 temporary housing manager Assistants and a referral clerk to fill the vacant positions created from the retirements. He also noted in that same memo that HRO Philadelphia was currently qualifying and rating 17 applicants for the vacant GS-11 Housing Manager Supervisor position. This GS-1173 position was ultimately filled by William Murphy after undergoing a competitive application process.

Murphy after going through a competitive application process and interviewing with Captain Cooper or Charles Silvia. Silvia depo page 42 line 14. Murphy depo page 4.

On July 12, 2001, Captain Cooper met with the applicants for the GS 7/9 Housing Manager positions, including Alan Bradley, to advise them that the positions were going out to contract. At this meeting Alan Bradley spoke to Captain Cooper about the settlement agreement that he had made with her concerning affording him priority consideration for the vacant Housing Management Positions. After this meeting, the Plaintiff made allegations that Captain Cooper cancelled the recruitment to get out of his settlement. Cooper affidavit at page 149. At this meeting Captain Cooper advised Alan Bradley that she was still thinking about placing Alan Bradley in housing. Bradley EEOC affidavit at page 112.

The next day on July 13, 2001, Captain Cooper told James Alan, the union representative that because Alan Bradley did not have a drivers license he could not fill the Housing Manager Assistant position. Alan Deposition page 9 lines 1-9.

On July 23, 2001, Captain Cooper again met with Alan Bradley and James Alan. At this meeting Captain Cooper told Alan Bradley that there was a possibility of a Reduction in Force and that if the plaintiff were placed in housing that he could loose his job as a consequence of the reduction in force.[4] Alan Bradley advised Captain Cooper that he nevertheless wanted the

[4]Later in her deposition testimony, Captain Cooper said she did not fill the position temporarily because if she transferred Alan Bradley even temporarily to the housing manager position, that would leave the supply tech position Alan Bradley held vacant, and could cause the Public Works department to loose its billet for that supply tech position because the Public Works Department was also undergoing a Functionaility Assessment study. However, this reason is suspect because there was no reason offered as to why it would have been necessary to leave the Supply Tech position vacant if Alan left that position.

Assistant Housing Manager position and was willing to take the risk of losing his job in a future reduction in force.

On September 21, 2001, the Plaintiff filed a formal complaint with the EEOC DON 01-32411-003. In this complaint he alleged that the Defendant breached the terms of the January 24, 2001 settlement agreement inasmuch as it failed to afford him priority consideration for the vacant housing manager positions, and that the failure to fill the positions with permanent government employees, was a result of discrimination based upon his disabilities of epilepsy and right arm paralysis. In addition he alleged that the failure to fill the positions was reprisal for his prior EEOC activity.

As a consequence of the Functionality Assessment in Housing that had commenced in March 2001, hiring controls were placed on all GS 1173 staff positions in housing effective April 2002. Hubner depo. Page 16- line 20. However, no one at the meeting with Jana Hubner on June 14, 2001 had any idea of the impact of the Functionality Assessment. Hubner page 10 line 11-20. Hubner page 16 line 13-14.

In May of 2002 an additional Housing Manager Assistant became vacant because a Laurie Bowers, who held a Housing Manager Assistant position took another job elsewhere with the Navy. Instead of immediately advertising this open position, The Housing Director Charles Silvia detailed a Mr. Victor Ramsey to this position for a 180 period.

When Mr. Bradley learned of the placement of Victor Ramsey into the position of Green Lane Housing Manager he had his attorney contact Captain Ruth Cooper to advise her in writing that the terms of his settlement agreement were breached because he was not afforded priority consideration for the position in which Mr. Ramsey was detailed. Cooper Depo. Page 43 and

exhibit 5 attached thereto. Captain Cooper responded to Mr. Bradley's claim that the settlement had been breached by the placement of Victor Ramsey by referring back to a meeting that she had with Alan Bradley and the union representative in the summer of 2001. In this letter she said that during her meeting with the Plaintiff and the union representative she "offered to extend the settlement agreement two more years since the department required a hiring freeze on all GS 1173 series positions while a functionality assessment was being completed, and you refused that offer." Cooper depo. Exhibit 4.

Then, after the personnel office received a request from Charles Silvia to fill the vacancy for the Housing Manager Assistant position vacated by Laurie Bowers, the position was posted and advertised on November 20, 2002. Silvia pages 55-56. The Plaintiff applied for the position. The recruitment was then cancelled the day after the Plaintiff applied for the position on November 21, 2002.

