UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

ALAN BRADLEY,
Plaintiff

VS. : C.A. NO. 04-412-ML

GORDON R. ENGLAND, Secretary
of the United States
Department of the Navy,
Defendant

Deposition of **JAMES A. ALLEN**, a Witness herein, taken on behalf of the Plaintiff, on TUESDAY, JUNE 6, 2006, 1:35 P.M., at the offices of the United States Attorney, Fleet Center, 50 Kennedy Plaza, Providence, Rhode Island, before Vivian S. Dafoulas, Registered Merit Reporter/Certified Realtime Reporter.

CONDENSED COPY

Vivian S. Dafoulas, RMR-CRR
50 Fieldstone Drive
East Greenwich, RI 02818-2064
(401) 885-0992

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

ALAN BRADLEY,
Plaintiff

VS. : C.A. NO. 04-412-ML

GORDON R. ENGLAND, Secretary:
of the United States
Department of the Navy,
Defendant

Deposition of JAMES A. ALLEN, a Witness herein, taken on behalf of the Plaintiff, on TUESDAY, JUNE 6, 2006, 1:35 P.M., at the offices of the United States Attorney, Fleet Center, 50 Kennedy Plaza, Providence, Rhode Island, before Vivian S. Dafoulas, Registered Merit Reporter/Certified Realtime Reporter.

Vivian S. Dafoulas, RMR-CRR
50 Fieldstone Drive
East Greenwich, RI 02818-2064
(401) 885-0992



APPEARANCES:

FOR THE PLAINTIFF:

JOSEPH F. HOOK, ESQUIRE
294 VALLEY ROAD
MIDDLETOWN, RI 02842

FOR THE DEFENDANT:

UNITED STATES ATTORNEY
BY: ANTHONY C. DiGIOIA, ESQUIRE
FLEET CENTER
PROVIDENCE, RI 02903

ALSO PRESENT: BARBARA DRAGOWSKI, ASSOCIATE COUNSEL



I N D E X


| WITNESS | PAGE |
|---|---|
| JAMES A. ALLEN | |
| EXAMINATION BY MR. HOOK | 4 |
| EXAMINATION BY MR. DiGIOIA | 16 |
| EXAMINATION BY MR. HOOK | 48 |
| EXAMINATION BY MR. DiGIOIA | 53 |
| EXAMINATION BY MR. HOOK | 56 |

| EXHIBITS | PAGE |
|---|---|
| 1 Affidavit of James A. Allen | 5 |




JAMES A. ALLEN,
called as a witness and having been first duly sworn, was deposed and testified as follows:
COURT REPORTER: Would you state your name, please?
THE WITNESS: James A. Allen. A-L-L-E-N.
EXAMINATION
BY MR. HOOK:
Q. Good afternoon, Mr. Allen. My name is Joseph Hook. I represent Alan Bradley in a case that he has pending against the Navy, employment discrimination case. Where do you currently reside, sir?
A. Middletown.
Q. Middletown, Rhode Island?
A. Yes.
Q. And where are you employed, sir?
A. Naval Station Newport, Public Works Department.
Q. And what do you do in the Public Works Department?
A. I'm an HVAC maintenance mechanic, heat, ventilation and air conditioning.
Q. And what grade level is that?
A. That's a WG-10.

Q. And how long have you been employed at Naval Station Newport?
A. Fifteen years.
Q. And so HVAC, that's heating, ventilation and air conditioning?
A. Correct.
Q. And do you know Alan Bradley?
A. Yes, I do.
Q. And how long have you known Alan Bradley?
A. Well, let me see -- I don't know -- 10 years.
Q. All right. In 2001, were you the union representative for the --
A. Correct. I was the union president.
Q. And did Alan Bradley come to you in your capacity as the union president?
A. Yes, he did.
Q. He was seeking assistance, correct?
A. Correct.
MR. HOOK: I'm going to ask you to take a look at a document and I'd like it marked as Plaintiff's 1.
(Whereupon, Plaintiff's Exhibit No. 1 was marked.)
BY MR. HOOK:



