ORIGINAL

UNITED STATES DISTRICT COURT
DISTRICT OF RHODES ISLAND

| | |
|---|---|
| ALAN BRADLEY, Plaintiff, vs. GORDON R. ENGLAND, Secretary of the U.S. Department of the Navy, Defendant. | Civil Action Case No. 04-412ML |

Tuesday, April 11, 2006

Fairfax, Virginia

DEPOSITION OF:

RUTH A. COOPER,

a witness, was called for examination by counsel for the plaintiff, pursuant to Notice and agreement of the parties as to time and date, beginning at approximately 1:05 o'clock, p.m., at the Fairfax Judicial Center, 4110 Chain Bridge Road, Hearing Room 5A, Fairfax, Virginia 22030, before Ronnie C. Palmer, a court reporter and Notary Public in and for the Commonwealth of Virginia when were present on behalf of the respective parties:

Q When you were captain in the United States Navy, were you at one point in time stationed at Newport, Rhode Island? Yes?

A Yes.

Q When?

A June 2000 through February 2004.

Q And what position did you hold at Naval Station Newport?

A I was the commanding officer until August 2003. I was also the program manager for Community Services for Navy Region Northeast from April, and I'm not sure of the year. I think it was 2001 until August 2003.

Q And when were you transferred out of Newport, Rhode Island?

A February of 2004.

Q And you previously had provided testimony in an equal employment opportunity investigation concerning Alan Bradley. Is that correct?

A I believe that's correct. Yes.

Q I am going to ask you to take a look at a document which purports to be an affidavit signed by

you, and I'm going to ask you about that.

MR. DIGIOIA: May I?

THE WITNESS: I have the document.

BY MR. HOOK:

Q You have it?

A I have it. What would you like me to do?

Q Is that the affidavit you in fact gave in the investigation at the Equal Employment Opportunity investigation concerning Alan Bradley?

A I wouldn't be able to tell you when I gave it, but yes. This is my signature, and I do recognize as a statement by me.

Q Okay. And on the last page of the document there contains a signature. Is that your signature?

A Yes. And my initials.

Q And that's on page 151 of the investigation report?

A Yes. I agree.

Q Okay. And this is dated August 16, 2002?

A That's what it says. That's correct.

Q You have no reason to believe that it

wasn't provided on a different day other than August --

A No. I have no reason to believe otherwise.

Q The information you provided in the affidavit was true to the best of your knowledge and information that you had at that time?

A Correct.

Q In the affidavit, the second page of the affidavit you testify that you were program manager for Quality of Life?

A Yes.

Q And what did that entail? What were your responsibilities?

A That was for Navy Region Northeast. That included family housing, bachelor housing, fleet and family support centers, child development centers, and moral, welfare, and recreation activities.

This would have been for all of the bases that were in Navy Region Northeast Naval Air Station Brunswick, the portions of the shipyard at Portsmouth New Hampshire or Maine depending on which senator you

listen to.

The subbase at Graeton, the Naval Station Newport, Weapons Station Earl. Towards the last portion of my tour, we picked up responsibilities for family housing at Great Lakes, Illinois, Crane, Indiana. I am not sure if I got the name right. There was a weapons station in Indiana.

We picked up full responsibility for Portsmouth, New Hampshire. For all those programs that I previously listed.

Q Were you responsibility for the housing operations at Naval Station Newport?

A Under the program manager concept as the commanding officer, I had the overall responsibility to monitor and insure that services were being provided at the appropriate and adequate level for the personal station at Naval Station Newport.

But from for person who had overall fiduciary responsibility, and accountability, and authority, that was as the program manager.

Q Okay. But did you wear the cap as a program manager?

A As program manager, yes. But not as the commanding officer.

Q Okay.

A That was once when program management started.

Q When did that program management start?

A Either 1st of April 2001 or 2002, and I honestly don't remember which year. I would say 75 percent it was 2001.

Q Okay. And as program manager, did you have -- supervise any civilian employees?

A Yes, I did.

Q Who did you supervise?

A Al Shannon, my direct employee. Al Shannon was my direct employee. The person that I supervised. He was my assistant program manager or deputy program manager.

Q Did Mary Silvia work for you?

A She would have for the first -- Well, in directly. She would have worked for me as the head of Fleet and Family Support Center for the first portion when I was the commanding officer prior to

Q Did you have him perform any favors for you not related to work?
A No.
Q I'm going to you a document, Captain Cooper, and ask you to identify the document.
MR. HOOK: While we are doing that, if the stenographer could please mark the affidavit Captain Cooper identified dated 16 August 2002 as plaintiff's 2.
(Cooper Exhibit No. 2 was marked for identification)
THE WITNESS: Okay.
BY MR. HOOK:
Q Can you identify what this document is?
A It says it's a settlement agreement.
Q All right. It's date 24 January 2001. Does it contain your signature on it?
A It does.
Q Have you seen this document before, Captain Cooper?
A I most likely did sign. My signature is on it. So, I would say that is a yes.

Q How did you come into contact with Alan Bradley?

A I think my first contact was when I got some type of a complaint about his working conditions that I read in my office, and I --

Q And did you in fact work to rectify that complaint that he had concerning his condition?

