conversations with Mr. Silvia concerning ways to accommodate Alan Bradley's inability to drive a motor vehicle?

A Yes, I do because I wanted there to be a positive feel for going on to this.

Q So, you had a conversation with Mr. Silvia in terms of ways to make the settlement agreement work?

A That if this were to be one of the employees that we were to select and we would need to be thinking along those lines.

I always said he might be, he could be, this might be somebody. We need to start thinking along these lines.

Q Where did it come to your attention or how did you get information that Alan Bradley had a problem with driving a motor vehicle?

A The most likely source that I can remember would have been Charlie Silvia.

Q Okay. And that would have caused you to think about having ways to accommodate his driving issue so he could work as a housing manager?

have proofed it. Before I sign anything, I read it. If I want to make changes, I will make changes.

Q You signed that letter?

A That is my signature, and I signed that letter.

Q You reviewed it for information for accuracy before you signed it?

A Yes.

Q It contains your understanding. It was your response to a letter that you had received from my office? Is that correct?

A According to the letter, it references your letter of 26 June.

MR. HOOK: Can we mark what's page 225 of the investigative report as plaintiff's --

MR. DIGIOIA: Can you use my copy. That is marked page 255 for the record.

THE WITNESS: I am sorry, 255.

MR. DIGIOIA: And, Mr. Hook, is it accurate to say you have agreed that the witness' discussion of what may have happened with the document that is marked as page 120 was speculation

to mark page 245 of the investigative report a letter
from my office dated June 26th as Plaintiff's 5.
(Cooper Exhibit No. 5 was
marked for identification.)
BY MR. HOOK:
Q In your letter that's been marked
Plaintiff's 4, you refer to a letter that I wrote
June 26, '02. Is that correct?
A That's what the reference line refers to.
Yes.
Q You wrote that the terms of the
settlement agreement have been adhered to since the
settlement agreement was signed.
A Uh-huh. That's what that line says.
Q And you wrote that in June 2001 the
Command advertised for housing management specialist
GS-1173 at the 7-9 grade level which meets the terms
of the agreement. Is that correct?
A That's what the letter states.
Q Fine. Now, the settlement agreement
required that the open housing management positions
be advertised at the GS-7 and 9 level, correct?

conference room where it was an open meeting for anybody who had applied for those positions, and I invited Mr. Allen to attend.

I subsequently had meetings with Mr. Bradley and Mr. Allen in my office separately. I am not sure how many there were. There may have been several meetings with Mr. Bradley and other representatives present in the room.

I just don't remember Mr. Evans being engaged in those.

Q All right. And in those meetings that you had with Mr. Bradley and the union representative, did you offer to extend the settlement -- the terms of the settlement agreement in terms of it's period to extend it an additional two years?

A I don't know the exact timing. But once it was brought to my attention that was one of the key issues that Mr. Bradley had, I stated that I had absolutely no problem at all extending it for an additional two years starting that day.

Q Okay. Now, you also referred to in this

particular letter marked as Plaintiff's 4 that I offered to extend your settlement agreement for two years since the Department of the Navy required a freeze on the hiring of the GS-1173 positions while a functionality assessment was being completed.

And you rejected on -- you refused that offer. Is that correct?

A That's what's in the letter. Yes.

Q Now, this letter is dated August 2002. And at that time, the Department of the Navy had a hiring freeze. That's what you wrote in your letter. Is that correct?

A I would have to check other documents to verify that that is accurate.

Q However when the positions that are referred to in this letter were canceled, there was no hiring freeze. Is that correct?

A I would have to consult documents on dates. I don't have that chronology in my mind.

Q Well, I am just trying to flush something out. At the time that this letter was written, there was a hiring freeze on hiring housing management

page 50 of the investigative report, Captain Cooper, and ask you if you can identify what that document is.

A At the top it says agenda for 14 June meeting. So, it would appear to be an agenda that Jana Hubner had compiled for that meeting.

