UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| ALAN BRADLEY | : | |
| VS. | : | C.A. NO. 04-412ML |
| GORDON R. ENGLAND in his capacity As Secretary of the Department of the United States Navy | : | |

**DEPOSITION OF ROBERT COREY**, a Witness in the above-entitled cause, taken on behalf of the Plaintiff, pursuant to Notice, before Linda J. Faria, a Notary Public in and for the State of Rhode Island, at the Law Office of Joseph F. Hook, 294 Valley Road, Middletown, Rhode Island on May 10, 2006 at 10:00 a.m.

**APPEARANCES:**

ORIGINAL

**FOR THE PLAINTIFF:**
BY: Joseph F. Hook, Esq.

**FOR THE DEFENDANT:**
U.S. DEPARTMENT OF JUSTICE
U.S. ATTORNEY'S OFFICE
BY: Anthony C. DiGioia, Assistant U.S. Attorney
BY: Barbara Dragowski

(COMMENCED AT 10:05 A.M.)

**ROBERT COREY**

Having been first duly sworn, testified as followed:

STENOGRAPHER: State your name and address for the record, please.

THE WITNESS: Robert Edward Corey, 316 Wyatt Road, W-Y-A-T-T, Middletown, Rhode Island.

**DIRECT EXAMINATION BY MR. HOOK**

Q Mr. Corey, where are you currently employed?
A I'm not. I'm retired.
Q Where did you retire from?
A In around 2006. In January of 2006.
Q January 2006 you retired?
A Yes.
Q Where did you work?
A Naval Station Newport.
Q So you just recently retired from the Naval Station Newport?
A Oh, excuse me, 2000, I'm thinking. January, 2000.
Q January, 2000?
A Yes, but I said 2006. That wasn't a good start.

Q What position did you hold immediately prior to retiring?
A Housing Director at the Naval Station.
Q How long did you hold that position as Housing Director?
A I'm not sure. It was late '70s, I think I was appointed to that position.
Q So, from the late 1970s to January 2000, --
A Correct.
Q -- you held a position of Director Housing at the Naval Station Newport?
A Correct.
Q Are you familiar with Alan Bradley?
A Yes.
Q And he in fact worked at Naval Station Newport in the Housing Department?
A Correct.
Q And he commenced working in the Housing Department in the mid 1980s; is that correct?
A Somewhere around there, to the best of my knowledge.
Q And are you aware that Alan Bradley had a disability of epilepsy?
A I knew it -- after he came to work, I

realized, yes.

Q When did you realize that he had epilepsy?

A I think -- I can't -- I don't recall exactly, you know. I'm not sure when he actually started but, you know, after I saw him visually having a problem, a seizure of some nature or whatever.

Q And that would have been -- would that have been in the mid to late 1980s that you actually observed him having an epileptic seizure?

A I think so. It was somewhere in there.

Q Now, are you aware that Alan Bradley was involved in an automobile accident on the base in the late 1980s; is that correct?

A Correct.

Q And how did you become aware of that?

A I was informed that he had been in an accident. He had gone out -- it was shortly after he was promoted to a position, if I'm correct, GS-5 Project Assistant Housing Manager. Assistant Manager rather. I think that was the title of the job at the time.

Q And he was out performing a job as an Assistant Housing Manager?

A Yes, he was going out to do some -- I don't recall what type of inspection, but I think he was going out to do an inspection.

Q Was he using a Government vehicle at that time?

A Yes, it was a -- I think it was a rental. We were renting. Some of our vehicles were rented, and I think it was a rented vehicle at the time.

Q All right. After that accident, did you take any action to prohibit Alan Bradley from operating Government vehicles on base?

A Yes.

Q What action did you take?

A Well, I didn't allow him to drive anymore.

Q And was that because of your concern for the safety of --

A Yeah. I'm not sure -- yes, part of it. And I'm not sure whether I told him he couldn't or whether I was told by the command. I can't recall that now but; nevertheless, he was not allowed to drive anymore.

