UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| ALAN BRADLEY, Plaintiff | |
| VS. | C.A. NO. 04-412-ML |
| GORDON R. ENGLAND, Secretary of the United States Department of the Navy, Defendant | |

Deposition of **RICHARD J. EVANS**, a Witness herein, taken on behalf of the Plaintiff, on TUESDAY, JUNE 6, 2006, 12:40 P.M., at the offices of the United States Attorney, Fleet Center, 50 Kennedy Plaza, Providence, Rhode Island, before Vivian S. Dafoulas, Registered Merit Reporter/Certified Realtime Reporter.

ORIGINAL

Vivian S. Dafoulas, RMR-CRR
50 Fieldstone Drive
East Greenwich, RI 02818-2064
(401) 885-0992

**APPEARANCES:**

**FOR THE PLAINTIFF:**

JOSEPH F. HOOK, ESQUIRE
294 VALLEY ROAD
MIDDLETOWN, RI 02842

**FOR THE DEFENDANT:**

UNITED STATES ATTORNEY
BY: ANTHONY C. DiGIOIA, ESQUIRE
FLEET CENTER
PROVIDENCE, RI 02903

ALSO PRESENT: BARBARA DRAGOWSKI, ASSOCIATE COUNSEL

established for him to go into.

Q. Was this position of a supply technician different than the prior supply technician position that he held, if you know, in the Housing Maintenance Section?

A. I would say yes because it required using a credit card and making buys from vendors and so forth. I didn't really know everything he did in his GS position in the past, okay, or the credit cards and the -- and the Visas and stuff like that that they used at Public Works were new at that time. They were just coming out with them so I would say yes, this was a different position than what he had.

Q. Okay. Now, at the time that Mr. Bradley came to work for you, were you aware that he had a pending EEOC complaint?

A. Yes.

Q. And part of that complaint that he had had to do with -- with making the building that he worked in suitable to his epilepsy condition?

A. Yes.

Q. And did you assist Captain Cooper in finding an accommodation for Mr. Bradley so he could work for you in the Department of Public

Works?

A. Yes.

Q. All right. Now, you were aware that Mr. Bradley had applied for Housing Manager positions, is that correct, sir?

A. Yes, I'm aware.

Q. Okay. And that occurred in the early part of 2001, correct, sir?

A. Yes.

Q. And had Alan spoken to you about his desire to go back to the Housing Department while he worked for you?

A. While he worked for me?

Q. While he worked for you.

A. The only thing he shared with me was he was very interested in getting one of the positions that they were going to fill in Housing which was three at the time which they were advertising.

He told me he was going to apply for one of those positions and hopefully he'll go back and work in an area that he liked in Housing and I do know for a fact that he applied for the positions and the positions were returned from Groton with his name as a referral for selection.

Q. So he was -- he came -- the position that

he applied for -- he actually -- his name came back with a referral to fill the position?

A. His name came back with other candidates as qualified for the position that was -- it was in Captain Cooper's hands to make a selection out of those however many candidates there were --

Q. Okay.

A. -- and she was well aware of the fact that she had promised Alan one of those positions when that came across her desk.

Q. Did you have any conversations with Captain Cooper regarding Alan filling one of those positions?

A. The only conversation I had was when the -- when the positions came back with referrals, she said, "Looks like I'll be able to put Alan in one of those positions." She called me and she said, "I have three positions. He's a qualified candidate and we can reasonably put him in the job with no problem," and then the next day it all just fell apart. They did away with the jobs.

Q. The very next day?

A. The very next day. She received the referral one day and the next day they abolished the jobs or -- or put a hold on them because they

were going to do a cutback.

Q. Now, what's the situation when they receive a referral? Is there a process where Groton, where -- where management asks for a position to be filled and then submits a request for those positions --

A. Right.

Q. -- to be filled?

A. Uh-hum.

Q. And then an actual -- a referral is either made or not made by headquarters in Groton?

A. Yeah. What happened was -- it's a hard thing to explain but the region the way they did it is you advertise the job, okay? They go through Office of Personnel Management, look at people's applications and position them at a rating to where they stand as an applicant for the position.

They may send you three or five of the top candidates that they reviewed, okay? His name was on one of the ones that they reviewed as being a qualified candidate. I don't remember what level it was and they come back to the Naval Station saying here's the applicants for the position, here's the order that they were on the list, and you can pick anybody on that list.

Q. And once a referral is made, does the -- the agency have the authority at that point to make a hire?

A. Yes, they do, but when the position comes back and they make that selection, it has to go back to Groton, Connecticut, back to the region for approval, and then they have to notify the incumbent.

See, Captain Cooper could not turn around and say to Alan Bradley you have that job. She could make the selection and send it back to the region. The region would make the phone call or OPM would make the phone call to the employee to accept the job and they would negotiate whatever step it was. It never reached that point.

Q. Did Captain Cooper tell you why the position was not filled?

A. She didn't elaborate. She told me that she had received confirmation from Northeast Region that they were doing a major cutback in the Housing Department and that those positions could not be filled.

Q. All right. Now, after she -- you had that conversation with her, with Captain Cooper, did you attend a meeting with Captain Cooper and