UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

---

ALAN BRADLEY, :

Plaintiff, :

v. : LAW NO. CA04-412ML

GORDON R. ENGLAND, in his capacity as Secretary of the Department of the United States Navy, :

Defendant. :

---

TELEPHONIC DEPOSITION UPON ORAL EXAMINATION OF

JANA HUBNER

July 25, 2006 - 1000
Norfolk, Virginia

APPEARANCES:

Joseph F. Hook
294 Valley Road
Middletown, Rhode Island 02842
Attorneys for the Plaintiff
By: JOSEPH F. HOOK, ESQUIRE
Of Counsel.

UNITED STATES ATTORNEY'S OFFICE
Fleet Center
50 Kennedy Plaza, 8th Floor
Providence, Rhode Island 02903
Attorneys for the Defendant
By: ANTHONY DiGIOLA, ESQUIRE
Of Counsel.

**ORIGINAL**

ALSO PRESENT: Barbara Dragowski

correct?

A That is correct.

Q And who is your current employer?

A My current employer is NAVFAC Atlantic.

Q What is the acronym for NAVFAC for?

A Naval Facilities Engineering Command.

Q Is that under the Department of the United States Navy?

A It is.

Q How long have you been employed by NAVFAC?

A Sixteen years.

Q What is your job there?

A I am the director of public private ventures.

Q Okay. What was your job in June of 2001?

A I was the deputy director of Navy housing at NAVFAC Atlantic. At that time, it was called something different. They just retitled it and I oversaw Navy housing operations across 50 naval installations in the Eastern United States, Caribbean, Mediterranean, Europe.

Q So did that include the -- in the summer of 2001, did your job of overseeing Navy housing include Navy housing in Newport, Rhode Island?

A That did. I oversaw it at a programmatic

level.

Q What do you mean at a programmatic level?

A Well, we were the ones that did the policy went forward for all the congressional notifications. I did not -- was not involved in the day-to-day supervision of any of the staff at the installation level.

Q Did you make any recommendations as to whether -- at the local level, as to whether there should be hiring or not?

A At times I could make recommendations. It was up to them at the level how they proceeded.

Q June of 2001, who was your superior at that time?

A Dr. Betty Bates.

Q And where is Dr. Bates's -- where was his office located?

A It's a lady and it is in Norfolk, Virginia, the same as my office at the time.

Q During, around, the summer of 2001, did you visit the various housing on the naval bases that had Navy housing on the Atlantic coast?

A Did I visit them?

Q Yeah.

A I was out periodically overseas and at

mark those pages as Plaintiff's 1. I would ask the stenographer to do that at this time and ask that you provide the stenographer those pages to be marked. Then I would ask you to take the exhibit back for reference.

(Whereupon, Plaintiff's Exhibit No. 1 was marked for identification.)

BY MR. HOOK:

Q Okay. Does the document on Page 50, the first page of Exhibit 1, entitled "Agenda for 14 June meeting," is that first page a memo that you prepared, Ms. Hubner?

A Yes.

Q And did you copy this to a Dave Lamoureux, Dawn Baronner, Jankowski, and I'm presuming that is Ed Jankowski; is that correct?

A Correct.

Q Alan Shannon, correct?

A Correct.

Q Do you remember the meeting in June of 2001 which this memo references, ma'am?

A Yes.

Q Was Captain Cooper, Captain Ruth Cooper,

present at that meeting, as well?
A To my best recollection, she was. We are going back four years and I handle many, many meetings. But my recollection was she was. I am not sure whether she was there the whole time.
Q Do you know who Charlie Silvia is?
A Yes, I do.
Q Do you remember whether he was at that meeting?
A I do not remember.
Q What was the purpose of that meeting?
A We were coming to discuss using a property management pilot at Newport. We had executed one in Portsmouth and another installation. It was an initiative out of NAVFAC headquarters.
Bill Pearson, who is on the to list, was from NAVFAC headquarters in D.C. We wanted to talk with Newport about pursuing a pilot for property management of Navy housing.
Q So you are considering pursuing a private property management pilot of Navy housing in Newport at that time?
A Correct. Contracting out for a private sector entity to perform property management.
Q Turning to the third line -- the fourth

line up from the bottom of that page, it states, "One to two, impact on the housing, slash, realignment, slash, termination through attrition."

Do you see where it says that?

A I do.

Q What did you mean by -- strike that.

That little notation there concerning the impact on the housing staff's realignment termination through attrition, would that be in regards to how the pilot program would affect the housing staff?

A It was.

Q Was there any discussion at that meeting concerning the meeting (inaudible) and how that would impact the housing staff?

THE COURT REPORTER: He's going to have to repeat that.

THE WITNESS: Yeah. You are going to have to repeat that. We didn't hear you.

BY MR. HOOK:

Q At the meeting that took place in June of 2001, was there any discussion as to whether a reduction in force would be impacting the housing staff in the future?

A There would have been an impact to the

housing staff. What the intent of that statement was was to minimize any impact, and that was the thought of if you have any existing vacancies, perhaps you want to consider filling them with contract hires and that you look at bringing the staff down through attrition.

Q And was that because of the possible pilot program, or was that because there was a potential riff out in the future?

A No. That particular comment is only in reference to the property management pilot.

Q In the meeting that took place on June 14, 2001, was there -- do you recall whether you had any discussions concerning functionality assessments being conducted at the Naval station in Newport and a potential riff of the housing staff in Newport?

