UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

ALAN BRADLEY
Plaintiff

v. CA. NO. 04-412ML

GORDON R. ENGLAND in his capacity as Secretary of the Department of the United States Navy
Defendant

**DEPOSITION OF ALAN R. SHANNON**, taken on behalf of the Plaintiff, pursuant to the Rhode Island Rules of Civil Procedure, on March 10, 2006, at the Law Offices of Joseph F. Hook, before Florence Almeida, Notary Public, convening at 11:00 A.M.

Original

**APPEARANCES**:

LAW OFFICES OF JOSEPH F. HOOK
BY: Joseph F. Hook, Esquire
Counsel for the Plaintiff

U.S. ATTORNEY'S OFFICE
BY: Anthony DiGoia, Esquire
Counsel for the Defendant

**ALAN R. SHANNON**, having been duly sworn, deposes and testifies as follows:

**EXAMINATION BY MR. HOOK:**

Q. Dr. Shannon, my name is Joseph Hook. I represent Alan Bradley in an employment discrimination case in the U.S. District Court entitled Alan Bradley vs. Gordon R. England, and you're here pursuant to a Notice of Deposition served upon the defendant in this matter, is that correct?

A. That is correct.

Q. Are you currently employed by the Department of the Navy sir?

A. Yes. I am.

Q. What is your position, sir?

A. I am a community support program director.

Q. What department do you work in?

A. Department of the Navy.

Q. What is there like a housing department or a public works department?

A. No. My program has all of those functions. It has family housing, bachelor housing, family support programs, moral, welfare and recreational programs, child and youth programs, and the galley programs.

Q. Were you in charge of overseeing the supervisors or

the various departments within those programs that you just mentioned?
A. Yes. I have line managers that work with me.
Q. At one time was Charles Silvia a housing manager director that worked for you?
A. That is correct.
Q. Was that -- do you know when that period of time was sir?
A. I'm trying to think when Charlie left. I don't know. I can't remember when he left.
Q. Were you involved in the hiring of Charles Silvia to the position of housing manager director?
A. That's correct.
Q. He was hired in approximately 2001 to that position?
A. I have to believe you. I don't remember to be honest with you.
Q. Prior to coming to today's deposition did you review any documents?
A. Yes. I have documents that I see that you that you have too. Your letter and affidavit that I gave back in August 16th, 2002, plus some other stuff. That's e-mail conversations and things like that. That I think you also have.

It came out of the file. It has the same numbers on the bottom.

Q. This affidavit you referred to is that the affidavit dated August 16th, 2002?

A. I just said. Yes.

Q. At that time to the best of your knowledge the information that you provided is true and accurate sir?

A. Yes.

MR. HOOK: I ask the stenographer to mark as Plaintiff's Exhibit 1 a copy of that affidavit sir.

(PLAINTIFF'S EXHIBIT 1 MARKED AND RECEIVED FOR IDENTIFICATION, AFFIDAVIT.)

Q. If you can take a look and make sure that is a copy of the same affidavit you submitted back in 2002?

A. Yes.

Q. Prior to coming here today to today's deposition did you have any conversation with anybody other than Ms. Dragowski or Mr. DiGoia concerning --

A. I did not.

Q. As a regional manager if there was any personnel actions to fill positions, would you receive a request from one of your directors to obtain the

funding to fill a position?

A. That is the usual process. Yes.

Q. In the spring of 2001 or late winter of 2001 did you receive a request from Charles Silvia to fill two housings manager positions at the Department of the Navy in Newport?

A. Specifically, I can't remember that, but, you know, if there is any personnel process, they would have to have gone through me.

Q. So if Mr. Silvia thought there was a need to hire a housing manager he would have to go through you, is that correct, sir?

A. I question the word need. If he wanted to fill the vacancy, he would have to go through me.

Q. In reviewing your affidavit, does that refresh your recollection as to whether in late winter or early spring of 2001 whether Mr. Silvia made a request upon you to fill two housing manager positions?

A. I read that in my deposition. To be honest with you, I'm fuzzy on the time line. There was a lot of things happening. And could I say exactly it was the spring of 2001. It happened sometime during that period of time. I would say. Yes. Or even later, I don't know. If there is a request

there to be had, they would have to come through me.

Q. Prior to those positions being filled, do you recall having a meeting with a Jana Hubner, Captain Cooper, and Charles Silvia in June of 2001 concerning the filling of positions within the 1173 series at housing?

A. Not specifically for the filling of the 1173 series. No.

Q. Do you recall having a meeting regarding housing with Jana Hubner and Captain Cooper and Charles Silvia in June of 2001 concerning the housing situation sir?

