(COMMENCED AT 11:00 A.M.)

CHARLES SILVIA,

Having been first duly sworn, testified as followed:

DIRECT EXAMINATION BY MR. HOOK

Q Mr. Silvia, my name is Joe Hook, and I represent Alan Bradley in the matter of Alan Bradley Versus Gordon R. England, and I'm going to show you a document which is a subpoena, and I'm going to ask you whether you received a copy of that subpoena, and are you here in pursuant to that subpoena?

A Yes.

MR. HOOK: I would mark that as Plaintiff's 1.

(PLAINTIFF'S EXHIBIT NO. 1 MARKED FOR IDENTIFICATION)

Q Mr. Silvia, were you formally employed by the U.S. Department of the Navy?

A Correct.

Q When did you commence working at the Department of the Navy?

A Um, I want to say it was in '67, I believe. No. I'm sorry. That's way too early. '87.

Q 1987?

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

```
**********************************
ALAN BRADLEY                     *
                                 *
        Vs.                      * C.A. NO. 04-412ML
                                 *
GORDON R. ENGLAND in his capacity*
as Secretary of the Department of*
the United States Navy           *
**********************************
```

DEPOSITION OF CHARLES SILVIA, a Witness in the above-entitled cause, taken On behalf of the Plaintiff, pursuant to Notice, before Linda J. Faria, a Notary Public in and for the State of Rhode Island, at the office of Joseph F. Hook, Esq., 294 Valley Road, Middletown, Rhode Island On January 5, 2006 at 11:00 a.m.

APPEARANCES:

FOR THE PLAINTIFF:
BY: Joseph F. Hook, Esq.

FOR THE DEFENDANT:
UNITED STATES ATTORNEY OFFICE
BY: Lisa Dinerman, Esq.

ORIGINAL

A I don't have a degree.
Q How many years did you attend college for, sir?
A Oh, approximately, two to two and a half.
Q Where did you attend college?
A Rhode Island College. I did several courses at URI.
Q Are you familiar with Alan Bradley?
A Yes.
Q In fact, you were his supervisor during some period of time while you worked at the Navy?
A Actually, we worked together for -- and I was trying to think this morning. I think it's very close to 25 years we worked together.
Q Now, sir, have you recently retired from the Navy?
A Yes.
Q When did you retire?
A March 10, 2003? No. 2004.
Q Now, you were initially a plumber pipefitter in the Public Works Department. Did there come a time where you became employed under the Housing Department at the Navy?
A Yes. I applied for a job there and became a

Housing Manager.
Q A Housing Manager?
A Yes.
Q What grade was that?
A That was a GS-5.
Q When did you apply for that job and obtain that job?
A I can't honestly say. I certainly have those records. If I knew you were looking for that, I certainly could have supplied them.
Q For, approximately, how many years did you work as a pipefitter before obtaining the Housing Manager job for the department of the Navy?
A Approximately, two years.
Q And from that position of Housing Manager within the Housing Department, did you ultimately become a Housing supervisor?
A Yes, I ended up retiring as the Housing director.
Q How many years were you a Housing manager for, approximately?
A Twenty.
THE WITNESS: Can I just question something? You're asking me these dates, and I'm

If I did, then certainly I could give you accurate dates, but I'm uncomfortable answering anything regarding when I started, when I was promoted, and so on and so forth.

Q All right, sir. After you were a Housing manager, you were a GS-5 Housing manager, what was the next position that you took within the department of the Navy?

A GS-7 Housing manager.

Q How did that position differ from the GS-5 Housing manager?

A A little more responsibility, but I was not in the supervisory position at that time.

Q The GS-7 Housing manager position was not supervisory?

A That's correct.

Q For, approximately, how long did you hold that position for, sir?

A I don't recall.

Q Do you recall when you became a supervisor within the Housing Department?

A When I became a GS-9, but I can't give you that date.

Q Do you know, approximately, sir?

answer.

A I didn't participate in the resolution of it whatsoever. I have no authority to resolve a complaint like that.

Q Now, Mr. Bradley in the early 1990s worked as a Housing manager within the Housing Department?