Between the time that the 2001 recruitments were cancelled, and the November 2002 position was cancelled, there was a need for a Housing Manger Assistant to be filled on a permanent basis. Murphy depo at page 22 lines 8-10. Because of the need for a permanent employee to fill the position, Mr. Murphy who was then a Housing Manager Supervisor inquired of Charles Silvia as to why Victor Ramsey could not keep the appointment, and Mr. Silvia said: "Alan was complaining about the appointment." Murphy depo at page 25 line 4-5. Mr. Murphy asked Mr. Silvia to hire Alan. Murphy depo at page 25 line 9-11. Mr. Silvia replied in the negative stating to Mr. Murphy: "No Alan is not coming to this organization" and "we do not want Alan in the organization." Murphy depo page 25 line24 page 26 line 26.

Victor Ramsey who held the housing Manger Assistant position for on a temporary detail,

provided an affidavit in this case. In his affidavit he said " While I held the position as the Green Lane Housing Manager in the year 2002, I spoke to Charles Silvia about making my position permanent as the Green Lane Housing Manager. At that time, Charles Silvia told me that Alan Bradley had filed a complaint, and that because of that complaint, that he would have to hire Alan Bradley before he could make my promotion permanent. He told me that this was not going to happen, and that 'Alan would not be given a position in the Housing Department while he was there.' He further said that 'Alan was not coming into the Housing Department and that I could thank Alan for not getting a permanent promotion.'" Ramsey affidavit paragraph 4.

In 2004, Alan Bradley received a notice to change his assignment from a GS 6 Supply Technician in Public Works and was transferred to a position of ("Wage Grade-5") WG 5 dispatcher in the department of transportation. His GS 6 position as a Supply Technician was abolished. The Navy downgraded the plaintiff pursuant to a Reduction and Force (RIFF), and contends that at the time of the RIFF the only position that he was qualified and eligible to receive based on his tenure was that of the WG 5 dispatcher. At or about the same time as this Reduction in Force, Jamie Thiebault and Mary Beth Oliviera received upgrades in their positions in Housing to the level of GS- 11s. Depo of William Murphy.

**II. Argument.**

1. The Plaintiff concedes that it has failed to see an EEOC counselor within 45 days after becoming aware of his non selection for the 1999 positions, and that he has not presented a basis to invoke the tolling provisions of 29 C.F.R. § 1614.105(a)(1) (2002). Thus, the 1999 claims of discrimination are barred. However, they are relevant as background information, and

on the issue of pretext.

2. Next, the Defendant contends that the Plaintiff cannot demonstrate that there was disparate treatment between the Plaintiff and any other similarly situated individual when the Defendant cancelled the recruitments for the vacant GS 7/9 Housing Manager positions in 2001, thus giving rise to the burden shifting analysis set forth under McDonald Douglas v. Greene , 411 US 792 (1973). The Defendant's position is that the Plaintiff must show that someone was hired to fill the exact position that the plaintiff sought to be promoted to, is too rigid a reading of the requirements that were set forth in McDonald Douglas. Rather a better approach, is the Plaintiff's position that all he need to show is that he was treated differently, in the failure to select him or promote him, than a similarly situated person, when the Defendant decided to cancel the recruitments and keep the GS 7/9 housing manager positions vacant.

Under the burden shifting framework of McDonald Douglas the Court set forth fourth a four-factor test which would be sufficient to establish a *prima facie* case without direct evidence of discrimination: There the Court held that a plaintiff could prove a primae facie case in a Tittle VII case by showing: (I) that he belongs to a (protected class) racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications. However, the Court "explained that the elements necessary for the prima facie case are not inflexible, as "[the] facts necessarily will vary in Title VII cases, and the specification above of the prima facie proof required . . . is not necessarily applicable in every respect in differing factual situations." Id. at 802 n.13. The Supreme Court has since repeated that "[t]he prima facie