Q. Sir, can you take a look at the document which has been marked Plaintiff's 1, sir?
A. Do you want me to read the whole thing?
Q. No, just take a look at it and if you could turn to the signature page which I think is the third page of the document, it could be the fourth. Page 176.
A. 176?
Q. Yes.
A. Yes.
Q. And is what's been marked Plaintiff's 1 an affidavit that you gave in Alan's EEOC complaint in August of 2002?
A. Uh-hum.
Q. And in that -- in that affidavit, you provided the truth; it was a true statement, correct, sir?
A. Correct.
Q. And attached thereto, that affidavit, there are two exhibits. There are two letters. One is dated July 23rd, 2001, that's at Page 177, and another letter which doesn't appear to be dated at Page 178, correct, sir?
A. Correct.
Q. Now, the letters you -- the two exhibits



that are marked as the -- the letters, those are letters that were prepared by Alan Bradley, correct, sir?
A. Yes, they were.
Q. All right. How did that happen? I mean you signed the letters. Did you -- when you signed those letters, did the events that occurred in there and are described, are they true?
A. Correct. And the reason for that, I was very busy. I told him to write it up and I actually made some corrections.
Q. All right.
A. Simple.
Q. So you made some corrections to the letters --
A. Right.
Q. -- before you signed them?
A. Correct.
Q. So the information that was put in there was accurate?
A. Yes.
Q. Now, do you recall going to a meeting with Alan Bradley and with Captain Cooper after the Housing Manager positions that Alan had applied for had been cancelled?



A. Yes, I recall it.
Q. Okay. And there was actually a subsequent meeting where Buzz Evans attended and you attended; do you remember that, sir?
A. Yes.
Q. Turning to Page 177, to the memo of July 23rd, 2001, it refers at the top to a meeting with Captain Cooper on July 12th, 2001?
A. Yes.
Q. And in that there's a description as to what occurred when Captain Cooper announced that she would be cancelling the GS-7/9 Housing Manager positions, correct, sir?
A. Correct.
Q. And then on the bottom, the last paragraph, there is a statement: "On Friday the 13th I met outside A-63 with Mr. Allen. That morning I was asked if I had a driver's license. I took it out and showed it to him. He was surprised because he was told by the Captain, off the record, that I did not hold a driver's license and could not fill such a position."
A. That's absolutely correct.
Q. So what did Captain Cooper tell you, sir?
A. Basically what is written here. We were

discussing it and she was under the impression that basically that Mr. Bradley did not hold a Rhode Island license and that could be substantial to him getting the position.
Q. All right. So did Captain Cooper tell you that because he did not hold -- have a driver's license that he could not fill the Housing Manager positions?
A. Correct.
Q. Now, reading that last paragraph --
A. Uh-hum.
Q. -- it reads as though it was written by Alan Bradley, correct, sir? He -- he wrote --
A. Yes. Regardless who it was written by, my name is there and I basically remember at the time that that's absolutely correct.
Q. All right. So this was a day after the meeting where she had indicated because of possible privatization or -- and Housing going out to contract in the future, that notwithstanding or in addition to that reason, that Alan could not fulfill those positions anyway because he didn't hold a driver's license?
A. Correct. That's the way I understood it.
Q. Turning to Page 178, which is the next



page on that document, sir, it says, "To Kelly Hipplewitz, subject..." There is a hole punched but you can see Alan Bradley or A. Bradley.
A. Correct.
Q. Is that referring to Mr. Bradley, sir?
A. Subject, Mr. Alan Bradley, yes.
Q. All right. In there you wrote that you witnessed Captain Cooper stating that his position in the Public Works Department would be rewritten. Do you remember that, sir?
A. Yes.
Q. Did Captain Cooper indicate that his position in the Public Works would be rewritten?
A. Yes, she did.
Q. Since the position did not list or explain the duties he is to perform. The duties performed in his past position are no longer required because others throughout the Public Works Department are performing such duties.
Is that information that you received from Alan or from Captain Cooper?
A. Well, I was -- I was a little familiar with it because we were on a reorganization, okay? So basically everybody was being put into certain positions.