A I wanted to look into it. I wanted to have my own firsthand knowledge before I made a decision on it. I went down and met with him and asked him to show me specifically the issues that he was talking about in his letter.

So, we spent one to two hours. I had him show me there was pieces of equipment he complained about. So, I had them turn all the equipment on so I could hear how loud they were and the noise they made.

He said there were shadows in the stairwell that could be a trigger. So, I had him show me the stairwell. He said his duties required him to get up on a ladder to take pieces of equipment off a shaft.

BY MR. HOOK:

Q But while we're here, you also stated in that affidavit that -- and I am going to paraphrase briefly -- he needed -- Strike that.

I am going to state it correctly. He needed to be in a quieter environment. He needed natural light, and he had restrictions from ladder climbing, and lifting because of an impairment with his arm.

Is that information that you received from Alan Bradley?

A His statement here is what I'm doing here is paraphrasing what was in his letter. I'm not making these statements nor is this information from another source. This is an attempt to paraphrase the letter from himself that I was reading from. So, this would have been information that was from Mr. Bradley.

Q So. You received some information from Mr. Bradley. He had in correspondence notified you of the request or the limitations that he had with his arm and you paraphrased that in this affidavit?

information that was provided by Alan Bradley?
A That's most likely correct. Yes.
Q That's fair enough. Also turning to the middle page of your affidavit, I'm going to -- You indicated that you worked with Mr. Bradley in his accommodation request and his resolution of his EEO complaints, and you had no other interactions with him. Is that correct?
A That's what I said at the time, and I believe it still to be correct.
Q You believe that still to be true?
A Yes.
Q In terms of his EEOC complaint, the resolution was the settlement agreement that was reached between the Navy and Alan Bradley that's been marked Plaintiff's 3?
A Yes.
Q Okay. Now, the resolution of that complaint required the Navy for a period of two years to announce housing managing specialist positions at GS-1173-9 at the Naval Station Newport at both the GS-7 and GS-9 level. Is that correct, ma'am?

A Yes. That's what it says.
Q And to afford the complainant priority considerations for such positions as noted above?
A That's what it states. Yes.
Q Do you understand what the concepts of priority consideration is?
A I have my understanding of it, but that may not be the exact definition.
Q What is your understanding of it?
A As long as an individual that had priority consideration was qualified that the person would be the first selected for the position.
Q So, your understanding of it and I will paraphrase. Strike that. I will leave that question alone.
Now after you entered into the settlement agreement, were you aware that there were two retirements at Naval Station Newport and there became two vacancies for the housing management specialist?
A At what point are you asking me that I became aware of that.
Q Strike that. After you executed this

agreement, did there come a point in time where you became aware that there were two vacant positions, housing management specialist position at Naval Station Newport?

A Yes.

Q And that was in the spring of 2001, correct?

A I don't remember when.

Q You don't know the exact date?

A No.

Q And after those positions were announced at both the GS-7 and 9 level, those positions were canceled. Is that correct? They weren't filled?

A Yes.

Q And the decision to cancel those positions was that your decision?

A Yes because as the commanding officer and program manager that would ultimately be my decision.

Q And who did you consult with to obtain advice as to whether to fill those positions or not?

A Alan Shannon as my deputy program manager and also Charlie Silvia was involved in some of those

do not remember conversations that I had that long ago as to what people said.

Q Why did you cancel the positions?

A Because of a debrief I had had from Jana Hubner who is from Naval facility in Engineering Command who had the overall responsibilities for family housing in the Navy.

And she discussed that there -- family housing positions were going under functionality assessment which would require them to create a most efficient organization which basically means you have to look at eliminating up to a third, if not more, of your manpower billets.

She advised as we were currently positioned with personnel at that time we would not have to RIF or retire in force anybody that we currently had as long as we didn't hire anybody new but that if we did hire new people into the vacant positions we would be looking at having to fire people within one year.

She advised that the prudent course would be not to hire any additional personnel into housing.

Is that correct?

A Yes.

Q And that was because of the settlement agreement, correct?

A Correct.

Q You go on to say I did not specifically tell him there was an EEO settlement agreement and did not show him the agreement. Is that correct?

A That's what I said at that time. Yes.

Q Then you go on to say I did discuss our agreement with Mr. Bradley to advertise the position at the GS-7, 9 level and that Mr. Bradley would be afforded priority consideration.

A Uh-huh.

Q So, did you tell Mr. Silvia that you had an agreement with Mr. Bradley that the positions were to be advertised at the 7, 8 level and that he, Mr. Bradley, would be afforded priority consideration?

A I don't remember anything in addition to what's there. I just don't remember things back that far.

Q Okay. Do you recall having any

conversations with Mr. Silvia concerning ways to accommodate Alan Bradley's inability to drive a motor vehicle?

A Yes, I do because I wanted there to be a positive feel for going on to this.

Q So, you had a conversation with Mr. Silvia in terms of ways to make the settlement agreement work?

A That if this were to be one of the employees that we were to select and we would need to be thinking along those lines.

I always said he might be, he could be, this might be somebody. We need to start thinking along these lines.

Q Where did it come to your attention or how did you get information that Alan Bradley had a problem with driving a motor vehicle?

A The most likely source that I can remember would have been Charlie Silvia.

Q Okay. And that would have caused you to think about having ways to accommodate his driving issue so he could work as a housing manager?