Q Do you know whether that was the meeting where the June 14, '01 wherein it was discussed whether the issue -- whether to cancel the housing management positions were discussed?

A You mean at this meeting?

Q Yes.

A This would not have been the meeting where that was discussed. This is the meeting where the impact on the housing staff realignment termination through attrition.

Q And what does that mean, impact on housing staff realignment termination through attrition?

A Well, what it says is what's the impact of whatever it is that she was going to talk about and she does not state in this agenda.

Then you either realign with existing employees to fill vacancies with existing employees, and you achieve termination through attrition meaning people who would normally retire or would move because they're a spouse of a military member and they leave for other reasons.

Q Okay. So at the meeting that occurred on January 14th, you discussed --

A June.

Q June 1st --

A 14.

Q June 14, thank you, of '01, you discussed the impact on the housing staff realignment and termination through attrition. Is that correct?

A Well, that would have been some of the topics that were discussed at that meeting. As you can see from the agenda, there were quite a few other topics that were discussed at the meeting.

Q All right. Did you also discuss how to implement a property management contract?

A I don't -- I can look at this agenda and this agenda says it was discussed, but I couldn't

about going back and forth. It never leaves engineering field detachment Atlantic or the NAVFAC Headquarters. It isn't until we get to page 54 that they start cutting somebody in the region in on it. I just don't remember that much about it.

Q Now, the pilot program, was that a reason that's referred to in the correspondence that you are holding now in your hand --

A No.

Q Was that a reason that you decided to cancel the recruitments that are referred to in Plaintiff's Exhibit 4?

A No. Any idea of a pilot program would not have been the logic. I mean all I remember was that Jana Hubner said you're going to have to RIF people out of housing. Do whatever you can ot to fire people.

Now if the pilot was part of that bundled with the FA, that could have been part of the over-arching warning being issued by Jana Hubner. So, you know, I can't say definitively.

All I knew was that Jana Hubner was

the positions either temporarily.

And on page 150, you responded that I looked into that and had discussions with Karen Peckham about that. Mr. Bradley is in Public Works which is undergoing an A76 study for contracting out.

If we move Mr. Bradley out of that billet, we lose that billet for Public Works. If Mr. Bradley were placed in housing on a temporary hire and his permanent billet were either eliminated by the A76 study, he could be left without a billet.?

A That is what it says. Yes.

Q At the time you provided that information, that was accurate information as you knew it at that time?

A Correct.

Q So, you did look in to see whether you could fill that housing position at least on a temporary basis and you contacted Karen Peckham to discuss that.

A Uh-huh. Specifically for being able to detail Mr. Bradley.

Q All right. So, you made a specific

EXHIBIT
Cooper #2
4-11-06 R. Palm

# AFFIDAVIT

State of Rhode Island
County of Newport

I, **RUTH A. COOPER, CAPTAIN, UNITED STATES NAVY**, *make the following statement under oath or affirmation. Pursuant to Public Law 93-579 (Privacy Act of 1974), as an individual supplying information for inclusion in a system of records, I have been informed of the following:*

*EFFECT OF NONDISCLOSURE: Disclosure of information by me is voluntary, however, I realize my failure to respond could result in a recommended disposition of the case on the basis of information available. Witnesses who are Department of Defense employees may be subject to administrative action for failure to testify.*

*AUTHORITY: The authority to collect the information requested by this interview is derived from one or more of the following: Title 5, Code of Federal Regulations, Sections 5.2 and 5.3: Title 5, United States Code, Sections 1302, 1303, 1304, 3301, and 3302; Executive Order 11478, as amended, Executive Order 10577; and 29 CFR Part 1614.*

*PURPOSE AND SCOPE: The information supplied will be used as part of the record in an equal employment opportunity discrimination complaint or grievance investigation. The record will be furnished to designees of agencies and departments of the Federal Government in order to resolve the complaint or grievance. The record may also be disclosed to any agency of the Federal Government having oversight or review authority with regard to Office of Personnel Management or Department of Defense activities, to the Federal intelligence agencies, or others, as published in the Federal Register.*

I am providing my statement in the presence of the agency representative, Mr Robert Knowles.