Q And did you inform -- strike that. And there was a concern about the safety because he was involved in an accident; is that correct?

A Right.
Q And he had epilepsy; is that correct?
A Well, I wasn't -- I wasn't sure it was epilepsy, you know. I don't know if I was ever told that. I don't recall that, but he had -- he had some sort of a black out. That's what I remember.
Q Were you concerned that because of the black out -- was the black out like -- strike that. You had observed him have seizures in your presence?
A Right. Well, he -- I never saw him black -- he just sort of sometimes would just somewhat freeze in his position. That's the best I can describe.
Q And did you understand that when he froze in his position, that those occurrences to be epileptic seizures?
A Well, somewhere in that -- yeah, I learned it was epilepsy. I don't know whether Alan told me or how I found out but it was epilepsy, yes.
Q Now, the decision to prohibit Alan from driving Government vehicles on the base, that was because of a fear that he might have another black out or a seizure; is that correct?
A Right. Right.
Q Now, Alan Bradley held a position of

Assistant Housing Manager in the Housing Department until the mid 1990s; is that correct?

A Yes.

Q And, then, he was transferred to a position as a Supply Technician within the Housing Department; is that correct?

A I think eventually he went to that position. I think he first went down to the self-help store. I think he was -- that position hadn't been created. The supply position initially. I think, originally, he went down to the self-help store. We were establishing a maintenance center, and I was given, approximately, 20 maintenance people, and we also started up a self-help store where occupants can come in and pick up various items to fix in their houses. The Navy encouraged that at the time.

Q Was that called Housing Maintenance?

A Yes.

Q Just to back track a moment. When Alan was -- when you prohibited Alan from driving on the base, did you notify Charles Silvia that -- strike that. At that time, did Charles Silvia work for you?

A I think so, yes. I think Charles came to work for me before Alan. Yes. Yes. I'm pretty sure

of it.

Q Did Ed Jankowski work for you at that time?

A No.

Q Was Charles Silvia notified that Alan was not to operate motor vehicles, Government motor vehicle on base?

A I don't know if I officially notified him of that, but Mr. Silvia knew he was not driving. I cannot recall if I officially notified Alan.

Q As Director of Housing, were you Alan Bradley's supervisor?

A I think -- I can't -- I had different layers at different times. I don't think I was his direct supervisor. I was Director of Housing. I don't -- at different times under different situations. I can't recall that I was his direct supervisor at that time. There was -- there was a maintenance -- a manager supervisor that was directly under me, and he probably reported directly to that person.

Q Who was that person?

A I don't know if it was -- gosh, there was Joe Sherman. There was Tommy Branagram. There was Gil Mello. There was -- I don't know at which period that was, which person was the supervisor.

MR. DIGOIA: Excuse me. What was the position called?

THE WITNESS: It was Supervisor Housing Manager.

Q That would be the person that would have been under you?

A That's correct.

Q Now, after Alan had the position in Housing Maintenance in the mid 1990s, he did hold a position as a Supply Technician; is that correct?

A I think that was -- he was changed to that position, if I'm not -- we were developing that organization, and we had created a position; and in there, there were some things that Alan couldn't do.

Q Okay. What were some of the things that Alan couldn't do?

A I think it was lifting and things. The position was developed before Alan went into it because we knew we needed that position as we organized that organization. And Alan was assigned to that position. And, then, it was brought to my attention, that there were certain things that Alan couldn't do as far as lifting and so forth in that nature.