A Not in that regard, no. We may have mentioned it briefly at that point in time. The assessment was being done at the highest levels. And up in Washington, no one really had an idea of the impact.

Q Okay. So if I could turn your attention to the exhibit that was marked in the fax. I believe it's Exhibit 2. I may have mixed up mine, but it starts out, "S.W. family housing functionality assessment," pages 59 through 73.

BY MR. HOOK:

Q Okay. Now, what has been marked as Plaintiff's 2 refers to a -- if I am correct, it refers to a functionality assessment on naval housing; is that correct, Ms. Hubner?

A That is correct.

Q And this functionality assessment began in March of 2001. If you would turn to Ppage 71 of that document, there is a notation in the middle of Page 71 where it says, "Remarks: Background and history. In March 2001, GNO N4 initiated a family housing, Navy functionality assessment."

Do you see where it says that, Ms. Hubner?

A I do.

Q In reviewing that document, does that indicate to you that functionality assessments concerning family housing began in March of 2001?

A Yes.

Q Now, can you tell me what a functionality assessment is -- what your understanding of a functionality assessment is?

A Navy-wide, the entire program, they were looking at where the program belonged. Family housing was operated out of the NAVFAC command. They were looking to realign it to what they call the major

Do you see where it says that?

A I do.

Q Also, the CNO wrote on the -- if you turn to Page 71, the last paragraph on Page 71. The CNO wrote, "The SIPB recommendations are approved, the following specific actions are required: A, initial personnel actions, period. The goal is to provide the maximum benefit and opportunities possible to the total work force impacted by a transfer of FHN operations and maintenance functions from EFDS to IMCS and NAVFAC HQS, period. This includes minimizing the potential for a reduction in force by implementing the following personnel actions?"

Correct, ma'am?

A Correct.

Q One of those things where the CNO was referring to in terms of minimizing the potential for a reduction in force was effective immediately in April of '02, placing a hiring freeze of 1173 personnel; is that correct, ma'am?

A That is correct.

Q Prior to this message from the CNO placing a hiring freeze on 1173 personnel -- strike that. I just want to clarify one thing.

Do you understand 1173 personnel to be

these positions that were held in housing management?

A That is correct.

Q So prior to the message from the CNO dated April of 2002 placing a hiring freeze of 1173, essentially, housing personnel, had you had any discussions with Captain Cooper or Charles Silvia or Allen Shannon concerning initiating a hiring freeze or not filling positions in housing in order to prevent an impact because of a potential reduction in force?

A In regards to the Newport property management pilot, yes. In regards to the functionality assessment, to the best of my recollection, no.

However, everyone in the field across Navy housing was aware that this study was ongoing, and no one knew what the final determination would be.

Q All right. In terms of what has been marked as Exhibit No. 2, the hiring freeze that was mentioned by the CNO, that applies to all 1173 personnel?

A Correct.

Q Not just housing managers as a 7 -- or GS-7 or 9 level, but all personnel within housing, correct, ma'am?

A That is what the message says.

Q Did you have any discussions with Allen

those in the maintenance and management side were more likely to be reduced than those in the referral side?

A Correct. Since we have privatized, Navy housing still has a referral function. The facilities maintenance function that had existed previously is no longer there.

Q So, in fact, what was considered a possibility in June of 2001 actually subsequently took place?

A That is correct.

MR. DiGIOLA: And now, let's go off the record for one moment.

(Discussion off the record.)

MR. DiGIOLA: Back on the record. I have no further questions.

MR. HOOK: I do have a few follow-up questions of Ms. Hubner.

EXAMINATION

BY MR. HOOK:

Q First, in Mr. DiGiola's examination of you, you referred to the PPV and congress giving

authority for the public private ventures; is that correct?

A That is correct.

Q That began in 1996?

A That is correct.

Q As a consequence of that authority, housing was -- staff at housing was susceptible to being impacted or changed or even reduced since 1996; is that correct?

A Correct. Now, it started very slowly and didn't pick up momentum, I would say to 2000, 2001, but the staff knew that potential existed.

Q Okay. Now, you had testified also that the potential riff might impact, because of the MSDFA (phonetic) study, the CA study, the possible public private venture, that there could be a reduction in housing staff at Newport and that some areas in maintenance were more in danger than positions in referral. Is that essentially what you testified as to, ma'am?

A They were the ones that would have been more affected through privatization, yes.

Q Okay. And what do you base that statement on? Are there any documents that you looked at back in 2001 or beforehand that would indicate that, or are you

Agenda for 14 June Meeting

From: Hubner, Jana L. (EFDLANT) [HubnerJL@efdlant.navfac.navy.mil]
Sent: Wednesday, June 06, 2001 6:13 PM
To: Lamoureux, Dave; Baronner, Dawn C. (EFDLANT); Newport FH; Jankowski,
Ed (CNER); Shannon, Alan (CNRNE); Pearson, William J (NAVFACHQ)
Subject: Agenda for 14 June Meeting

Agenda for Property Mgt Meeting on 14 June (flexible)

0800-0830 - Overview of property Management Concept - Bill Pearson

0830 - 0900 - Cost reimbursable contract - Dave Lamoureux

0915-1030 - Overview of current maintenance contracts - Charlie Silvia

11-12 - How to implement property mgt contract with existing contracts - what stays, what is terminated

1-2 - Impact on the Housing Staff - Realignment/Termination through attrition

2-3 - ROICC interface

3-4 - Prepare executive summary for Capt Cooper

EXHIBIT
Pff's 1
7/25/06 ah



273