A. What do you mean by situation?

Q. I have a better way of doing this sir.

A. Okay. I had that too.

MR. HOOK: May the stenographer mark a document which has the number 50 at the bottom of it.

(PLAINTIFF'S EXHIBIT 2 MARKED AND RECEIVED FOR IDENTIFICATION -- MARKED NO. 50.)

Q. May I ask you to take a look at that document, sir?

A. Yes.

Q. Did you review that document before coming here

today?

A. Yes.

Q. What do you understand that document to be?

A. It was a meeting about housing.

Q. Was it an agenda for a meeting about housing?

A. Yes.

Q. After receiving the notice concerning that agenda do you remember actually going to that proposed meeting?

A. Yes. I was there.

Q. Who was present at that meeting?

A. I remember Jana Hubner. I remember Mr. Lamoureux. I think he was a commander at the time. I remember Bill Pearson. And I think "Jane Cuski" might have been there too.

Q. Was Captain Cooper present at that meeting?

A. I can't remember. She may have been. She may not. I don't remember.

Q. Was Charles Silvia at that meeting?

A. I don't think Charlie would be there. No.

Q. You don't remember whether he was there or not, but you don't think he was there?

A. I don't remember. I don't think he was there, correct. This was a meeting that was more than

just about Newport housing. It would be doubtful he was there.

Q. He's referred to in the document, there is a place where Charles Silvia is referred to current maintenance contracts?

A. That was an agenda. I don't think that he gave a review. I don't remember him being there. No.

Q. Now the agenda for this meeting refers to a meeting of June 14th, and the memo is dated June 6th, of 2001, and to the best of your recollection the meeting occurred on June 14th, 2001, is that correct?

A. To the best of my recollection. Yes.

Q. Referring to your affidavit sir turning to Page 163, which is noted 163 of the affidavit the top paragraph. You indicated that they advised us it would be in our best interest to terminate all recruitment actions in the 1173's, because they were affected positions. At that point we looked at options an canceled all our recruitments for the 1173 position?

A. I think, yeah. That is to the best of my knowledge that is what we did exactly.

Q. After that meeting that occurred in June 14, 2001

did you make the decision to cancel all the 1173 positions?

A. Yes.

Q. Did you consult with Captain Cooper concerning that?

A. I'm sure I talked to her. Yes. I did. She had the job as the base commander at the same time too. So the program stuff was left mostly to me. She was my boss.

Q. She was, in terms of chain of command, she was your boss?

A. That is correct. Not as the commanding officer, but as the program director.

Q. Can you tell me why you canceled those 1173 positions?

A. The housing program within the whole region was undergoing a lot of change. And I recollect from this meeting most of the substance of this meeting was more about what choices we would possibly have for this change. We would, basically, have one of three options. We would have a commercial assessment study done, which is a A-76 study; that's where the government competes with commercial enterprise for a certain -- running a

certain section of the government in this piece of housing. That was one choice.

The other choice was a functionality assessment in which the government self-assesses itself to establish a most effective organization. And the third thing that was brought up at the meeting was the possibility of undergoing a public private venture. Those things are important to know because, regardless of what happens in any one of those three, there is going to be less people to do the work, or no people. If it was a CA, it could be no people. So based on that knowledge, you know, to hire someone knowing this is coming down the train track would put that person hired in jeopardy, because I would have to turn on the fire time or lay him off, because the position would probably go away.

Q. At the time did you know, could you see into the future whether, in fact, if you did hire that person you would have to fire that --

A. Pretty much. I had that sense it would be definitely they would have to go away.

Q. Did you know that for a certainty? You didn't know what was going to happen in the future?

A. I would think that it did. I'm not positive. I think it did, because that's why we sort of dropped the -- well, actually there was a contract with the pilot guy up in New Hampshire, we were going to base our statement of work on what he was doing. We sort of just stopped talking about this pilot project, because of the result of this meeting.

Q. After this meeting that occurred on June 14 there were some housing management needs, how did you decide how you were going to meet those needs?

A. Well, as it turns out, we thought we would be going down this functionality assessment road. Shortly after we felt that way we basically were directed to participate in the public/private venture, which basically turned over all of the Navy housing assets to a partner.

The Navy goes into a partnership with a big property management company for total operation of the housing area. In our case there was a whole process that goes through this. Business agreements that are struck. The Navy entered into a limited liability company with a company called GMH Centex. And that is now it was called Northeast Housing LLC. That is now what we have in

place here in the Navy region northeast.