A I'm not aware of that.

Q And then in the mid 1990s, are you aware that his job within the Housing Management Department was transferred to the position of a Supply Tech?

A Yes.

Q He was transferred from a GS-5 Housing manager to a GS-6 Supply Tech?

A Correct. I do recall that.

Q You do recall that?

A Yes.

Q Do you recall participating in the transfer of his job from a GS-5 Housing manager to a GS-6 Supply Tech?

MS. DINERMAN: Objection.

THE WITNESS: I'm not sure what you just asked me.

MR. HOOK: Can you read the question back.

(Pending question read back.)

THE WITNESS: And I guess my concern is, I'm not sure what you mean regarding participation.

Q Were you involved, consulted? Did you make recommendations?

A Yes.

Q What specifically did you do, sir?

A Again, I'm really having a hard time to give you specifics. I remember writing up the proposed job description. Whether they took my recommendations or not, I don't recall, and that's about the extent of it.

Q So you wrote up the proposed job description of Supply Tech?

A Yes. Can I just explain myself where I'm having problems here? That was a good many years ago, and for me to specifically say what I did and what I didn't do is really difficult. I'm really having a hard time doing that. You know, if we were sitting here talking back and forth, I could probably give you details of what I did and what I didn't do; but where I'm under oath, I'm not sure that I could give you specific details and be correct in every one

position of Housing manager required the incumbent to possess a driver's license?

A No, I'm not saying that.

Q Do you recall --

THE WITNESS: Can I explain that?

MR. HOOK: Sure.

THE WITNESS: Um, when I was the Housing director, my employer made it quite clear to me that Mr. Bradley did not need a driver's license to become a Housing manager.

Q Who made that clear to you?

A Captain Ruth Cooper. That we certainly could find ways to supply transportation.

Q All right. Now, back in 1999, before Captain Cooper was your boss --

A Yup.

Q -- did anyone, your superiors make it clear to you that the position of Housing manager did not require a driver's license?

A No.

Q Do you recall Alan Bradley having an accident on the base while he was driving?

A Yes.

Q And did that accident concern you in terms

Housing manager? Yes, I recall.

Q All right. And in 2001, at or about the time that you took the position of Housing director --

A Mm-hmm.

Q -- there were two retirements?

A Mm-hmm.

Q And who retired, do you recall?

A I believe it was Tom Wilson and Robert Correale.

Q And as a result of their retirement, there were a couple of vacancies within the Housing Department --

A Correct.

Q -- for Housing managers?

A Correct.

Q And you requested that an advertising go out to fill those positions, do you recall that?

A Yes.

Q And an advertisement did go out to fill those positions, and it was done on a GS-7, GS-9 basis?

A I don't recall that. But I recall the positions being posted, yes.

Q And after those positions were advertised, do you recall having some discussions with Captain Ruth Cooper concerning the possibility of Alan Bradley filling one of those positions?

A Yes.

Q And the possibility of certain accommodations being made --

A Yes.

Q -- that would allow Alan Bradley to fulfill the duties of Housing manager?

A Correct.

Q And one of those was the possibility that he use a golf cart?

A No, I don't recall that. I recall us placing him in an area where he could go from one place to another possibly walking, but I don't recall a golf cart per se.

Q What place was that?

A In the Greene Lane area at that time the majority of our housing was.

Q And if he worked in the Greene Lane as a Housing manager, would he be required to drive? Could he fulfil substantially all the essential duties of the job without driving?

A I think he could. My opinion would be, yes.
Q Now, do you recall meeting with Captain Cooper and Alan Shannon and Janet Hiebner in June of 2001, shortly after you were hired?
A Mm-hmm. Yes.
THE WITNESS: Could I ask for a break and take you up on that offer of some water?
MR. HOOK: Yes. No problem.
THE WITNESS: Thank you.
MR. HOOK: I'm going to give you a chance to look at the affidavit. You can mark that as Plaintiff's 3.
(PLAINTIFF'S EXHIBIT NO. 3 MARKED FOR IDENTIFICATION)
Q Mr. Silvia, do you recall meeting with Captain Cooper, Alan Shannon and Janet Hiebner in a meeting in the summer of 2001, or June of 2001, concerning the cancellation of the Housing manager vacancy or job openings?
A I recall a meeting taking place. I don't recall all those people being there. I don't believe that Alan Shannon was there, but that's just my recollection.
Q Who was there?