case method established in McDonnell Douglas was 'never intended to be rigid, mechanized, or ritualistic. Rather it is merely a sensible, orderly way to evaluate the evidence in light of common experience as it bears on the critical question of discrimination.'" U.S. Postal Service Bd. of Governors v. Aikens, 460 U.S. 711, 715 (1983) (quoting Furnco Constr. Corp. v. Waters, 438 U.S. 567, 577 (1978)). The Supreme Court emphasized that the presentation of a prima facie case is not meant to be "onerous," "Thus, 'the central inquiry in evaluating whether the plaintiff has met his initial burden is whether the circumstantial evidence presented is sufficient to create an inference [of discrimination].'" Shah v. Gen. Elec. Co., 816 F.2d 264, 268 (6th Cir. 1987)(quoting B. Schlei and P. Grossman, Employment Discrimination Law 247 (Supp. 1983-84)).; See also Patterson v. McLean Credit Union, 491 U.S. 164, 186-87 (1989) (holding that **an** employee's showing that she was qualified for an available position, applied for the position, did not get the position, and that the position remained open or was filled by someone outside the plaintiff's protected class was sufficient to establish a primae facie case. McClain v. NorthWest Cmty. Corr. Ctr. Judicial Corr. Bd., 440 F.3d 320, 332 (6th Cir. 2005) (finding that primae facie case established when employee showed that he was treated differently from similarly situated employees outside the protected class). A fair reading of McDonald Douglas and the cases decided thereafter lead to the conclusion that the elements of a prima facie case are fact-specific and differ from case to case. Jones v. Sch. Dist. of Philadelphia, 198 F.3d 403, 411 (3d Cir. 1999); " Because employment discrimination cases arise in a variety of contexts, the prima facie elements must be tailored to the given case." Rodriguez Torres v. Carribean Forms Mfr. Inc., 399 F3rd. 53 (1st Cir. 2005).

The Defendant cited Clifford v. Barnhart, 449 F3rd. 276, 281 (1st Cir. 2006) and Webber

v. International Paper Company, 417 F 3rd. 229 (1st Cir, 2005) to support its argument that the Plaintiff failed to present a primae facie case, because the Housing Manager positions that Alan Bradley applied for in 2001, and 2002, were not filled by anyone on a permanent basis. Those cases are distinguishable to the case at bar. Although in Clifford v. Barnhart, the First Circuit Court of Appeals noted that the employer did not challenge the Plaintiff's ability in that case to establish a primae face case of discrimination regarding his non selection, which included (1) that he was a member of a protected class; (2) that he applied for an open position; (3) that he was not selected, and (4) that the employer hired another individual with similar qualifications. However, the issue of whether an employer is required to fill the exact vacant position for which the Plaintiff applied in order to establish a primae facie case in a non selection or failure to promote claim was not before the Clifford Court.

The case of Webber v. International Paper Company was not a failure to promote, or a non-selection case, as the case at bar, but was rather a termination case. In that case, the Plaintiff contended that he was treated less favorably than the employees that were not terminated because of his disabilities. In that case, the First Circuit Court of Appeals sustained the District Court's granting of a directed verdict because the Plaintiff failed to show in the presentation of his case at trial, that the persons that were retained were not handicapped. Webber v. International Paper Company, 417 F3rd 229 (1st Cir 2005).

In this case, the Plaintiff is able to show that he applied for the GS 7/9 Housing Manager Positions in 2001 and 2002, that he was qualified for the positions, that each time after he applied for the positions, the Defendant chose not to fill them with permanent employees. That the positions remained open until 2004 at which time the Housing Department went out to contract.

During the time between the Defendant's decision to cancel the recruitments in June of 2001 through the cancellation of the recruitment in November 2002, two similarly situated persons were treated more favorably than the Plaintiff. Specifically, Victor Ramsey filled the position as Green Lane Housing Manager from May 2002 - November 2002 on a detail. Additionally, a William Murphy who was similarly situated to the Plaintiff in that he was seeking a position in the 1173 series, was hired in the 1173 series as a Housing Manager Supervisor in the summer of 2001. The hiring of William Murphy was done even though the Defendant was advised by Jana Hubner not to fill any positions in the GS 1173 series at the June 14, 2001 meeting. Following the June 14, 2001 meeting, the Defendant chose to cancel the recruitments for the positions for which the Defendant had received a referral to hire Mr. Bradley, and proceeded to fill a vacancy of a housing manager supervisor position in the GS 1173 series with someone outside the Plaintiff's protected class.