When Alan came to me, this was my main concern, because he already had legal -- I believe legal, a lawyer at the time and we wanted that position rewritten for what he was doing basically in that job function in Public Works. Follow me on that?
Q. So you were also concerned that his position as supply technician be rewritten?
A. Correct.
Q. Because of a possible reorganization?
A. Well, we reorged and basically Alan got additional duties assigned to him so we basically wanted his position description updated basically.
Q. Okay.
A. If I can remember correctly, this is what we were doing.
Q. In here there is a statement on the third paragraph from the bottom, it states that I was present when the Captain informed Mr. Bradley there was a possibility of returning him to the Housing Department for a while but she decided not to take that chance.
A. I believe that's correct. I -- I don't know what you are referring to as far as -- and that's -- that's on the basis that they were going



to contract out those three positions I believe.
Q. Okay. The second paragraph up from the bottom writes -- reads: "Captain Cooper brought up the issue of Mr. Bradley's driver's license stating that she was informed that Mr. Bradley did not have a license and could not fill the position."
Did she -- did she bring up that issue with you, sir?
A. Yes. On a couple of occasions, yes, she did.
Q. When did she bring that up with you?
A. Sometime that summer of 2001, if that's what you're getting at.
Q. Do you have an independent recollection of her telling you that Alan couldn't fill those positions because he did not have a driver's license?
A. No, I don't. It's 2006. It was 2001. Sorry there's no dates here but I do not recall exactly when she said that.
Q. But you recall that she did say it?
A. Yes.
Q. Okay. And you have an independent recollection that she did, in fact, say that he couldn't fill those positions because he didn't

have a driver's license?
A. Yes.
Q. All right. Sir, I'm going to turn your attention to your affidavit, sir.
A. Okay.
Q. Page 175 of your affidavit.
A. Got it.
Q. The second question: "Do you have any reason to believe that Captain Cooper cancelled the recruitment to discriminate against Mr. Bradley or to keep from hiring Mr. Bradley?"
And at that time when you -- when you submitted this affidavit, you stated that, "In my personal opinion, I do not believe Captain Cooper discriminated against Mr. Bradley." Correct, sir?
A. Correct.
Q. And you also stated that, "I believe that Mr. Charlie Silvia discriminated against Mr. Bradley based upon information that I heard." Is that correct, sir?
A. Correct. Yes.
Q. "Specifically I have heard through hearsay that Mr. Silvia said that Mr. Bradley would never receive the Housing Manager position because of his handicapping condition." Is that a correct



statement, sir?
A. Yes, it is.
Q. It says, "Since Mr. Silvia works directly for Captain Cooper, I believe he influenced her not to select Mr. Bradley." Is that a true statement, sir?
A. Yes.
Q. Sir, who told you that Mr. Silvia said that Alan Bradley would never receive a Housing Manager position because of his handicapping position -- condition?
A. At the present time I'm -- I'm reading -- can I just read the response?
Q. Yes, sir.
A. At the time we did this, which I believe was 2002, I felt -- as of this time, I will give those two particular individual names up, which was Mr. Joe Bettencourt, vice president, Mr. Joe Bettencourt, vice president of the union at the time. The other individual was Mr. Vic Ramsey, Victor Ramsey, and he was a steward in the union at that present time.
Q. Okay. After -- after Alan came to you, did you speak to Joe Bettencourt and Victor Ramsey about Alan Bradley's case?



A. They came to me. Basically I heard it through them.
Q. And what did Joe Bettencourt say to you?
A. He basically -- apparently he had a meeting -- excuse me -- he had a meeting with Victor Ramsey and Victor Ramsey stated this fact of what Mr. Silvia said.
Q. Did you speak to Victor Ramsey?
A. Yes, I did.
Q. What did Victor Ramsey tell you?
A. He said the exact same thing.
Q. What did -- were his words essentially that Mr. Silvia said that Mr. Bradley would never receive the Housing Manager position because of his handicapping condition?
A. Correct. We didn't get into detail concerning the matter. If I -- if I remember correctly, we were dealing with another grievance concerning another individual that worked for Housing Maintenance at the time, and they told me, in the union office -- by the way, just to let you know that Mr. Bettencourt is deceased as of August 2002.
Q. Okay. Did they make any written statements or was it oral?



A. It was oral to me. We had weekly meetings on all union concerns.
Q. Now, the Mr. Silvia that's referred to in that paragraph, is that Mr. Charles Silvia?
A. Correct.
Q. And in 2001 and 2002, he was the Director of Housing, is that correct?
A. As far as I remember, yes.
Q. Where did this meeting take place with your conversation with Mr. Bettencourt?
A. In the union office.
Q. In the union office?
A. Correct. Building 1121, Naval Station Newport.
Q. Where did your conversation with Mr. Ramsey take place?
A. Same place.
MR. HOOK: I have nothing further.
EXAMINATION
BY MR. DiGIOIA:
Q. Mr. Allen, I just have a few questions. Mr. Allen, we met a few moments ago when I went out to bring you into this room, is that right?
A. That's correct.
Q. Have we ever met other than that?