**Disability:** None.

**Protected Title VII Activity:** **I have been a witness in an EEO proceeding.**

**Current Position:** Program Manager for Quality of Life in the Northeast Region/Commanding Officer, Naval Station Newport, Rhode Island

**Inclusive Dates of Current Assignment:** Two years.

**Prior Assignment:** Commander, Military Sealift Command, Pacific

**Supervisor:** Admiral Michael Tracy, Commander, Navy Region Northeast



Affiant's Initials RAC

Q. Briefly describe your primary duties and responsibilities in your current position.

R. As the Program Manager for Quality of Life, I am responsible for policy, programs, manpower, budget, for the following areas: Navy Family Housing, Combined Bachelor Quarters, MWR, Fleet and Family Support Center, and Child Development Programs in the Northeast Region. For example, all of the housing offices at the command are subordinate to me as the Program Manager. As Commanding Officer, I am responsible for the accomplishment of the mission and overall responsibility for operations at Naval Station Newport.

Q. How many employees do you supervise directly and indirectly?

R. As Program Manager, I directly supervise one civilian and about 150 military. indirectly supervise approximately 1200 employees -- appropriated and nonappropriated. As Commanding Officer, I have about 30 direct reports and about 550 indirect reports.

Q. Do you directly supervise anyone with an apparent or claimed disability?

R. Not a direct supervision, but we do have employees with disabilities employed at Naval Station.

Q. Have you provided any accommodations to any of your employees due to disability?

R. I have provided accommodations to Mr Bradley that I was personally involved in. We recently hired a social worker who is blind, and we have made accommodations for him. We provide interpreters or real-time reporters for hearing impaired employees. I know of other employees with disabilities, but they have not required specific accommodations.

Q. What is your work relationship to the Complainant, Mr Alan Bradley?

R. There are about four levels of supervision between Mr Bradley and myself.

Q. How long have you known Mr Bradley?

R. About a year and a half.

Q. In what capacity?

R. I first became involved in knowing Mr Bradley when he put in a request for accommodation. He needed to be in a quieter environment, he needed natural light, and he had restrictions from ladder climbing and lifting because of an impairment with his arm. I do not



Affiant's Initials [initials]

know the exact diagnosis of his arm problem, but he informed me his limitation with his arm are related to his condition of epilepsy.

Q. How often do you typically have direct contact with Mr Bradley?

R. I would not normally have direct contact with him. During the time I was working on his accommodation issue, I saw him quite frequently. After that issue was resolved, I probably only saw him two or three times during the course of the year.

Q. Do you work closely enough with Mr Bradley to have any type of working relationship with him?

R. No.

Q. Have you ever had any social contact with Mr Bradley outside of work?

R. No.

Q. Have you ever had any disagreements or conflicts with Mr Bradley?

R. I have worked with Mr Bradley in his accommodation requests and in resolution of his EEO complaint. I have had not other interactions with him.

Q. Mr Bradley claims discrimination based on reprisal. Are you aware that Mr Bradley filed a previous discrimination complaint? If so, when and how did you become aware of the complaint?

R. I am aware he filed a prior complaint that resulted in a settlement agreement. I believe his prior complaint was filed before I arrived. My change of command was June 22, 2000, and I believe his precomplaint occurred prior to my arrival. I signed Mr Bradley's settlement agreement as settlement authority in my role as Commanding Officer. I did not participate in the mediation. My Executive Officer, Commander Lee Frietag, participated in the mediation, along with the agency representative, Robert Knowles.

Q. Were you involved in the issue giving rise to Mr Bradley's prior complaint?

R. No. As I stated, I assumed my position June 22, 2000, and I believe Mr Bradley's complaint started before my arrival.

Q. Are you angry with Mr Bradley for filing an EEO complaint?

R. No.



Affiant's Initials ___

Q. Have you suffered any negative employment consequences as a result of Mr Bradley filing his discrimination complaints?