*(PLAINTIFF'S EXHIBIT NO. 4 MARKED FOR IDENTIFICATION)*

Q Sir, what's been marked as Plaintiff's 4 is a document -- strike that. Can you identify what this document is, sir, what's been marked as Plaintiff's 4?
A Yes, it's a Merit Staffing Certificate. That's the title of the document. And it's either selection or non-selection of a candidate.
Q On the bottom of this document, it contains your signature; is that correct?
A Right.
Q And you were the selecting official; is that correct?
A Yes.
Q And the title of the position was Housing Manager Assistant; is that correct?
A Management assistant.
Q And that was at the GS-1173?
A Yes. 7/9.
Q Position 7/9?
A Correct.
Q And in the middle of the document, it indicates promotion eligible and there are three

persons listed: Alan Bradley, Mary Oliviera and James Thibault; is that correct?
A Correct.
Q And you as a selecting official selected Mary Oliviera and Jamie Thibault; is that correct?
A Correct.
Q Now, prior to making that selection, did you review the rating sheet -- actually, take a look at a document.
MR. DIGOIA: Can we have that marked?
MR. HOOK: Yes. If the steno can please mark what is entitled, Rating Sheet, as Plaintiff's 5.
*(PLAINTIFF'S EXHIBIT NO. 5 MARKED FOR IDENTIFICATION)*
Q Sir, prior to making the selection, you were personally familiar with Alan's work going back to the mid 1980s; is that correct?
A Correct.
Q And, by the way, do you know how long Mary Beth Oliviera worked for the Department of Navy prior to this selection? I mean, she held a prior position within the Department of Navy; is that correct?
A Yes.

correct, sir?

A I don't recall this sheet. There were some rating sheets at the time, but I don't explicitly recall this. This could be. I don't know.

Q So, you don't recall seeing what's been marked Plaintiff's 5?

A I don't recall seeing that, no. Not at this time, no.

Q Okay. Turning back to a prior question that I didn't get to. Do you know how long Mary Oliviera worked for the Navy prior to being selected as an Assistant Housing Manager?

A No, I can't recall. I don't have the dates. I can't recall how long its been.

Q But it was -- she worked for the Navy for less time than Alan Bradley had worked; is that correct?

A Yes.

Q And Jamie Thibault worked for the Navy for less time than Alan Bradley had worked for the Navy?

A Yes. I think Jamie Thibault also had Veteran preference. She was ex-military.

Q Now, when it came down to making your selection, Alan Bradley was considered as an eligible

candidate?

A Correct. All of them were considered as eligible candidates.

Q Did you consider Alan Bradley's inability to operate a motor vehicle in making the selection?

A No, not in this position. This was not a Housing Manager position. This was a Housing Management Assistant. Their duties was assignment of military family housing, tenant/landlord complaints, discrimination complaints, doing surveys, housing, surveys and things of that nature. There was one -- the only thing that was in there, there was one duty in there of doing housing management duties and why I put that in there, at that time, there was sort of a tiff going on. I guess it was throughout the Navy about the housing referral and assignment people who were not in the 1173 series. By putting that one paragraph in there, they were considered housing in the 1173 series which was an exclusive housing series which helped them in a riff.

Q Okay. Why were Jamie Thibault and Mary Beth Oliviera chosen over Alan Bradley?

A Well, to the best of my knowledge, that I can recall. Now, I can't, of course, recall actually

for one second?

MR. HOOK: Sure.

(OFF-THE-RECORD DISCUSSION)

MR. DIGOIA: Thank you.

MR. HOOK: All right, sir. I'm going to ask the stenographer to mark as Plaintiff's 6 Pages 141 and 1242.

*(PLAINTIFF'S EXHIBIT NO. 6 MARKED FOR IDENTIFICATION)*

Q Turning to Plaintiff's 2 which you referred to previously, sir, that was the position of Housing Management Assistant that Alan Bradley held at the GS-5 level prior to the temporary position that he had as before taking the position of as a Suppy Technician?

A Yes.

Q The position that he was seeking in 1999 which Jamie Thibault and Mary Beth Oliviera were ultimately hired was a GS 7/9 position; is that correct?

A Correct.

Q And that position was entitled Housing Management Assistant, correct?

A It was -- yes, it was. I'll answer your

question. Yes, it was.