Q. When did they take over the property management?

A. I think it was November 1st. I can't remember. It was about a year and a half ago. I know it was on November 1st. I don't know whether it was 2002 or 2003. I would say 2003.

Q. About a year and a half ago?

A. I think it was about a year and a half ago. Yes.

Q. Now between June of 2001 and a year and a half ago would be some time in 2004 by the best of my scenario, how did housing -- I'm going to put it in a different way.

Between the time of the meeting of June 14th, 2001 and the time that GMH housing took over the housing management, did you make a decision that you would fulfill the housing management needs with temporary contract workers?

A. That was through some what we call ISOT contracts and CASU contracts. I don't know what that means, but, basically, they're government authorized agencies that can provide temporary help. They're not government employees, and they can be terminated at any time.

Q. In fact, there were some contractors ISOT

contractors --
A. Well, the only one I know specifically that we had in the Newport office was for a secretarial position. That's the only one I know for certain.
Q. Do you know whether there were any temporary contractors that fulfilled the duties of housing managers in Newport between June of '01 and the time GMH took over?
A. I don't know that. I'll tell you, basically, the direction from me to the Charlie Silvias in the region was that they would have to do more with less.
That the existing people would have to double up on their duties until we get everything sorted out.
Q. I'm going to return to your e-mail correspondence.
Did you tell Charlie Silvia after the meeting of June 14 that he was not to fulfill, hire any new housing managers within the 1173 series.
A. I can't remember saying specifically not to. I probably expressed concern about not bringing anybody on the roles. I don't remember specifically saying don't.
Q. If there were a need for a housing manager, could

the Charlie Silvias of the world or at that time Charlie Silvia was the director, come to you and seek permission to hire a new person?

A. If there was a need, that is correct.

Q. Did Charlie Silvia do that?

A. He brought me a request that I did approve for recruitment, but recruitment does mean selection. But the process for the human resources within the government is a long, arduous program. Not knowing where we were going with PPV at the time, I didn't want to stop any recruitment actions from starting, because we could be caught short if, in fact, it didn't happen. And so I probably signed that knowing full well that before I got a certificate to hire or even after I got a certificate to hire I could cancel that certificate and cancel the recruitment process.

Q. Is it your testimony that between the meeting of June 14th, '01 and approximately a year and a half ago Charlie Silvia did bring in a request for or at least a recruitment for a housing manager?

A. That is true. I can't say no. I can't say yes.

Q. Did he ever ask you for permission to fulfill that position of housing manager?

A. No. He wanted to fill vacancies; that is not a need. At the time I didn't think there was a need. He wanted to fill vacancies, because he had them on the books. So if you don't fill the vacancies, you know, you can't -- keep -- you spend money that way.

There are certain requirements to do that.

Q. Did he ever request of you to make a request to have Victor Ramsey fill the position of housing manager?

A. Not for me. I don't know Victor Ramsey.

Q. The e-mail conversation that you brought goes from Page 51 to Page 57, I'm going to ask the stenographer to mark these pages 51 to 57 as Plaintiff's 3. Then I'm going to ask you to identify what the document is, sir?

A. Okay.

(PLAINTIFF'S EXHIBIT 3 MARKED AND RECEIVED FOR IDENTIFICATION -- STRING OF E-MAILS.)

Q. Doctor, could you take a look at what has been marked Plaintiff's Exhibit 3 and tell me what that document is, sir?

A. That is a string of e-mails that had to do with this bringing on this extending the pilot project

for property management down to Newport.

Q. At the time of those e-mails communications were you considering bringing that pilot property management program down to Newport?

A. Not me personally. The Navy was interested in expanding this pilot program. They were looking, since which we had one already going up in Portsmouth, New Hampshire. They thought it would be a good idea to bring it down here. It's close enough.

Q. At the time that the Navy was considering bringing their pilot program down to Newport, did that have -- was that a reason for not filling the housing manager positions in June of 2001?

A. It could have been a reason. I think if you read on Page 51 that after discussing the issue of instituting property management pilot study at Newport with the CO. I wanted to defer any actions at the present time. We're unsure what direction -- I don't know what that is in Navy housing of the shore, infrastructure planning board, and the Navy housing is heading, when considering the various challenges of functionality assessments and A-767.

And at that time, you know, the CPC was

being discussed. That didn't seem like that it was going to be a reality, but so I knew that the A-76 or the C-A was coming.