A I believe it was Captain Cooper, Janet Hiebner and myself.

Q Was anybody else there at that meeting?

A I think I recall A.J. Jankowski being there.

Q At that time, did you decide to cancel the vacant Housing manager positions?

A I'm not sure I would agree with that.

Q Do you recall the Housing manager positions that were open, the two open positions being cancelled at that time?

A Absolutely, and I remember canceling them. I just don't agree that it was my decision.

Q Do you have a recollection as to why those Housing manager positions were cancelled at that time?

A To the best of my recollection was that the Northern Division who we work for and the Northeast region was directing Naval Station of Newport to go into a property management arrangement which would require an outside developer to come in and take over the management of all the Navy housing in the Newport area.

Q So is that a study, a property management study or --

A No. It was a strong suggestion that was being made to the Command to do that.
Q There was a strong suggestion to the Command that you undergo a property management study?
A Yes. Specifically, it was either going to be that or they were going to be contracted out within the next six months anyway is what we were told by Janet Hiebner, as I recall.
Q Or the jobs would be contracted out?
A Or the jobs would be contracted out totally, yes.
Q But, at that time, there was no hiring freeze on the 1173 Housing manager positions?
A I don't recall. There couldn't have been if the jobs were posted.
MR. HOOK: Can I take a look at that affidavit, sir?
THE WITNESS: Yes.
Q Mr. Silvia, the affidavit that's been marked as Plaintiff's Exhibit 3, is that an affidavit that you signed in the course of an EEO complaint investigation concerning Alan Bradley?
A Yes.
Q And the information that you submitted at

two permanent positions that were open?
A Yes.
Q So at the time that you made the decision when you felt as though you were in a lose/lose situation --
A Yes.
Q -- you were considering either hiring a permanent employee or contracting out the position? Those were the facts at the time?
THE WITNESS: Would you mind -- I don't think I understand that question.
MR. HOOK: Can you read the question back.
(Question read back)
THE WITNESS: Can I just clarify my recollection of the situation?
MR. HOOK: Sure.
THE WITNESS: The intent was to hire two new employees. That's what we were going to do. In the process of hiring those two employees, we were directed that we would have to hire temporary employees or something to that effect; that we would not be able to hire full-time employees because of the mandates that they were placing on us regarding

property management. Does that make any sense?

Q So, is it your testimony that you were directed, that it was a direction by higher ups that you could not fill those positions at that time in June of 2001? You could fill them with temporary employees or you could fill them with contractors?

A That's not a yes. That's a hell yes.

Q And who made that direction?

A I think a strong suggestion was made by Janet Hiebner who almost gave us an ultimatum; either you do this or you're not going to have any money in our budget to do anything else the following year. They were the ones who funded our budget out of Northern Division, not the Naval base per se.

Q All right. So at that time, you had the -- according to your testimony, your choices were to fill the positions either with temporary employees or with contractors?

A No.

Q Okay. What was --

A Temporary employees would have been a contractor coming in and hiring them as a temporary.

Q Sir, I don't understand the choice that you were referring to in your affidavit that you refer to

on Page 157 and 158?

A I thought I responded by saying it really doesn't make any sense. I don't know why I would state that. It doesn't make any sense to me now.

Q Well --

A You know, our concern about hiring a temporary employee would have nothing to do with the people presently working there; so that's why this doesn't make any sense to me now.

Q All right. Did you consider hiring Alan Bradley to fill that position temporarily at that time?

A No, I couldn't because he wasn't working for me at the time.

Q Did you have any conversations with Captain Cooper about hiring Alan Bradley for the position of Housing manager temporarily?

A No, I don't recall that I did.

Q Now, the position of Housing manager was in the 1173 series; is that correct, sir?

A Correct.

Q Was the position of housing, GS-11 Housing manager supervisor in the 1173 series?