Given the facts set forth above, the Plaintiff has met his initial burden of proving a prima facie case of discrimination under the flexible, fact specific McDonald Douglas framework that he was treated differently than similarly situated persons.

3. Next, the Defendant contends that the Plaintiff cannot demonstrate a pretext for the multiple and varied reasons that have been offered in this case by the defendant, as to why it did not fill the vacant positions that the Plaintiff was to be afforded priority consideration for. In this case, the Defendant has provided multiple, varying, changing and conflicting reasons as to why the Housing Manager position which he was to be afforded priority consideration for was not filled. These include the possibility of a pilot program. Jana Hubner. A Functionality

Assessment. Captain Cooper. A Commercial Activities Study and Public Private Venture. Alan Shannon. A hiring Freeze in 2001. Letter of Captain Cooper. Going out to contract. Charles Silvia. The defendant also contends that the Plaintiff cannot show that the reasons provided by the Defendant for the placement of Victor Ramsey into the temporary detail as the Green Lane Housing Manager were pre-textual. The Defendant claims that it placed Victor Ramsey in that detail because he was already in the housing organization, and that it did not want to leave Mr. Bradley' billet vacant because that could harm the Public Works department if Mr. Bradley took the detail because the Public Works Department was under an A76 Study and Mr. Bradley's position could be deemed unnecessary if left vacant.

It is not necessary for the plaintiff to disprove that the Navy was in fact considering a pilot program, was undergoing a Commercial Activities Study, or a Functionality Assessment at the time that the positions in issue were cancelled. Nor is it necessary for the Plaintiff to disprove that Victor Ramsey was in the Housing Department at the time of his detail, and that the Public Works department was undergoing an A-76 study. See, Thomas v. Contuocook Valley School District, School Adm Unit No. 1, 150 F.3rd 31 (1st Circuit 1998). Rather, the plaintiff must show that the proffered reason was a pretext for not hiring the Plaintiff because of his disabilities or because of reprisal for his engaging in prior EEOC activity. Strate v, Midwest Bank Cetre, Inc., 398 F.3rd 1011 Id. Pretext can be shown by demonstrating "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons such that a fact finder could infer that the employer did not act for the asserted non-discriminatory reasons" Santiago-Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 56 (1st Cir. 2000); It can also be shown by demonstrating the employer's changing rationale for making an adverse

employment decision. Thurman v. Yellow Freight Sys., Inc., 90 F.3d 1160, 1167 (6th Cir. 1996), opinion amended by 97 F.3d 833 (6th Cir. 1996). Pretext can also be shown by demonstrating that the employer continued to refuse to hire the Plaintiff after its justification was no longer applicable. See Reeves, 530 U.S. at 147-48 (noting that "once the employer's justification has been eliminated, discrimination may well be the most likely explanation" . Pretext can also be shown by demonstrating derogatory remarks made by the decision maker. See Gonzalez v. El Dia, Inc. 304 F.3rd 63 (1st Cir. 2002).

In this case, the Plaintiff has presented ample evidence that the decision not to fill or promote him to the vacant Housing Manager positions in the summer of 2001, and keep the positions vacant was a pretext for discrimination. Specifically, the decision to cancel the GS 7/9 1173 Housing Manager positions in the summer of 2001, was discretionary. The Functionality Assessment that was referred to began in March 2001 and no hiring controls were implemented until April 2002. Captain Cooper in 2001 advised Alan Bradley at a meeting with a Union Official that she could not fill the position because there was a hiring Freeze on 1173 series positions. Indeed, subsequent to the commencement of functionality assessment others in were hired in the 1173 series including Charles Silvia and William Murphy. Even after the June 14, 2001 meeting with Jana Huber, Charles Silvia or Captain Cooper hired William Murphy to a position in the 1173 series (as a Housing Manager Supervisor), despite the testimony of the Jana Hubner that she advised Captain Cooper and Charles Silvia not to make any hires in the 1173 series because of the pilot program.

Furthermore, the justification that the Defendant provided for not filling the vacant

housing manager positions, a meeting with Jana Hubner in which it was advised not to fill the positions if it were to participate in the pilot program, was not applicable as of August 15, 2001, when the Defendant decided it was not going to participate in the pilot program. Hence the Defendant could have filled the positions as of that date, but instead did do so even though the Plaintiff pleaded that his settlement agreement be honored.