A. No. No.
Q. In fact, the first time we ever spoke was earlier this morning, is that right?
A. Correct.
Q. And you called me to ask me -- you called me to ask me if the deposition was occurring today, is that right?
A. Correct.
Q. And some other things about time and when you were likely to get out, be through for the day?
A. Correct.
Q. Did we discuss the substance of the deposition at all?
A. No.
Q. Now, have you discussed the substance of the case with Mr. Hook before today?
A. Yes. One aspect of it.
Q. Which aspect was that?
A. Concerning me -- can I take a look at the -- is that okay --
Q. At what?
A. 175. Concerning me I would not basically name those individuals at the time I -- I made the affidavit.
Q. I see. Did you discuss any other



substance of the case with him about the meeting with Captain Cooper --
A. No.
Q. -- or anything else?
A. No.
Q. Do you know Mr. Hook --
A. No.
Q. -- other than this case?
A. No.
Q. All right. Did you have a conversation with him about appearing here as a witness?
A. Yes.
Q. And did you tell me that he told you --
A. Yes.
Q. -- that you shouldn't come unless you received something by registered mail?
A. Correct.
Q. When did he tell you that?
A. The first time I spoke to Mr. Hook.
Q. And that was about the -- your refusal to name the people who had given the hearsay evidence?
A. Correct.
Q. When was that?
A. I would say May 23rd or 24th, I believe.
Q. Of this year?



A. Correct.
Q. So your first conversation with Mr. Hook was roughly five years after the events that are the subject of your affidavit?
A. Correct.
Q. Okay. Because those occurred in approximately --
A. Correct.
Q. -- spring of 2001?
A. Correct.
MR. DiGIOIA: Let me ask you to bear with me for a minute.
THE WITNESS: Uh-hum.
MR. DiGIOIA: The person in this room that has the toughest job of everyone is the court reporter. She tries to take down word for word the questions I ask and the answers you give, and we both make her job a lot tougher if I interrupt your answers or if you answer the question before I finish it.
So if we could both make a real effort not to step on each other's words not because either one of us would be offended but just because otherwise we'd make her job so much more difficult, fair enough?



THE WITNESS: Fair enough.
MR. DiGIOIA: Okay.
BY MR. DiGIOIA:
Q. You never heard Charlie Silvia make any statement about Alan not getting the job, did you?
A. No.
Q. So you have no personal knowledge of that?
A. No.
Q. Do you know when he allegedly made statements that you just testified to about him not getting the job because of his handicapping condition to Mr. Bettencourt or Mr. Ramsey?
A. I don't -- I'm going to say spring of 2001. That's the best I can come up with.
Q. And why were you going to say that?
A. Because we had some Housing issues then. I recall that.
Q. What were the Housing issues that you had?
A. Basically it was a few grievances concerning overtime.
Q. All right. And so you think you were talking about the grievances regarding overtime?
A. Correct. And if I remember correctly,

PLAINTIFF'S EXHIBIT NO. 1
FOR IDENTIFICATION Allen
DATE: 6-6-06 RPTR:
PENGAD 800-631-6989

# AFFIDAVIT

State of Rhode Island
County of Newport

I, **JAMES A. ALLEN**, *make the following statement under oath or affirmation. Pursuant to Public Law 93-579 (Privacy Act of 1974), as an individual supplying information for inclusion in a system of records, I have been informed of the following:*

*EFFECT OF NONDISCLOSURE: Disclosure of information by me is voluntary, however, I realize my failure to respond could result in a recommended disposition of the case on the basis of information available. Witnesses who are Department of Defense employees may be subject to administrative action for failure to testify.*

*AUTHORITY: The authority to collect the information requested by this interview is derived from one or more of the following: Title 5, Code of Federal Regulations, Sections 5.2 and 5.3: Title 5, United States Code, Sections 1302, 1303, 1304, 3301, and 3302; Executive Order 11478, as amended, Executive Order 10577; and 29 CFR Part 1614.*

*PURPOSE AND SCOPE: The information supplied will be used as part of the record in an equal employment opportunity discrimination complaint or grievance investigation. The record will be furnished to designees of agencies and departments of the Federal Government in order to resolve the complaint or grievance. The record may also be disclosed to any agency of the Federal Government having oversight or review authority with regard to Office of Personnel Management or Department of Defense activities, to the Federal intelligence agencies, or others, as published in the Federal Register.*

RECEIVED
2 AUG 30 3:17

**Disability:** None.

**Protected Title VII Activity:** I have never personally filed an EEO complaint, but I have served as an employee representative in an EEO proceeding.