R. No.

Q. Have you ever made any negative comments regarding Mr Bradley's complaints?

R. No.

Q. When and how did you become aware of Mr Bradley's medical condition?

R. I saw a letter or email from Mr Bradley that may have been related to his prior EEO complaint alleging disability discrimination. I set up an appointment and met with Mr Bradley. I spent about two hours having him show me his work environment and discussing what his issues were. During that discussion, Mr Bradley shared with me that he had epilepsy, and his concerns about safety issues involving his seizures. He openly discussed his concerns with me.

Q. What was the end result of that meeting?

R. We worked with his department and moved him to a different position in an office setting, rather than an industrial environment.. We arranged a different work environment for him with an office with natural light. I provided the physical accommodations to Mr Bradley based on that being the right thing to do. It was not negotiated as any part of an EEO complaint.

Subsequent to that, there was a mediation of his EEO complaint in January 2001. We entered into a settlement agreement with Mr Bradley providing him that the next time a Housing Manager position was advertised, it would be announced as a GS-07/09, rather than a straight GS-09. This would afford Mr Bradley to meet the qualifications to be considered. We also agreed to afford Mr Bradley priority consideration for the position.

Q. Did the agreement mandate that Mr Bradley would be selected?

R. No. It states he would be afforded priority consideration. This means he would be looked at without comparison with other candidates and could be selected. If we had gotten to the point of giving Mr Bradley priority consideration, I would have consulted Labor Relations for what my requirements were.

Q. What was your involvement in the action to fill the Housing Manager, GS-1173-07/09, positions?

R. Mr Silvia contacted me and said he wanted to advertise the position. I told him to make sure the position was advertised at the GS-07/09 level. I did not specifically tell him there was an EEO settlement agreement and did not show him the agreement. I did discuss our agreement



Affiant's Initials [initials]

with Mr Bradley to advertise the position at the GS-07/09 level and that Mr Bradley would be afforded priority consideration.

I informed Mr Silvia that Mr Bradley might be the person we would be hiring. I knew there were driving issues with Mr Bradley, and we were already having conversations about accommodating his inability to drive. We had not gotten into the details, but we were thinking in terms of how we would accommodate Mr Bradley if he were selected.

Q. What was your involvement in the decision to cancel the recruitment action for the Housing Manager, GS-1173-07/09, position?

R. That was a joint decision made in discussions with Mr Alan Shannon.

Q. What happened that caused you to cancel the recruitment?

R. Around June 14, 2001, we received a high-level briefing from Jana Hubner, NAVFAC Engineering Command, who owns Navy Housing. They are the program managers for all Navy Housing. The briefing occurred in my Command Conference Room. Mr Shannon, Charlie Silvia, and I attended the briefing. There may have been some other employees from Housing, but I am not sure. We had asked for the briefing to explore the concept of contracting out property management. It was during that brief, that Ms Hubner informed us of the Navy-wide functionality assessment of Headquarters 1173 billets Navy-wide. The information was rather vague and confusing but the gist of the information was that there would be potential RIFs in the future in 1173 positions. She reviewed our current status, and said if we did not hire anybody else and restructured with our current billets, we could avoid a RIF.

Q. Did the Headquarters mandate that you not fill the 1173 positions?

R. It was not a mandate, but a strongly recommended and strongly encouraged statement.

Q. Was the June 14, 2001, meeting the first time you heard of the FA?

R. Yes.

Q. What occurred after the meeting?

R. I had conversations with Mr Silvia. We reviewed what we had heard, and talked to Al Shannon. Mr Shannon and I agreed that the last thing we wanted to do was set employees up to be RIF'd. We decided to hold any recruitments, and obtain more information before we proceeded with any additional hiring.



Affiant's Initials ______