Q It was a different -- it was a higher graded position than the one that Alan had?

A It was a different position also.

Q It was different, and it was higher graded; is that correct?

A Right.

Q What's been marked Plaintiff's 6, and I've taken this from the EEOC Investigative Report, Pages 141, 142, entitled Job Opportunity Announcement. And this is an announcement is June 23rd, 1999, GS-7 1173 series for a Housing Management Assistant. Is this the job, this announcement for the position of Housing Management Assistant that was considered, actually, where you ultimately hired Mary Beth Oliviera and Jamie Thibault?

THE WITNESS: Can I look?

MR. HOOK: Yes, sir.

(WITNESS PERUSING EXHIBIT 6.)

A Yes, to the best of my knowledge.

Q So, what's been marked Plaintiff's 6, to the best of your knowledge, was the job opportunity announcement for the Housing Management Assistant positions --

A Correct.
Q -- which Alan applied for in 1999, and competed against Mary Beth Oliviera and Jamie Thibault?
A Correct.
Q Now, that job included -- the duties of that job, at least a brief description of the duties of that job were listed in this announcement; is that correct?
A Correct.
Q And the skills were also listed in that announcement; is that correct?
A Correct.
Q And the duties included more than just making housing referrals, correct?
A Oh, yeah, if you read through that, correct, --
Q The applicants --
A -- duties.
Q The person who ultimately got that job would ultimately have some responsibilities that were at least similar to that of a Housing Manager?
A Yeah, because he'd be dealing -- he or she would be dealing with private housing. Some of the

operating budget, and I had money to fill those positions.

Q So, the Navy didn't want there to be kind of grade creep where everybody's grade started to get bigger --

A That's right. It was throughout CNET. This was throughout CNET. It wasn't maybe throughout the whole Navy, but CNET at the time. And we report it to CNET.

Q So, if I understand your testimony correctly, you actually tried to create a position that Alan would automatically have because he was in that job that was going to pay him more?

A I tried to -- yes, definitely. In fact, I tried to do two positions but that was one of them.

MR. DIGOIA: Nothing further.

MR. HOOK: Just a couple of follow-up questions.

**RE-DIRECT EXAMINATION BY MR. HOOK**

Q Are you familiar with William Murphy?

A Yes.

Q And he worked for you as a Housing Manager; is that correct?

A Correct.

Q And Charles Silvia, he also worked for you as a Housing Manager?
A Correct.
Q And did Laurie Bowers also work for you as a Housing Manager?
A I don't recall.
Q You don't recall Laurie Bower? She may have been after you. All right. The positions that Charles Silvia had and William Murphy had as Housing Managers, those positions, were they the same positions that is identified in Plaintiff's 6?
A Yeah.
Q You understood those positions to be completely different positions?
A Yes. They were Housing Managers.
Q They were Housing Managers?
A Or Supervisory Housing Managers. They worked on the Housing Management. They didn't work on this side. There were two branches in the divisions. There was a housing division and two branches.
Q All right. Now, the position of Housing Manager, okay, did you understand that position to require the operation -- with the ability to operate

a motor vehicle? Not this position. Not what you understand that Jamie Thibault and Mary Beth Oliviera had; but the position of Housing Manager itself, did that require the operation of a motor vehicle?

A Yes. Yes. Most of the time. The seven would definitely require it, and the nine some of the time. The seven would go from area to area. I mean, we had inspections every 45 minutes. We had a north and south area. The seven would have to be able to go to the different areas.

Q So, was it your understanding that Alan could not hold the position as a Housing Manager at least at the seven level, not this position?

A Right.

Q Because of his inability to drive?

MR. DIGOIA: Objection. There's no evidence that he applied for that Housing Manager position as a seven before this witness. This is purely speculative. I object to the question.

MR. HOOK: You may answer.

MR. DIGOIA: If you need the question repeated.

THE WITNESS: Yes. Would you?