Q. At least this time you deny thinking the PPV was going to be a reality?

A. Correct.

Q. The PPV again could you tell me what that stands for?

A. Public private venture.

Q. Is that what ultimately occurred where GMH took over the management of housing at Navy?

A. That is correct.

Q. That occurred approximately a year and a half ago?

A. That is correct.

Q. In 2001, June 2001 you weren't sure this PPV would happen, so the Navy was considering a pilot program that is discussed in what has been marked Plaintiff's Exhibit 3 and the e-mail communication you referred to?

A. That was one of the ones that we were considering.

Q. Ultimately on August 15, 2001 you requested that the Navy stop all actions to include Naval station Newport and any ongoing property management pilot study, is that correct?

worth it just to say no. Just to get the word no back.
Q. Sir you're Charles Silvia's supervisor when he was the housing director, is that correct?
A. Yes.
Q. Did you take any action to take any disciplinary action against him prior to his being either retired or removed from that position?
A. I don't know what that has to do with this.
Q. You can answer sir.
A. I prefer not to answer that.
Q. You're required to answer the question sir.
A. Yes. I did.
Q. What action did you take against him sir?
A. I removed him from his office and set up an office on my staff for him temporarily. While he underwent the process to retire.
Q. Was there any reason why you took that action, sir?
A. I lost confidence in him.
Q. What caused you to lose confidence in him sir?
A. I just, you know, I didn't agree with his management style.
Q. What was it about his management style that you didn't agree with?

A. He didn't manage money well. He didn't manage people well. He didn't manage materials well.
I don't think he had the discipline that one should have to come into that level of a position. It's a very senior position.
Q. When you say he didn't manage people well, what were his deficiencies in managing the people?
A. There was just a lot of grossing down in his organization. People were disgruntled.
Q. Did the people in his organization have any complaints concerning any derogatory statements that he may have made towards his subordinates?
A. I never got any of those complaints.
Q. Did Darlene Gammons raise a complaint?
A. Darlene Gammons raised a complaint for several reasons. It wasn't specifically slated at Charlie that I know of. It was she felt that she deserved more than what she was getting.
MR. HOOK: Nothing further.
EXAMINATION BY MR. DIGOIA:
Q. Doctor, do you still have Plaintiff's Exhibit 3 in front of you it's numbered Page 51?
A. Yes. I have that.
Q. Directing your attention to Page 51 of Plaintiff's

# AFFIDAVIT

State of Rhode Island
County of Newport

I, **ALAN R. SHANNON**, *make the following statement under oath or affirmation. Pursuant to Public Law 93-579 (Privacy Act of 1974), as an individual supplying information for inclusion in a system of records, I have been informed of the following:*

*EFFECT OF NONDISCLOSURE: Disclosure of information by me is voluntary, however, I realize my failure to respond could result in a recommended disposition of the case on the basis of information available. Witnesses who are Department of Defense employees may be subject to administrative action for failure to testify.*

*AUTHORITY: The authority to collect the information requested by this interview is derived from one or more of the following: Title 5, Code of Federal Regulations, Sections 5.2 and 5.3: Title 5, United States Code, Sections 1302, 1303, 1304, 3301, and 3302; Executive Order 11478, as amended, Executive Order 10577; and 29 CFR Part 1614.*

*PURPOSE AND SCOPE: The information supplied will be used as part of the record in an equal employment opportunity discrimination complaint or grievance investigation. The record will be furnished to designees of agencies and departments of the Federal Government in order to resolve the complaint or grievance. The record may also be disclosed to any agency of the Federal Government having oversight or review authority with regard to Office of Personnel Management or Department of Defense activities, to the Federal intelligence agencies, or others, as published in the Federal Register.*

I am providing this statement in the presence of the agency representative, Mr Robert Knowles.

**Disability:** None.

**Protected Title VII Activity:** EEO Complaint.

**Current Position**: Deputy, Community Support Program Manager, NF-05

**Organization**: Community Support, Commander Navy Region Northeast, Newport, Rhode Island

**Inclusive Dates of Current Assignment**: Two years. I have worked for the Navy 35 years.

**Supervisor**: CAPT Ruth Cooper.



Affiant's Initials ARS

161

PLAINTIFF'S EXHIBIT 1 - 9D 3/10/06

Q. Briefly describe your primary duties and responsibilities in your current position.

R. I run the Community Support Program, which consists of oversight and management of Fleet and Family Support Programs, Bachelor Housing, Family Housing, Child Development, MWR, and all administrative and business programs.

Q. How many employees do you supervise directly and indirectly?

R. I supervise 10 people directly, and approximately 1200 full and part-time employees – appropriated and non-appropriated fund.