A Yes.

Q Was the position of Referral clerk in the Housing Management Department within the 1173 series?

A I don't believe so.

MR. HOOK: All right. Sir, I'm going to have you take a look at a document, and we'll mark it as Plaintiff's 4.

MS. DINERMAN: May I see it, please?

(PLAINTIFF'S EXHIBIT NO. 4 MARKED FOR IDENTIFICATION)

Q Now, that's a memorandum. What's been marked as Plaintiff's 4 is a memorandum that you wrote, correct, sir?

A Yes.

Q And it concerned the meeting that took place in June of 2001, with Captain Cooper and Janet Hiebner?

A No, I don't believe so. What this is, this was a situation report that we used to submit every Wednesday morning to the Captain at the Department Heads' meeting. The Department Heads would be in supply, the recreation, Welfare recreation, public works, different branches that were Department Heads at the Naval Station, and this is a memorandum informing everyone of what we would speak to at that

particular time.

Q Can I take a look at that memorandum, sir? What's been marked as Plaintiff's 4 is a memorandum that you prepared for the week ending June 15, 2001?

A Correct.

Q And in this memorandum, you wrote that HRO Philadelphia is currently qualifying in rating 17 applicants for the GS-11 Housing manager supervisor position, correct?

A Mm-hmm.

Q You also wrote that the secretary position was filled on July 1?

A Yes.

Q And you also wrote that we are preparing the necessary paperwork to contract three temporary Housing manager assistants and a Referral clerk to fill the vacant positions created from a recent retirement?

A Correct.

Q And that was -- what you were essentially doing was referring to filling the positions that you had cancelled from your meeting -- well, the positions that you understand were to be cancelled after your meeting with Captain Cooper and

to the barracks; one of them pertained to our housing office, but the Assistant Director's job was never filled in our housing office; so if it was pertaining to the other position, it's very possible that one of those 17 people could have been from our organization applying for it or vice versa. It could have been the job that I was looking for, but it was never filled.

Q Well, at that time, you were -- in June of 2001, you were the Housing director at that time?

A Correct.

Q And did you hire a Mr. Murphy to be a Housing supervisor?

A Yes.

Q And that was done subsequent to June -- subsequent to your June meeting with Janet Hiebner and Captain Cooper?

A You may be right. I don't recall. Now that you're saying that, it's a very strong possibility that's what it was, yes.

I'm uncomfortable with me responding to anything else. You're questioning me about do I recall this, and I think I should say from now on, no, I don't recall it, and you can tell me what it is, and then

it does refresh my memory. Its been awhile, and quite frankly, I've almost been retired for two years, and I kind of put this all behind me. I know that doesn't sound very complimentary to Alan in his particular suit, but that's the truth.

Q All right. Sir, would there be any -- I mean, if you were looking to -- if you were concerned about employees within the organization getting potentially wiped out by a Veteran, if there were new hires in the 1173 series in Housing and you're seeking to -- were you seeking to keep the employee that you had and not take on any additional employees because there could be a potential rift where people would be bumped?

A You're asking me what my feeling was?

Q What your concerns were at that time in 2001?

A I don't recall.

Q All right. Would there be any reason to hire, if you're seeking to protect the employees that you had to hire another person to fill a Housing supervisor position notwithstanding a potential rift that was out there?

MS. DINERMAN: Objection.

Kelly Hiberits from the Human Resource office in Groton concerning a complaint of employment discrimination that Alan made in the summer of 2001?

A I do not recall that.

Q Do you recall stating to Kelly Hiberits that you fully intended to hire Alan to the position of Housing manager prior to the positions being cancelled?

A I do not recall that.

Q You have no recollection of that, sir?

A That's correct. I do not recall that.

Q And you have no reason to question what's contained in that report is true?

A Absolutely not, but I do not recall it.

Q Now, those vacant positions in the summer of 2001, the vacant Housing manager positions, did you in fact fill them with outside contractors?

A Correct.

Q Who did you hire to fill those positions?

A I do not recall.

Q You don't recall any of the person's names?

A No.

Q Do you know how many people were hired? Was it less than five?