The defendant's multiple, varied accounts, and changing rational as to what was discussed at the June 14, 2001 meeting, and the reasons that housing manager position was cancelled is further evidence of pre-text. Santiago-Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 56 (1st Cir. 2000) Thurman v. Yellow Freight Sys., Inc., 90 F.3d 1160, 1167 (6th Cir. 1996) ("An employer's changing rationale for making an adverse employment decision can be evidence of pretext."), opinion amended by 97 F.3d 833 (6th Cir. 1996). In this case, the account of the June 14, 2001 meeting by Jana Hubner, Captain Ruth Cooper, Alan Shannon and Charles Silvia, is varied and there statements contradict each other. Jana Hubner said the positions were recommended to be cancelled because the pilot program only. Captain Cooper said she was advised to cancel the positions by Jana Hubner because of a Functionality Assessment. Captain Cooper said that a Commercial Activities study was not discussed. Alan Shannon said the positions were cancelled and not filled because of a Functionality Assessment, or a Commercial Activities Study and because the possibility of a Public Private Venture (PPV). Charles Silvia said that it was because of the possibility of Housing going out to contract and because the they were advised that if the filled the positions they would lose their funding. Charles Silvia further testified that he and Captain Cooper later learned that this was not true and that the positions could be filled. Furthermore, the Plaintiff has shown that the possibility of a

PPV was considered going back to 1996. Jana Huber depo page 34, and that Functionality Assessments and Commercial Activity Assessments were fairly not rare reviews. Cooper depo page 31 and 32 . In fact, it was not until some time in 2004 or 2005 that part of housing went out to private contract. Shannon Depo page 17.

The Plaintiff was also was advised by Captain Cooper he would not be placed in the housing manager position even on a temporary basis because he could lose his job as a Supply Tech in a future Reduction in Force during his meetings in 2001. That notwithstanding being apprised of this risk Alan Bradley told Captain Cooper that he was willing to take the risk of losing the job as a consequence of a Reduction in Force in the future. Captain Cooper still refused to afford Alan Bradley priority consideration for the vacant positions. (Captain Cooper also said she was seeking to protect the Public Works Department from losing a billet if Alan left his job as a Supply Tech. However, this rational, does not explain why the Supply Tech billet could not be filled if the Plaintiff took a position in Housing).

Additionally, after Alan Bradley filed his EEOC complaint in this matter, another Housing Management Assistant position became vacant in the Spring of 2002, by Laurie Bowers taking another position with the government. Instead of immediately advertising this position, Charles Silvia detailed a Mr. Victor Ramsey to this position for a 180 period. When Mr. Bradley learned that Victor Ramsey had been detailed to the position of Green Lane Housing Manager in the summer of 2002, he contacted Captain Cooper through his attorney in writing. Captain Cooper responded to Mr. Bradley's attorney's letter. In that response there was no mention of the rational of protecting the public works department from losing the supply tech billet. See Cooper Depo exhibits 4 and 5. The decision to detail Victor Ramsey as housing manager was made after

Mr. Bradley filed his EEOC complaint alleging discrimination based upon the cancellation of the 2001 recruitments, and while that claim was being investigated.

Only after the personnel office received a request from Charles Silvia and it went through a process was this housing manager position advertised on November 20, 2002. Silvia pages 55-56. Alan Bradley applied for the position. Bradley affidavit. However, the recruitment was cancelled the day after the Plaintiff applied for the position. Affidavit of Alan Bradley. Because there was a need to fill the position with a permanent employee, Mr. William Murphy inquired of Mr. Silvia as to why Victor Ramsey could not keep the appointment, and Mr. Silvia said “Alan was complaining about the appointment.” Murphy depo at page 25 line 4-5. Mr. Murphy asked Mr. Silvia to hire Alan. Murphy depo at page 25 line 9-11. Mr. Silvia replied in the negative stating to Mr. Murphy: “No Alan is not coming to this organization” and “we do not want Alan in the organization.” Murphy depo page 25 line24 page 26 line 26. Mr. Murphy indicated that there was a was a concern about Alan driving after his accident. Murphy depo. Page 27 lines 6-11. The intent of Mr. Silvia not to hire Mr. Bradley and his animosity towards him is illustrated in Victor Ramsey’s affidavit. He said he said “ While I held the position as the Green Lane Housing Manager in the year 2002, I spoke to Charles Silvia about making my position permanent as the Green Lane Housing Manager. At that time, Charles Silvia told me that Alan Bradley had filed a complaint, and that because of that complaint, that he would have to hire Alan Bradley before he could make my promotion permanent. He told me that this was not going to happen, and that ‘Alan would not be given a position in the Housing Department while he was there.’ He further said that ‘Alan was not coming into the Housing Department and that I could thank Alan for not getting a permanent promotion.’” Ramsey affidavit paragraph 4.