**Current Position:** HVAC Maintenance Mechanic, WG-10

**Organization:** Public Works Department, Naval Station Newport, Rhode Island

**Inclusive Dates of Current Assignment:** I have been in my current position approximately 10 years.

**Supervisor:** Bob Maynard.

Q. According to the record, you were President of AFGE in July 2001. Is that correct?



Affiant's Initials JA

R. Yes.

Q. What is your work relationship to the Complainant, Mr Alan Bradley?

R. I do not work with Mr Bradley. He is employed in Public Works as a Supply Technician, but I have no work dealings with him whatsoever.

Q. Do you know Mr Bradley and in what capacity?

R. I know him just to speak. I didn't really know him at all until last year when he came to me in my Union capacity with some issues.

Q. Mr Bradley claims discrimination based on reprisal. Are you aware that Mr Bradley filed a previous discrimination complaint? If so, when and how did you become aware of the complaint?

R. I became aware he had filed a complaint about July 2001. He mentioned to me he had a lawyer and he was basically going to file an EEO complaint.

Q. Did you have any direct involvement in any decisions impacting Mr Bradley for which he filed EEO complaints?

R. No. He indicated that he had sought legal advice, so I told him to talk to his lawyer.

Q. Did you attend a meeting with CAPT Cooper and the applicants for Housing Management, GS-1173-07/09, positions to inform them that the recruitment action for Housing Manager positions was being canceled and the reason why?

R. Yes. The policy of most unions is when an employee wants to speak to the CAPT or when the CAPT speaks to employees, I am asked to attend in my union capacity.

Q. What occurred in that meeting?

R. I made a memo for record regarding the meeting and what occurred. My memo thoroughly discusses what occurred in the meeting, so I would like the memo considered as part of this sworn statement.

Q. Is there anything you could add regarding the meeting?

R. It has been a while since the meeting. However, I do recall CAPT Cooper making the statement prior to the meeting that if a Housing Manager position opened, Mr Bradley would be the first consideration.



Affiant's Initials [initials]

Q. Did you participate in the prior mediation of Mr Bradley's complaint that afforded him priority consideration for Housing Manager positions?

R No.

Q. Do you have any reason to believe that CAPT Cooper canceled the recruitment to discriminate against Mr Bradley or to keep from hiring Mr Bradley?

R. In my personal opinion, I do not believe CAPT Cooper discriminated against Mr Bradley. I believe that Mr Charlie Silvia discriminated against Mr Bradley based on information that I heard. Specifically, I have heard through hearsay that Mr Silvia said that Mr Bradley would never receive the Housing Manager position because of his handicapping condition. Since Mr Silvia works directly for CAPT Cooper, I believe he influenced her not to select Mr Bradley.

Q. Is there a person I could speak with that could validate they heard Mr Silvia make that comment?

R. We have confidentiality procedures we have to abide by, so I cannot divulge the individual's name that passed the information to me.

Q. Has Mr Silvia ever made similar comment to you regarding not hiring Mr Bradley for Housing Manager positions?

R. No.

Q. Do you have anything further to add at this time?

R. On a personal note, I feel Mr Bradley was discriminated against. However, CAPT Cooper proved to the Union that the decision to go contract with the Housing Manager positions was cost effective for the government. I believe that management could have placed Mr Bradley in one of the positions and contracted out the other positions. One of the main issues concerning this case is management believing that Mr Bradley could not qualify for the position because he had no state driver's license. I verified with Mr Bradley that he does possess a valid driver's license and that is in my statement which I asked be considered with this affidavit.

*END OF STATEMENT*

*I have been afforded the opportunity to provide information relevant to the issues. I have nothing further to add to my affidavit.*



Affiant's Initials ____

*I have read the above statement consisting of _4_ pages and it is true and complete to the best of my knowledge and belief. I understand that the information I have given is not considered confidential and that it may be shown to the interested parties.*

Subscribed and sworn before me
at: Naval Station Newport, Rhode Island,
on this 16th day of August 2002.