(PENDING QUESTION READ BACK.)

A It would be a problem. We had to have the ability for the manager to move from area to area quickly.

Q Okay. So, just to be clear from my understanding. To hold the position as a Housing Manager as opposed to a housing referral position --

A Correct.

Q -- he would have been required to have a motor vehicle operator's license?

A In fact, it was in the PD's, I think, at one time.

MR. DIGOIA: I didn't hear the end. Did you say --

THE WITNESS: It was in the position description.

MR. DIGOIA: Did you say at one time?

THE WITNESS: I don't know if it's still in there or not. I don't recall. But it was a requirement. They had to be able to do that. I mean, it wasn't something where you could just be in one area.

MR. HOOK: Okay. I have nothing further.

MR. DIGOIA: Thank you very much.

(DEPOSITION ADJOURNED AT 11:38 A.M.)

# C E R T I F I C A T E

I hereby certify that I am expressly approved as a person qualified and authorized to take depositions pursuant to Rules of Civil Procedure of the Superior Court, especially but without restriction thereto, under Rule 30 (e) of said Rules; that the witness was first sworn by me; that the transcript contains a true record of the proceedings.

IN WITNESS WHEREOF, I have hereunto set my hand this 13th day of June, 2006.

[signature]

LINDA FARIA

CERTIFIED SHORTHAND REPORTER

NOTARY PUBLIC

My commission expires on April 26, 2009.

I.D.#48027

08/12/99 08:28 ☎2866 ARO GROTON ☑005

# MERIT STAFFING CERTIFICATE

| | |
|---|---|
| ISSUING OFFICE: HUMAN RESOURCE SERVICE CENTER – NORTHEAST<br>BOURSE BUILDING – 7TH FLOOR<br>111 SOUTH INDEPENDENCE MALL EAST<br>PHILADELPHIA, PA 19106 | CERT. NO. GRN 99-0125 — PAGE NO. 1 OF 1<br>DATE OF ISSUE: 7/27/1999 |
| ISSUED TO: Public Works Department<br>Housing Division<br>Personnel Support Branch<br>Naval Station Newport, Newport, RI | DATE OF EXPIRATION: 8/27/1999<br>PPP REQUISITION NUMBER: 9GRN080 |

SYMBOLS FOR REPORTING ACTION: (S) SELECTED (D) DECLINED

THE ELIGIBLES LISTED BELOW ARE CERTIFIED FOR SELECTION. INDICATE THE SELECTEE BY WRITING AN "S" TO THE RIGHT OF THE NAME AND COMPLETE INFORMATION REQUESTED IN THE BOX BELOW. THE SELECTING OFFICIAL MUST SIGN AND DATE THE BOTTOM OF THIS FORM.

| VACANCIES: TWO | TITLE OF POSITION: Housing Management Assistant, GS-1173-7/9 | DUTY LOCATION: Newport, RI |
|---|---|---|
| ACTION | NAME/SSN/ACTIVITY | |

PROMOTION ELIGIBLE:

Alan Bradley NS
Mary Oliveira S
Jayme Thibault S

REASSIGNMENT ELIGIBLE:

Olga R. Coston NS

THIS CERTIFICATE IS SUBJECT TO CONTINUED PPP CLEARANCE.

STATUS MUST BE VERIFIED PRIOR TO MAKING ANY JOB OFFER.

SIGNATURE OF SELECTION OFFICIAL AND TITLE: R. E. Corey DATE: 8/10/99

THE ATTACHED CONTAINS IDENTIFIABLE PERSONAL DATA WHICH ARE TO BE SAFEGUARDED PURSUANT TO THE PRIVACY ACT OF 1974. THIS INFORMATION IS TO BE RELEASED ONLY TO AUTHORIZED PERSONNEL HAVING A NEED TO KNOW FOR OFFICIAL USES. WHEN NOT IN USE THE ATTACHED IS TO BE STORED IN A LOCKED CABINET OR SECURED ROOM.