Q. Do any of those individuals have any claimed disabilities?

R. I am sure there are some, but I could not specifically say.

Q. What is your work relationship to the Complainant, Mr Alan Bradley?

R. None.

Q. Do you know Mr Bradley?

R. I do not.

Q. Mr Bradley claims discrimination based on reprisal. Are you aware that Mr Bradley filed a previous discrimination complaint? If so, when and how did you become aware of the complaint?

R. I am not aware of Mr Bradley or any complaint.

Q. What was your involvement in the recruitment process for the Housing Manager, GS-1173-07/09, position?

R. I am the Regional Program Personnel Coordinator for all Community Support Programs. All personnel actions have to go through me. I believe the Store Front Manager, Charlie Silvia, requested to fill the position, That action came through me, and I then forwarded it to Jennifer LaTorre, at the Navy Region Northeast. Jennifer is the manpower specialist. She makes sure there is funding and a billet available, and then initiates action for HRO to conduct the recruitment, which she did. That was in the late winter or spring of 2001. I am normally finished at that point.

In this case, we ran into a glitch. The Navy Facilities Engineering Command is the Program Manager for all of Housing. They came up in the spring, possibly in May, and announced to us there is a housing functionality assessment under way that would affect all levels of housing from



Affiant's Initials AB

162

the program manager to the activity level. I do not recall the exact date of the meeting. CAPT Cooper and myself attended the meeting locally from the program side. Then, there was a Commander from Code N46 at OPNAV (Chief of Naval Operations) in Washington, D.C. I do not recall his name. There was another attendee from the EFD staff in Norfolk, but I do not know his name. They basically explained to us there will be three options we will have. A very small area of housing will remain in civilian positions, primarily referral. The other portions of housing would most likely be contracted out or be subject to a commercial activity (CA) study. They advised us it would be in our best interests to terminate all recruitment actions in 1173s because they were the affected positions. At that point, we looked at the options, and canceled all of our recruitments for 1173 positions.

Q. Do you recall how many recruitments you had in process?

R. We were recruiting for two Housing Manager positions at the time. I think we contracted out positions, rather than filling them internally. Right now, housing is in a turmoil, and all 1173 positions are frozen. We are just finishing the first phase of the functionality assessment, and 23 positions at the program manager level (NAVFAC (Naval Facilities Engineering Command), EFDs (Engineering Field Divisions), and EFAs (Engineering Field Activities) were eliminated along with a reorganization. Now we are going into the second phase, which will go into the activity levels. From my understanding, over 300 positions at the activity level will be eliminated, which would be primarily 1173s. This information has been presented at meetings, but we have not received the guidance yet to begin the reduction.

From my position, it did not make sense to bring an employee on board, only to turn around and give them a reduction-in-force notice a year later.

Q. Was there a higher-headquarters' freeze imposed on those positions?

R. A freeze was imposed April 30, 2002. However, prior to that, the guidance we were given was not to fill positions. We were told to create vacancies and fill positions by contract or other means.

Q. Has the agency made any permanent placements in the housing function since being informed of the functionality assessment?

R. No.

Q. Have you filled any housing positions temporarily?

R. Not here. I have a temporary laborer that I have approved for Groton and a secretarial position at Earl, New Jersey. ALF

Q. Do you know whether or not Victor Ramsey was placed in housing?



Affiant's Initials ALF

R. I am not familiar with Mr Ramsey and am unaware he has been placed in housing.

Q. Who made the decision to cancel the announcement?

R. That was my decision.

Q. What was CAPT Cooper's involvement?

R. She is the program manager, but as Deputy, I have full authority to make the decision.

Q. Was CAPT Cooper involved in the decision?

R. I am sure we talked about it. I basically said it makes no sense hiring people and turning around and firing them.

Q. Did you attend a meeting with CAPT Cooper and the applicants for the Housing Manager position to inform them that the recruitment action was being canceled?

R. I did not attend, and I did not know about the meeting. Once I canceled the recruitment, I was not sure about the process to notify the candidates. CAPT Cooper wears two hats—she is the Program Manager for the Region and her other hat is the Commanding Officer, Naval Station, Newport.

Q. Were you aware there was an EEO settlement agreement that was to provide Mr Alan Bradley priority consideration for the Housing Manager position?