Instead of immediately advertising the position and abiding by the settlement agreement that had been previously entered with Alan Bradley, Charles Silvia placed Victor Ramsey in the vacant Housing Manager position pursuant to a temporary detail in May 2002.

Although the Defendant was undergoing the various studies its managers cited, there is ample evidence from the above facts for a reasonable jury to conclude that the reasons offered by the Defendant, in failing to fill the 2001 and 2002 vacancies, and the decision to temporarily detail Victor Ramsey to one of the positions without affording the Plaintiff priority consideration are pre-textual and meant to hide the invidious discrimination. . The inquiry is whether the decision not whether the Defendant was undergoing the varies studies, but whether, the decision was motivated by Mr. Bradley's disabilities or as reprisal for his prior EEOC claims. Thomas v. Contuocook Valley School District, School Adm Unit No. 1, 150 F.3rd 31 (1st Circuit 1998); See also See Santiago-Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 55 (1st Cir. 2000) [**17] (comments by a supervisor questioning whether a woman could work and raise children made within two weeks of the female employee's termination was sufficient to create a jury question on a gender discrimination claim); Fernandes v. Costa Bros. Masonry, Inc., 199 F.3d 572, 588-89 (1st Cir. 1999) (statements by a business owner that "I don't need minorities" and "I don't have to hire . . . Cape Verdean people" was sufficient to establish a viable Title VII claim), abrogated on other grounds, Desert Palace, Inc. v. Costa, 539 U.S. 90, 156 L. Ed. 2d 84, 123 S. Ct. 2148 (2003); Mulero-Rodriguez v. Ponte, Inc., 98 F.3d 670, 675-76 (1st Cir. 1996) (statement by a person able to influence the decision maker that the plaintiff was the only Puerto Rican running a Cuban company was sufficient to create a triable issue of national origin discrimination).

4. Mixed Motive Analysis.

Additionally, this case is also appropriate to be analyzed under the mixed motive analysis distinct from the McDonald Douglas Analysis. Where the plaintiff can show that his disabilities played a motivating factor even in part, in the decision not to fill the positions, he will have established liability.[5] The plaintiff is permitted to prove that his disability played a motivating factor by way of circumstantial or direct evidence. Desert Palace Inc. V. Costa, 539 U.S. 90, 123 S Ct. 2148; 156 L.Ed 84. (2003). However, if the Plaintiff can show that his disability was a motivating factor, the Employer can assert a partial defense, by proving that it would have made

---

[5]The ADA has been amended since Price Waterhouse. In a Americans with Disabilities Act claim, if the disability was a motivating factor, regardless of whether the agency would have taken the same action anyway, the agency is liable for equitable relief Injunctive relief, attorney fees, and costs. Prior to the Civil Rights Act of 1991 (CRA), which became effective on November 21, 1991, an employer could avoid liability in a mixed motive case if it could show that it would have made the same decision even absent the unlawful factor. See Price Waterhouse, 490 U.S. 228. The CRA effectively overruled this holding, adding Section 703(m) to Title VII. This section makes clear that a violation of Title VII is established when a complaining party demonstrates that "race, color, religion, sex, or national origin was a motivating factor for any employment practice, even though other factors also motivated the practice." 42 U.S.C. § 2000e-2(m). Regardless of whether the agency is able to establish that it would have made the same decision even absent the unlawful discrimination, the complainant, while not eligible to receive the full range of available remedies, may be entitled to **declaratory relief, injunctive relief, attorney's fees and costs**. See Guidance, Part III.C., 18-20