**TERRY CALCUTT**
Investigator

**JAMES A. ALLEN**
Affiant



Affiant's Initials JA

23 July 2001

The Meeting with Captain Cooper July 12th 2001.

In that meeting Captain Cooper stated that she gathered all employees who qualified for the two GS-7/9 housing manager positions to explain the reason for canceling those two positions.

She states that she has received notice from the region office that housing is going out to contract in the future. (Privatization) She states that they advised her not to fill the vacant positions. Though there was not a definite date set as to when such actions will occur. She determined to cancel only the GS-7/9 positions and bring in a contractor while she chose to allow for the GS-11 manager's position to be filled. Plus keep the process on going to create and fill the newly established GS-11 referral position? She also allowed housing to take a temporary secretary from a private contractor and make that person a permanent GS-5 employee in the housing department days after canceling my GS-7/9 position. She stated that it was her choice to cancel those positions and no one else.

She states that she does not have a crystal ball and cannot predict when such actions, of housing going out to contract, will take place.

She determined that only the GS-7/9 housing manager positions needed to be cancelled while the other 3 positions were a necessity to be filled.

She states that everyone in the meeting were well qualified. She was only looking out in everyone's best interest, not to fill those positions.

She stated that filling those positions with a Public Works employee would leave billets vacant. Causing her to keep those billets unable to be filled during the CA study, which is taking place in the Public Works right now.

She did not want to fill those positions on a temporary basis as well for the same reasons

That is why she has come to the conclusion to cancel the positions. To alleviate any problems that may occur later on.

When I asked about my situation and settlement the captain responded " Yours is a different situation and I do not have time to discuss it. Set up a meeting with my office so you, Mr. Allen, Mr. Evans and Mr. Silvia can discuss the matter." As of today July 23rd we are still trying to schedule such a meeting.

On Friday the 13th I met outside building A-63 with Mr. Allen. That morning I was asked if I had a Driver's license. I took it out and showed it to him. He was surprised because he was told by the captain "off the record" that I did not hold a driver's license and could not fill such a position."

James Allen
Union President

To: Ms. Kelly Hipplewitz
Subj: Mr. A[illegible] Bradley

When Captain Cooper decided to eliminate the position of the GS-7/9 Housing Manager she called for a meeting with the Union and all the available applicants. In the meeting she explained that housing was to be going out to contract in the future but could not predict when such actions will be taking place. In that meeting she stated that she would like to have given everyone a chance to fill the position but because of the circumstances with the CA study she made the decision not to fill the positions. Stating it was her decision and no one else's. At that meeting Mr. Bradley brought up the issue of his settlement and what was to become of it. Captain Cooper's response to his question was "Yours is a unique situation and we will have to set up a meeting to discuss the issue because she did not have time to discuss the issue. We later set up a time to meet with her on the next available time.

At the scheduled meeting with Captain Cooper and his Supervisor Mr. Buzz Evans I witnessed Captain Cooper telling Mr. Bradley that if a manager position ever becomes available he would be given first chance to fill such a position. I also witnessed Captain Cooper stating that his position in the Public Works Department would be rewritten. Since the position did not list or explain the duties he is to perform. The duties performed in his past position are no longer required because others throughout the Public Works Department perform such duties.

I have witnessed the treatment that Mr. Bradley has been receiving since his relocation to Public Works. He has brought forth such issues that have been ignored over the past 18 months. Repeatedly asking Mr. Evans and Captain Copper to establish a position without any luck.

Constantly being misinformed of the situations taking place. I am aware of the times Mr. Bradley was informed of the management positions becoming available in housing and was encouraged to apply.

I was present when Captain Copper informed Mr. Bradley that there was a possibility of returning him to the housing department for a while but she decided not to take that chance.

Captain Cooper brought up the issue of Mr. Bradley's driver's license. Stating that she was informed that Mr. Bradley did not have a license and could not fill the position. Yet when I met with Mr. Bradley the next morning he showed me his Rhode Island driver's license. That is when he asked me about the Rehabilitation Act and what does the statement "consideration without regards to a disability" and "providing Reasonable Accommodations" listed on each Vacancy Announcement mean to this command.

I was there when Captain Cooper informed Mr. Bradley that his position would be rewritten and brought up to date. Mr. Bradley and I still have not seen such actions taken to establish or even update what he is to perform within Public Works. I have witnessed the treatment he is going through and has been going through over the past 18 months from this command even after alerting them of such problems.

James A Allen

James Allen
Union President