7/28/99 KHP Forward to Ldrs. 8/10/99

08-12-99 09:30 RECEIVED FROM:2866 P.05

PLAINTIFF'S EXHIBIT 4 LJF 5-10-06

188

HR251255

Prom. elig. #2

## RATING SHEET

**JOB TITLE:** Housing Management Assistant, GS-1173-07/9

**NAME:** Alan Bradley **ANNOUNCEMENT NO:** GRN99-0125

I. Does the applicant meet the **HIGHLY QUALIFIED SCREEN?** **YES** ✓ **NO** ___

| **II. JOB ELEMENTS** | **III. ANNUAL APPRAISAL** |
|---|---|
| 1. Knowledge of DoD and Navy Dept Family Housing policies, practices and procedures Relating to the assignment/termination and Housing referral programs. | ______ |
| 2. Knowledge of leases, sales contracts, FHA/VA, conventional financing, real estate properties, market conditions, and pertinent landlord and tenant laws. | ______ |
| 3. Skill in investigating complaints, interviewing parties and witnesses to the complaint, reviewing and analyzing evidence, and writing reports. | ______ |
| 4. Ability to coordinate surveys including collecting data, coordinating results and report findings. | ______ |
| 5. Knowledge of DoD utilization/inventory reports. | ______ |
| 6. Ability to communicate effectively both orally and in writing. | ______ |
| **TOTAL ANNUAL RATINGS:** | **(A)** ______ |
| **IV. UNIVERSAL ELEMENT** | **(B)** ______ |
| **V. EDUCATION** | **(C)** ______ |
| **VI. AWARDS** | **(D)** ______ |
| **VII. PRIOR SERVICE** | **(E)** ______ |
| **VIII. FINAL RATING** (Total of lines A thru E) | **(F)** ______ |