R. Not until yesterday. I learned about it when I tried to find out why I was being interviewed in this investigation.

Q. Do you have any knowledge that the recruitment was canceled to avoid offering the position to Mr Bradley?

R. Absolutely not. That had nothing to do with it.

Q. Do you have anything further to add at this time?

R. No.

*END OF STATEMENT*

*I have been afforded the opportunity to provide information relevant to the issues. I have nothing further to add to my affidavit.*



Affiant's Initials ewf

*I have read the above statement consisting of _5_ pages and it is true and complete to the best of my knowledge and belief. I understand that the information I have given is not considered confidential and that it may be shown to the interested parties.*

Subscribed and sworn before me
at: Naval Station Newport, Rhode Island,
on this 16th day of August 2002.

**TERRY CALCUTT**
Investigator

**ALAN SHANNON**
Affiant



Affiant's Initials ______

Agenda for 14 June Meeting

From: Hubner, Jana L. (EFDLANT) [HubnerJL@efdlant.navfac.navy.mil]
Sent: Wednesday, June 06, 2001 6:13 PM
To: Lamoureux, Dave; Baronner, Dawn C. (EFDLANT); Newport FH; Jankowski, Ed (CNER); Shannon, Alan (CNRNE); Pearson, William J (NAVFACHQ)
Subject: Agenda for 14 June Meeting

Agenda for Property Mgt Meeting on 14 June (flexible)

0800-0830 - Overview of property Management Concept - Bill Pearson

0830 - 0900 - Cost reimbursable contract - Dave Lamoureux

0915-1030 - Overview of current maintenance contracts - Charlie Silvia

11-12 - How to implement property mgt contract with existing contracts - what stays, what is terminated

1-2 - Impact on the Housing Staff - Realignment/Termination through attrition

2-3 - ROICC interface

3-4 - Prepare executive summary for Capt Cooper



50

PLAINTIFF'S EXHIBIT 2-DD 3/10/06

RE Estimate OF HOURS AND COSTS FOR PILOT

From: Lonigan, Susan M (Efdlant) [LoniganSM@efdlant.navfac.navy.mil]
Sent: Wednesday, August 15, 2001 11:17 AM
To: Shannon, Al GS (NSNPT); Jankowski, Ed (CNER)
Cc: Cooper, Ruth CAPT (NSNPT 00); Lafollette, Paula L (EFANE); Smith, Donna H. (EFDLANT); Noce, Susan J (EFANE); Bates, Betty L. (EFDLANT); Newport FH
Subject: RE: Estimate OF HOURS AND COSTS FOR PILOT

Al,

Thanks for your reply. CAPT Cooper's position is understandable considering the uncertainty of the future. Should the property pilot prove a viable option for any of the CNRNE activities, the contracting process can be activated.

V/R
Sue

Susan M. Lonigan
Family Housing Programs
LANTNAVFACENGCOM
(757) 322-4547, DSN 262
FAX (757)322-4578, DSN 262
Visit www.housing.navy.mil for P-930, change 13

-----Original Message-----
From: Shannon, Al GS (NSNPT) [mailto:ShannonA@cnrne.nsnpt.navy.mil]
Sent: Wednesday, August 15, 2001 8:59 AM
To: Lonigan, Susan M (Efdlant); Jankowski, Ed (CNER)
Cc: Cooper, Ruth CAPT (NSNPT 00); Lafollette, Paula L (EFANE); Smith, Donna H. (EFDLANT); Noce, Susan J (EFANE); Bates, Betty L. (EFDLANT); Newport FH
Subject: RE: Estimate OF HOURS AND COSTS FOR PILOT

Susan / Ed,

After discussing the issue of instituting a Property Managerment Pilot Study at Naval Station Newport with the Naval Station Commanding Officer, Navy Region Northeast elects to defer any action at the present time. Upon reviewing all the various scenarios with regard to creating a more efficient organization, we are unsure what direction the SIPB and Navy Housing is heading when considering the various challenges of functionality assessements, A-76, or property management and will wait for additional direction from our Navy leadership.

We still are favorably impressed with the possible opportunities that





PLAINTIFF'S EXHIBIT 3.20 3/10/06

a property management contract might offer, but think any decision to proceed at this time would be premature.

Therefore, request you stop all actions to include Naval Station Newpo rt in any ongoing property management pilot studies.

Alan Shannon
Deputy
Community Support Programs
1A Simonpietri Drive
Naval Station
Newport, RI 02841

DSN: 948-6974
COM: 401-841-6974
FAX: 401-841-6973

-----Original Message-----
From: Jankowski, Edward GS (NSNPT N72)
Sent: Tuesday, August 14, 2001 2:40 PM
To: 'Lonigan, Susan M (Efdlant)'; Jankowski, Edward GS (NSNPT N72); Sh annon, Al GS (NSNPT)
Cc: Lafollette, Paula L (EFANE); Smith, Donna H. (EFDLANT); Noce, Susa n J (EFANE); Bates, Betty L. (EFDLANT)
Subject: RE: Estimate OF HOURS AND COSTS FOR PILOT

Al,

FYI and request that you respond to inquiry.