**The Americans with Disabilities Act, adopted the enforcement provisions of Title VII, including the provision that allows for declaratory relief if the complainant demonstrates that a discriminatory consideration motivated the employment action, even though other factors also motivated that decision.** See 42 U.S.C. § 12117(a) (adopting various enforcement provisions of Title VII, including 42 U.S.C. § 2000e-5 (which refers to 42 USC section 2000e-2 as an enforcement mechanism). Moreover, several circuit courts have held that the mixed-motive analysis available in the Title VII context applies equally to cases brought under the ADA. See Baird v. Rose, 192 F.3d 462, 470 (4th Cir. 1999); Foster v. Arthur Anderson, LLP, 168 F.3d 1029, 1033-34 (7th Cir. 1999); McNely v. Ocala Star-Banner Corp., 99 F.3d 1068, 1076 (11th Cir. 1996); **Katz v. City Metal Co**., 87 F.3d 26, 33 (1st Cir. 1996); Buchanan v. City of San Antonio, 85 F.3d 196, 200 (5th Cir. 1996); Pedigo v. P.A.M. Transp., Inc. 60 F.3d 1300, 1301 (8th Cir. 1995).

the same decision even absent consideration of the Plaintiff's disability. Id. Thomas v. Contuocook Valley School District, School Adm Unit No. 1, 150 F.3rd 31 (1st Circuit 1998). See also Price Waterhouse v. Hopkins, 490 U.S. 228, 258 (1989) (plurality opinion) (Our Supreme Court opined that : [I]f the plaintiff establishes that a prohibited discriminatory factor played a `motivating part' in a challenged employment decision, the burden shifts to the employer to prove by a preponderance of the evidence that it would have made the same decision anyway."). Price Waterhouse, 490 U.S. 228. However, to avail itself of this partial defense the defendant must do more than show that it was permitted to take the requisite actions, but rather must show that it would have made the same decision even absent consideration of the Plaintiff's disabilities. Thomas v. Contuocook Valley School District, School Adm Unit No. 1, 150 F.3rd 31 (1st Circuit 1998). In Thomas the First Circuit wrote:

> "The claim asserted in the plaintiff's complaint is not that she was terminated without "sufficient cause" but that the Board's nonrenewal decision was the result of discriminatory animus against her perceived disability. Although the State Board's determination may establish that sufficient grounds existed to terminate Thomas based on her classroom performance, it does not necessarily follow that poor classroom performance was the reason why the Board and/or Bramblett terminated her employment. Rather, the lawfulness of the School Board's decision not to renominate Thomas turns on the Board's actual motivation , as opposed to whether it could have terminated her, at the time of the nonrenewal. See Bradley v. Pittsburgh Bd. of Educ. , 913 F.2d 1064, 1075 (3d Cir. 1990) (holding that a state finding "that defendants could properly terminate an employee" does not establish that "the employer would have terminated the employee" in the absence of protected First Amendment activity)(emphasis in original).

.

In Desert Palace Inc. V. Costa, 539 U.S. 90, 123 S Ct. 2148; 156 L.Ed 84 our Supreme Court held that under Sec. 2000e-2(m), "a plaintiff need only present sufficient evidence for a reasonable jury to conclude, by a preponderance of the evidence, that "race, color, religion, sex, or

national origin was a motivating factor for any employment practice.''" The Court further went on to hold that a Plaintiff can prove its motivating factor claim based upon direct or circumstantial evidence. Id.

In this case, there is direct evidence that Alan Bradley's disabilities were in fact considered in the decision not fill the vacancies. Prior to the June 14, 2001 meeting with Jana Hubner, and the decision to cancel the positions Captain Cooper was advised by Charles Silvia's of Alan Bradley's inability to drive a motor vehicle. Captain Cooper discussed with Charles Silvia ways to accommodate Alan's inability to drive a motor vehicle so that he would be capable of filling the position. Charles Silvia expressed that he did not want to hire Alan Bradley. After the recruitments were cancelled, and a conference with the Plaintiff and James Alan on July 12, 2001 Captain Cooper expressed to the Plaintiff that she was still considering placing him in one of the vacant positions. However, the very next day, on June 13, 2001, Captain Cooper told James Alan that the Plaintiff could not hold the position because he did not have a drivers license. This is a reference to his physical limitations that he had due to his seizure disorder of epilepsy. Captain Cooper had previously discussed Alan Bradley's inability to drive with Charles Silvia.. Furthermore, Alan Bradley was previously excluded from holding the position as Housing Manager at the GS 7 level because of his inability to operate a motor vehicle and his epilepsy. Corey Deposition.