**IX. QUALIFIED** ______ **HIGHLY QUALIFIED** ✓

**RATER** Mary Dorgson **DATE OF RATING** 7/26/99

PLAINTIFF'S EXHIBIT 5

196

HR251270

# Job Op.portunity Announcement

| | |
|---|---|
| Announcement Number: | GRN99-0125 |
| Announcement Date: | 06/23/1999 |
| Title: | **Housing Management Assistant** |
| Pay Plan: | GS |
| Series: | 1173 |
| Grade and Salary: | 07 |
| Opening Date: | 06/24/1999 |
| Closing Date: | 07/08/1999 |
| Location: | Naval Station Newport, Newport, RI |
| Area of Consideration: | Current Career/Career Conditional Employees of the Naval Station Newport |
| Who May Apply: | All current career/career conditional employees of the Naval Station Newport only |
| Duties: | This position is located in the Family Housing Support Branch, Housing Division, Naval Station Newport. The incumbent frequently contacts property owners, other government agencies, real estate brokers, planning/zoning commissions and redevelopment housing authorities within the commuting vicinity to solicit their participation in the Housing Referral Program and the Equal Opportunity in Off-Base Housing Program. Obtains listings of vacant living accommodations in apartment housing, individual residences, housing developments and mobile home parks within the commuting vicinity. Compiles detailed information on sales and rental units available, and from this data publishes brochures and information listings. Interviews military and DoD civilian personnel applying for housing in the civilian community. Updates master record daily on the LAN Network system. Investigates and mediates civilian rental complaints from landlords/tenant relations, following through to completion. Interviews, counsels and assigns government quarters in accordance with current policies. |
| How to Apply: | The following forms must be received in the HRSC-NE, Customer Focus Division (Code 53.4/M. Thompson), 111 South Independence Mall East, Philadelphia, Pennsylvania, 19106, or postmarked, on or before the closing date of the announcement. Do NOT use government paid postage. It is against Federal Regulations (18 USC 1719), and your application will NOT be considered. TELEFAXED applications will NOT be considered Applications received through the use of postage paid government envelopes are in violation of 18 USC 1719 and will not be considered. |
| Qualifications: | The requirements of the Operating Manual for Qualification Standards for General Schedule Positions apply. One year of specialized experience equivalent to at least GS-05 level that equipped the candidate with the particular knowledge, skills, and abilities to successfully perform the duties of the position. Examples of specialized experience would be reviewing housing documents for accuracy. Providing advice to local housing managers and applicants on-routine occupancy assignment/termination and referral matters. Providing technical assistance to higher level staff members on occupancy, audits and inspections. |
| Evaluation Method: | Candidates who meet basic eligibility will be evaluated on the relevance and quality of their experience, education and accomplishments in relation to the evaluation factors listed below. Therefore, it is important-to address these criteria specifically. Please address each evaluation factor describing how your work experiences (including unpaid or volunteer work), education, or training demonstrates the possession of the particular Knowledge, Skill or Ability. Important details include those describing the level of difficulty of the accomplishment (e.g., the complexity, preciseness, independence, judgment, adaptability, inventiveness, originality involved) and the degree of relevance or similarity (e.g., abilities, skills and knowledge required, items or guidelines worked on or with, working conditions) to the duties of the position to be filled. |
| Substitute Education for Experience: | One full year of graduate level education or Superior Academic Achievement. The education must have been obtained at the graduate level in an accredited college or university. Such education must demonstrate the knowledge, skills, and abilities necessary to do the work of Housing Management Assistant. Superior Academic Achievement is based on (1) class standing, which applicants must be in the upper third of the graduating class in college, university, or major subdivision. (2) Grade Point Average (GPA), which applicants must have a GPA of 3.0 or higher out of a possible 4.0 ("B" or better) as recorded on their official transcript. (3) honor society membership, which applicants can be considered eligible based on membership in one of the national scholastic honor societies. In order to get credit for any education, a transcript must be attached. |
| Other Pertinent Information | Highly Qualified Screen: In order to meet the highly qualified screen the applicant must |

of 2

141

PLAINTIFF'S EXHIBIT 6 5-10-06

| | |
|---|---|
| | have the following criteria. Applicant must identify experience gained through work involving the renting, leasing, selling, and assigning/terminating housing to military which provided knowledge of housing regulations and procedures. |
| Direct Inquires to: | Mary Thompson, DSN 243-5151 |
| Forms Required: | · Resume or OF 612, Optional Application for Federal Employment. (SF 171 and associated forms will be accepted in lieu of a resume or OF 612). Your resume or application must contain the following: - Announcement number, position title, series and grade - Your full name, address and day & night phone numbers - Social Security Number - Relevant experience including name of employer, dates of employment, job title, series and grade, average hours if other than 40, start and end dates and a description of duties and responsibilities - Education/Training - Awards - Current Performance Appraisal |
| Knowledge, Skills, and Abilities: | 1) Knowledge of DoD and Navy Department Family Housing policies, practices and procedures relating to the assignment/termination and housing referral programs 2) Knowledge of leases, sales contracts, FHA/Va, conventional financing, real estate properties, market conditions, and pertinent landlord and tenant laws 3) Skill in investigating complaints, interviewing parties and witnesses to the complaint, reviewing and analyzing evidence, and writing reports 4) Ability to coordinate surveys including collecting data, coordinating results and report findings 5) Knowledge of DoD utilization/inventory reports 6) Ability to communicate effectively orally and in writing |
| Notes: | This position has promotion potential to Housing Management Specialist, GS-1173-9 SELECTIVE SERVICE REGISTRATION: Males born after December 31, 1959 will be required to certify that they have registered with the Selective Service System. If you failed to do so, you will be required to certify that you did not knowingly and willfully fai to register. This requirement must be met before you can be appointed to this position. Selectee is required to participate in the Department of Defense (DoD) direct deposit of pay. The Department of Navy is an Equal Opportunity Employer |

142