R/ Ed

-----Original Message-----
From: Lonigan, Susan M (Efdlant) [mailto:LoniganSM@efdlant.navfac.navy .mil]
Sent: Tuesday, August 14, 2001 2:03 PM
To: Jankowski, Ed (CNER)
Cc: Lafollette, Paula L (EFANE); Smith, Donna H. (EFDLANT); Noce, Susa n J (EFANE); Bates, Betty L. (EFDLANT)
Subject: RE: Estimate OF HOURS AND COSTS FOR PILOT

Ed,

I understood that CAPT Cooper would be providing LANTDIV approval to p roceed with the property pilot for Newport sometime this month. Can y

ou tell us if she is still considering this option? and, if so, when w
e might receive the "go ahead?"

Thanks.

Sue

Susan M. Lonigan
Family Housing Programs
LANTNAVFACENGCOM
(757) 322-4547, DSN 262
FAX (757)322-4578, DSN 262
Visit www.housing.navy.mil for P-930, change 13

-----Original Message-----
From: Lonigan, Susan M (Efdlant)
Sent: Thursday, July 05, 2001 2:12 PM
To: Jankowski, Ed (CNER); Shannon, Alan (CNRNE)
Cc: Lafollette, Paula L (EFANE); Smith, Donna H. (EFDLANT); Noce, Susa
n J (EFANE)
Subject: RE: Estimate OF HOURS AND COSTS FOR PILOT

Ed, Al,

I wanted to assure you that, even though the dollars provided to contr
acting were labeled Newport, the funds were requested to allow contrac
ts to continue support of the pilot and to prepare for an undertaking
the size of that which would be required in Newport. Much of the effo
rt on the updating of the scope of the property management contract ha
s the potential of benefiting Newport but there are several activities
, both on the East Coast and elsewhere, where the Property Management
initiative may succeed. Before any future contracts are advertised, t
he scope used in Portsmouth needs to fine-tuned to incorporate "lesson
s learned" and expanded to include functions required of larger proper
ty inventories, on-base, off-base, possible F&GOQ management, etc.

I apologize for any misunderstanding. Please call if you have any que
stions.

Sue

Susan M. Lonigan
Family Housing Programs
LANTNAVFACENGCOM

(757) 322-4547, DSN 262
FAX (757)322-4578, DSN 262
Visit www.housing.navy.mil for P-930, change 13

-----Original Message-----
From: Jankowski, Edward
Sent: Thursday, July 05, 2001 11:07 AM
To: Smith, Donna H. (EFDLANT); Jankowski, Ed (CNER); Shannon, Alan (CNRNE); Lonigan, Susan M (Efdlant)
Cc: Lafollette, Paula L (EFANE)
Subject: RE: Estimate OF HOURS AND COSTS FOR PILOT
Importance: High

Al,

As you can see from the e-mails below, NAVFAC has provided FY01, BP11 funds to initiate the development of the Property Management Pilot Contract for NAVSTA Newport.

I told Donna Smith this morning to Tag this action, and to NOT PROCEED until they (LANTDIV) got the approval to proceed from Captain Cooper or yourself.

To my knowledge a final decision had not been rendered regarding this action for NAVSTA Newport. Correct??

R/ Ed

-----Original Message-----
From: Smith, Donna H. (EFDLANT) [mailto:SmithDH@efdlant.navfac.navy.mil]
Sent: Thursday, July 05, 2001 9:51 AM
To: Jankowski, Ed (CNER)
Subject: FW: Estimate OF HOURS AND COSTS FOR PILOT

Ed

NAVFAC has given us the funds for the Property Pilot Management for Newport. Our contracts office has been given the information to process an OA in FIS. My POC is Karen Freeman at DSN 262-4085.