Further direct evidence of discrimination is a statement made by Charles Silvia to the EEOC investigator concerning his cancellation of the Housing Manager positions, in which he stated that he was seeking to protect his current employees from a person who had prior military or other benefits. The Plaintiff is asking that an inference be drawn that Mr. Silvia was referring to

the Plaintiff as a disabled person because Mr. Silvia knew at the time he cancelled the recruitments the Plaintiff who he knew had epilepsy, was to be afforded priority consideration. Specifically, Mr. Silvia made a statement as to why he did not fill the recruitment in which he was expressly discriminating against persons who had prior military or "other benefits." He said "I was very uncomfortable with the decision I was forced to make. I felt an obligation to the people who worked for me to try to protect their positions. However, I also wanted to fill the Housing manager positions with civil service employees. I felt it was a loose/loose situation. Our concern about hiring an employee temporarily was that someone coming into the organization that has prior military or any other benefits might wipe someone out who had been with the organization for 20-30 years, if we had to do away with personnel. . . ." Silvia affidavit at page 157 and 158.

Finally, the the Plaintiff has shown direct evidence of discrimination in past actions by the Defendant's exclusion of him from Housing Manager positions based upon his inability to drive because of epilepsy. Plaintiff may also prove his mixed motive case by way of circumstantial evidence. The Plaintiff has set forth sufficient circumstantial evidence outlined in section of this memorandum that establishes that his disabilities was a motivating factor in the decision not to fill the vacancies.

5. Finally, the defendant contends this the Plaintiff cannot establish a claim of retaliation for engaging in prior EEOC activities. In order to establish a prima facie claim for FLSA or FMLA retaliation, a plaintiff must show that: (1) she engaged in activity protected under either act; (2) she subsequently suffered adverse action by the employer; and (3) a causal connection existed between the employee' s activity and the adverse action. See, Calero-Cerezo v. The US Dept of

Justice, 355 F3rd. 6 (1st Cir 2004a Richmond v, Oneok, 120 F3rd 205 (10th Cir. 1997) citing Archuleta v. Colorado Dep't of Institutions, 936 F.2d 483, 486 (10th Cir. 1991). Temporal proximity to the Plaintiff's prior activity and the adverse employment action can be circumstantial evidence sufficient to meet the primae facie showing of retaliation. See Clark County School v. Breeden, 532 US 268 (2001).

In this case, the Defendant contends that the Plaintiff cannot show a causal connection between the Defendant's actions of cancelling the recruitments in 2001 and 2002, and the detailing of Victor Ramsey to the position of Green Lane Housing Manager was causally related to the Plaintiff's prior protected EEOC activity. However, the placing of Victor Ramsey into the temporary detail in 2002 occurred after the Plaintiff filed an EEOC claim alleging discrimination based upon his disabilities for the cancellation of the 2001 recruitments, and while that matter was being investigated. The cancellation of the recruitments in 2001, occurred only a four months after a settlement agreement had been reached whereby the Plaintiff was to be afforded priority consideration for the exact positions in that were cancelled. The decision makers, including Captain Cooper and Charles Silvia where aware of the settlement, and had discussed ways that the Plaintiff could hold the job notwithstanding his disabilities. Charles Silvia had indicated to Captain Cooper that he did not want to hire the Plaintiff. There is temporal proximity to the Plaintiff's prior activity, and a direct relationship to the settlement agreement that he had to be afforded priority consideration for the GS 7/9 housing manager positions and the adverse employment action of cancelling the recruitments for those positions after receiving a referral to hire the Plaintiff is sufficient to establish a primae facie showing of retaliation. See Clark County School v. Breeden, 532 US 268 (2001)

Wherefore, the Plaintiff prays that this Honorable Court deny the Defendant's motion for summary judgment.

PLAINTIFF
Alan Bradley
By his Attorney

/s/ Joseph F. Hook

Joseph F. Hook, RI Bar No 5418
294 Valley Road
Middletown, RI 02842
(401) 846-5200
Fax (401) 848-0984

CERTIFICATE OF SERVICE

I the undersigned certify that on this 10th of October , I e-mailed true copy of the within memorandum of law to Anthony DiGioia, Esq, Assistant US Attorney at anthony.digio@usdoj.gov