V/R
Donna

> -----Original Message-----

RE Estimate OF HOURS AND COSTS FOR PILOT

> From: Hubner, Jana L. (EFDLANT)
> Sent: Wednesday, May 23, 2001 1:05 PM
> To: Smith, Donna H. (EFDLANT); Lonigan, Susan M (Efdlant)
> Subject: FW: EeSTIMATE OF HOURS AND COSTS FOR PILOT
>
>
>
> -----Original Message-----
> From: Mravinec, Ronald H (NAVFACHQ)
> Sent: Wednesday, May 23, 2001 12:51 PM
> To: Smith, Lisa R (NAVFACHQ); Clemons, Sylvia B. (EFDLANT)
> Cc: Bergo, Alan R (NAVFACHQ); Pearson, William J (NAVFACHQ); Hubne
r,
> Jana L. (EFDLANT); Colyn, Jane M (NAVFACHQ); Annunziata, Frank A.
> (EFDLANT); Vasquez, Fred G (NAVFACHQ)
> Subject: RE: EeSTIMATE OF HOURS AND COSTS FOR PILOT
>
> The following has been entered in FIS:
> 1717035.2514/18825/445/($25,535.00)
> 1717035.2514/11805/106525/$25,535.00
>
> -----Original Message-----
> From: Colyn, Jane M (NAVFACHQ)
> Sent: Wednesday, May 23, 2001 9:34 AM
> To: Mravinec, Ronald H (NAVFACHQ)
> Cc: Bergo, Alan R (NAVFACHQ); Pearson, William J (NAVFACHQ); Hubne
r,
> Jana L. (EFDLANT)
> Subject: FW: EeSTIMATE OF HOURS AND COSTS FOR PILOT
>
> Ron,
>
> Please transfer FY01 FHN O&M funds from HQs BP18 to LANTDIV BP11 in
> the amount of $25,535.00 to support the Property Management pilot at

> Newport.
>
> Thank you.
> Jane
>
> -----Original Message-----
> From: Pearson, William J (NAVFACHQ)
> Sent: Wednesday, May 23, 2001 7:18 AM
> To: Bergo, Alan R (NAVFACHQ)
> Cc: Colyn, Jane M (NAVFACHQ); Pearson, William J (NAVFACHQ)
> Subject: FW: EeSTIMATE OF HOURS AND COSTS FOR PILOT
>
> Alan,

RE Estimate OF HOURS AND COSTS FOR PILOT

>
> Per our earlier discussion, please send $25,535.00 to
LANTDIV to
> support second pilot at Newport. These funds will pay for the LANTD
IV
> acquisition support.
> Please cc me and Jana on the correspondence.
>
> Thanks, Bill
>
>
> -----Original Message-----
> From: Hubner, Jana L. (EFDLANT)
> Sent: Tuesday, May 22, 2001 3:33 PM
> To: Pearson, William J (NAVFACHQ)
> Subject: RE: EeSTIMATE OF HOURS AND COSTS FOR PILOT
>
> Bill,
>
> As I sent you the other email, I came across this one. You need to
> send us the funds in BP 11 and we will send to contracts. thks, Jan
a
>
> -----Original Message-----
> From: Pearson, William J (NAVFACHQ)
> Sent: Tuesday, May 15, 2001 2:30 PM
> To: Hubner, Jana L. (EFDLANT)
> Cc: Bates, Betty L. (EFDLANT); Fetterly, Barbara J.
> (EFDLANT); Colyn, Jane M (NAVFACHQ)
> Subject: RE: EeSTIMATE OF HOURS AND COSTS FOR PILOT
>
> Jana,
>
> We will fund the requirement from HQs. What do we need to do
?
>
> R/ Bill
>
>
> -----Original Message-----
> From: Hubner, Jana L. (EFDLANT)
> Sent: Wednesday, May 09, 2001 6:25 PM
> To: Pearson, William J (NAVFACHQ)
> Cc: Bates, Betty L. (EFDLANT); Fetterly, Barbara J
.
> (EFDLANT)
> Subject: FW: EeSTIMATE OF HOURS AND COSTS FOR
> PILOT
>

RE Estimate OF HOURS AND COSTS FOR PILOT

> Bill,
>
> Since the Prop Pilot is a pilot for the entire Navy, can NAVFAC fund the contract support requested by Dave? R/Jana
>
> -----Original Message-----
> From: Lamoureux, Dave A. (EFDLANT)
> Sent: Wednesday, May 09, 2001 2:21 PM
> To: Hubner, Jana L. (EFDLANT)
> Cc: Baronner, Dawn C. (EFDLANT)
> Subject: EeSTIMATE OF HOURS AND COSTS FOR PILOT
>
> FY 01
> I received the burden rate from Karen Freeman and I added in time for Janice's likely role as SSA or SSB Chair. I apportioned the hours at 70% for me, 20% for Janice, and 10% for you
>
> The weighted, burdened, composite rate for this effort for FY-01 is $43.07 X 500 hours = $21,535.00 + $4,000.00 for trips from your estimate (below) = $25,535.00