A Regarding the -- if you could clarify. We had two, and then it built up to three positions; and, yeah, there was more than one person there and then left. If you're looking for actual numbers to fill those three positions, I don't recall, no.

Q How many positions were filled by contractors?

A At least three that I recall.

Q And while you were director, the Housing director, --

A Mm-hmm.

Q -- were those positions filled by temporary outside contractors during the entire time that you remained as Housing director until your retirement?

A I believe so.

Q Do you remember a Mr. Fencesca (phonetic) filling one of the positions as Housing manager as a contractor?

A I remember the name, yes.

Q All right. And did he remain on as a -- do you remember when he was hired?

A No.

Q Was it shortly after you became Director of Housing?

contractors?
A Correct.
Q And one of those was Mr. Kevin Fencesca?
A May be.
Q All right. And do you recall how long he lasted in the position?
A You know, I don't. They were working for someone else. They weren't working directly for me; so I don't recall, no.
Q Who were they working for?
A I think they were working for Bill Murphy at the time. He was the Housing manager supervisor.
Q Did you ever have any conversations with Mr. Bill Murphy about the possibility of hiring Alan Bradley in the Housing Department?
A I recall having conversations. I don't recall specifically what it was about, no.
Q Well, you worked with Bill Murphy, correct?
A Yes.
Q He was the Housing manager supervisor?
A Yes.
Q And you were the director, and he was a supervisor?
A Yes, he worked for me.

Q And during the course of your -- while you worked together, you obviously had conversations?

A Oh, sure.

Q So is it your testimony, you don't recall ever having a conversation with him concerning hiring Alan Bradley?

A What I'm saying is that I'm sure we must have had conversations, but I don't recall what the conversations involved. Let me just try to clarify. I'm sure we had conversations about Alan in working as a Housing manager because at the time the jobs were open, Captain Cooper made it quite clear that we were going to do that, and we were going to do our very best to compensate anything that we had to.

Q All right. So at that time, it was before the positions were cancelled, Captain Cooper had made it clear to you that she was going to do the best she could to make it so that Alan could fill one of those positions?

A I think I can be specific in saying that she told me that she made a commitment to Alan that she would do everything in her power to possibly get him a Housing manager's job. That's what I recall.

Q Was there any reason at that time that you

would not have wanted to hire Alan within the Housing Department not withstanding Captain Cooper's commitment was to Alan?
A I don't recall one.
Q Did you indicate or state to Captain Cooper that you didn't want to hire Alan?
A Not that I recall.
Q Did you tell anybody else at that time between -- well, between the time you became Housing director in 2001, until you retired, did you tell anybody that you worked with that you did not want to hire Alan as a Housing manager?
A Not that I recall.
Q Now, you recall that Laurie Bowers worked for you as a Housing manager?
A Correct.
Q And she took another position somewhere else within the department in the Navy during your tenure as Housing director?
A Correct.
Q And she was a Housing manager?
A Correct.
Q And when her position became vacant, you filled that position with Victor Ramsey, correct?

A That's incorrect.

Q What did you do to fill that position?

A I believe that I had Victor Ramsey fill that job temporarily because he was an employee of mine working in the department.

Q So after Laurie Bowers left that position, --

A Yes.

Q -- Victor Ramsey worked within the Housing, Department --

A Correct.

Q -- underneath you?

A Everyone did, yes.

Q And instead of advertising that position, you reassigned Mr. Victor Ramsey into that position as Housing manager?

A Yes. I'm trying to recall why we didn't advertise it, and I can't remember.

MR. HOOK: I'm going to have you take a look at this document, sir.

THE WITNESS: Sure.

(Witness perusing document)

MR. HOOK: If you could mark this Plaintiff's 6.

Q Do you know whether at the time that he -- at the time that you retired and before then, what duties Victor Ramsey was performing?

A He was performing some contractual duties, contracting inspector duties, more or less working for Mark Silvia out in the Contracts Division at that time.

Q After the 190 day assignment to the Greene Lane Housing manager project, did Victor Ramsey continue to fill that position or did that position --

A He went back to doing his job as the contract specialist or whatever it was out there. He and Mark Silvia worked out there together.

Q What happened to the position that Laurie Bowers vacated?

A One of the big problems that we always had in Housing is that the summer months are always the busiest where people come and go so much so the May, June, July time frame would have been the most difficult for us. I don't believe that the job was ever filled, but that's my recollection. I may be incorrect. I just don't think it was.

Q Did you make a request -- if you were going

to fill a position, who would you contact to request that the position be filled or advertised so that it will be filled?

MS. DINERMAN: Objection. When I say objection, it's just for the record. I can't tell you not to answer a question.

THE WITNESS: Oh, I see.

A It was a whole process you had to go through. Do you want me to go through that process?

Q Yes, sir.

A Okay. The best that I recall, the job had to be verified, and the job description had to be verified by the Northeast Region. And after they okayed it, then it would come back to Naval Station Newport, and then if the CO agreed with it, then it could go to the Housing referral. Not the Housing referral. What am I looking for. It's right on the tip of my tongue. Where you hire people. The, um, the personnel office. It shouldn't have been that hard. You send it over to the personnel office, and then they would put it on a list of jobs to be checked to see if there was anyone in a status to fill that job even before it went out to advertising. The reassignment jobs for the country or the East

Coast or whatever. And after that was satisfied, then they would send it to Philadelphia who would then post the job.

Q All right. So before it was announced, before a job would be announced, it would have gone through that process?

A Basically, that was the process, yes.

Q So after Mr. Ramsey left his job, do you recall taking any action -- or strike that. After Victor Ramsey fulfilled the 180 days as a Greene Lane Housing manager and that position again became vacant, did you take any steps to have that job filled permanently?

A I don't recall. My best recollection is no, but I really don't recall.

Q Do you know who Dennis Pichelo (phonetic) is?

A Yes.

Q Who is he?

A He was the person in charge of the personnel office in the Newport detachment.

Q And would he be the person who would send out the job advertisements after the process you had just mentioned had gone through?

A His office would, yes.
Q And his office would only do that after at least receiving a request to fill a position from the Housing Department in Newport?
A Correct.
Q Do you recall a Housing management position being advertised or listed in November of 2002, and then immediately cancelled?
A I don't recall that, no.
Q You don't have any recollection of taking any action to fill a position in November of 2002 of Housing manager?
A I don't recall, no.
Q While you were Housing director, what was the position that Ed Jankowski held?
A He would have been -- wait. I don't know.
Q In the summer of 2001, after you received your position of Housing director, do you know what position Ed Jankowski held?
A No.
Q Did you have contact with Ed Jankowski in the performance of your duties?
A Yes, every day.
Q Every day?

A He was the director of, and I'm trying to think of the correct name for it, but it was something, Quality of Life Manager which included NWR housing, BLQ's, several different areas that were life issues regarding Navy.

Q Was he one of your superiors?

A Yes. The reason I hesitated, he had little contact, but he did my evaluation; so, yes, he was my superior.

Q Were you aware that there was consideration of a property management pilot study being conducted at the Naval Station in Newport in the summer of 2001?

A Yes.

Q And how did that differ from the hiring of the contractors that you hired to fill the Housing manager positions?

A One was going to be imposed. The property management study was going to be imposed on us by Northern Division. That was the reason that those jobs were cancelled.

Q Were you aware that in August of 2001, Alan Shannon wrote to Susan Longegan, Ed Jankowski and Captain Ruth Cooper that -- hold on, sir. Strike

what I just said. It was Captain Cooper who requested that the Housing go under this property management pilot study?

A I don't believe so.

Q Do you know where that came from?

A I believe it came from Northern Division.

Q Were you aware that Alan Shannon wrote in a memo to Captain Cooper and Ed Jankowski in August of 2001, requesting that Newport be -- requesting that all actions to include Naval Station Newport in any ongoing property management pilot stop?

MS. DINERMAN: Objection.

A I was aware of that. No. No. Let me correct myself. I was aware that it was stopped. Whether I actually saw that memo or not, I can't say.

Q So in the summer of 2001, August of 2001, you became aware that the property management pilot had stopped?

A I don't recall. I know it was stopped. I just don't recall when.

Q Okay. And, at least, if I understand your testimony correctly, and I want to be clear, that property management study, the possibility of Housing going out to contract was one of the reasons not to

fill the Housing management positions in June of 2001?

A Correct.

THE WITNESS: Can I clarify my answer?

MR. HOOK: Yes, sir.

THE WITNESS: We were under the impression, and I say we, myself and Captain Cooper, were under the impression that we had to go under property management. That we didn't have any choice in it. It wasn't until later on that we found out that we did have a choice, and that's when everything started changing. What we were told, and to the best of my recollection, what we were told, is either we go into the property management study or the funds would not be available to pay our management people the following year. Now, that's not a lot of choice. So we just assumed that we had to go in the property management study. When we realized that that wasn't the case or when we found out that that wasn't the case, and I'm not even sure how we found out; but when it was found out that that wasn't the case, that's when we decided that we weren't going to participate. Does that clarify anything?

MR. HOOK: Yes, sir.

a Navy contract. It wasn't something that we put together per se.

Q All right. So you didn't interview the candidates who filled the positions?

A Yes.

Q Oh, you did?

A Yes.

Q So you had -- there would be a pool of candidates that you would meet to fill the positions?

A Yes.

Q And they were individually hired to fill the positions?

A Yes, but they weren't hired by the Housing office per se. There was a contract office down in Philadelphia who hired, who managed these type of employees. And the only reason that I know they existed is the person who worked across the hall from me, Tina Vars was the one who told me about it, she had hired people from the same Government agency. So the Government agency wrote the contract I guess is what I'm saying, and then they hired people who qualified for that contract, and in turn those contractors who qualified for that contract sent people to us to interview.

# AFFIDAVIT

State of Rhode Island
County of Newport

**I, CHARLES R. SILVIA,** *make the following statement under oath or affirmation. Pursuant to Public Law 93-579 (Privacy Act of 1974), as an individual supplying information for inclusion in a system of records, I have been informed of the following:*

*EFFECT OF NONDISCLOSURE: Disclosure of information by me is voluntary, however, I realize my failure to respond could result in a recommended disposition of the case on the basis of information available. Witnesses who are Department of Defense employees may be subject to administrative action for failure to testify.*

*AUTHORITY: The authority to collect the information requested by this interview is derived from one or more of the following: Title 5, Code of Federal Regulations, Sections 5.2 and 5.3: Title 5, United States Code, Sections 1302, 1303, 1304, 3301, and 3302; Executive Order 11478, as amended, Executive Order 10577; and 29 CFR Part 1614.*

*PURPOSE AND SCOPE: The information supplied will be used as part of the record in an equal employment opportunity discrimination complaint or grievance investigation. The record will be furnished to designees of agencies and departments of the Federal Government in order to resolve the complaint or grievance. The record may also be disclosed to any agency of the Federal Government having oversight or review authority with regard to Office of Personnel Management or Department of Defense activities, to the Federal intelligence agencies, or others, as published in the Federal Register.*

I am providing my affidavit in the presence of the agency representative, Mr Robert Knowles.

**Disability:** None.

**Protected Title VII Activity:** I have personally filed an EEO complaint alleging age discrimination.

**Current Position**: Housing Director, Naval Station Housing Office, GS-1173-11. My position was recently downgraded from GS-12 due to Navy wide downgrading of 1173 positions.

**Organization**: Naval Station Newport, Rhode Island

**Inclusive Dates of Current Assignment**: April 2001 to present.

**Prior Position:** Facilities Manager and Supervisor of Housing Managers, GS-1173-11, Naval Station, Newport.



PLAINTIFF'S EXHIBIT NO. 3 FOR IDENTIFICATION 1-15-06 DATE: RPTR:

153

Affiant's Initials CRS

379

**Supervisor**: CAPT Cooper. She delegates some responsibility to Alan Shannon.

Q. Briefly describe your primary duties and responsibilities in your current position.

R. I am responsible for communications, overall budget, care and maintenance of 1435 homes, along with responsibility for referral services to occupants not living in housing.

Q. How many employees do you supervise directly and indirectly?

R. Normally, I supervise seven employees: two supervisors, the referral and assignment people, which consist of five employees. I am missing one supervisor. If that position were filled, I would only supervise three supervisors. I indirectly supervise an organization of approximately 23 employees.

Q. Do you supervise anyone with a claimed disability?

R. Not currently.

Q. What is your work relationship to the Complainant, Mr Alan Bradley?

R. None whatsoever at this point. I previously supervised Mr Bradley for about 8 years when we had the Housing Maintenance Center. I supervised him until about October 2000.

Q. How long have you known with Mr Bradley and in what capacity?

R. About 17 years. He has worked about that long at Newport in various positions.

Q. How often do you currently have direct contact with Mr Bradley?

R. I have not seen him for six to seven months.

Q. When he worked in your organization, how often did you have contact with him?

R. Daily. Our offices were connected.

Q. How would you describe your working relationship with Mr Bradley?

R. Good until the separation of the maintenance and housing organization. At that time, the CO of Public Works decided he didn't want housing to have maintenance, so he moved it back to



Affiant's Initials CLS

Public Works and contracted out all of those positions. Mr Bradley was extremely upset, as did a lot of people in the organization.

Q. Have you ever had any social contact with Mr Bradley outside of work?

R. Not since the separation of housing and maintenance. Prior to that, we went to a Red Sox game now and then, and that sort of thing.

Q. Have you ever had any disagreements or conflicts with Mr Bradley?

R. For the time that we worked together, we had minor disagreements, but no more than other employees.

Q. Mr Bradley claims discrimination based on reprisal. Are you aware that Mr Bradley filed a previous discrimination complaint? If so, when and how did you become aware of the complaint?

R. I am aware that he filed at least two complaints, some of those were when he worked for me.

Q. Were you involved in the issue giving rise to the complaints?

R. He did not make a complaint against me specifically, but I was very involved in the process of the complaint. I was involved in a settlement of a prior complaint he filed, but not the settlement agreement being contested in this complaint.

Q. Are you aware of a complaint settlement that afforded Mr Bradley priority consideration for a Housing Manager position?

R. No.

Q. Did you ever get angry with Mr Bradley for filing a complaint?

R. Absolutely not.

Q. Did you ever suffer any negative employment consequences as a result of Mr Bradley filing his discrimination complaints?

R. No.

Q. Have you ever discussed Mr Bradley's complaints with him?

R. When he worked with me, I discussed a prior complaint with him. I have not had any discussions with him regarding his recent complaints.



Affiant's Initials CA

Q. Have you ever made any negative comments regarding Mr Bradley's complaints?

R. No.

Q. Are you aware that Mr Bradley has a claimed disability?

R. When he first started working for housing several years ago, he indicated he had epilepsy and indicated he had a problem with his hand. I was present five or six times when he had seizures.

Q. What was your involvement in the action to fill the Housing Manager, GS-1173-07/09, position or positions?

R. I was totally responsible for advertising the positions. I was Director at the time. There were two vacancies. We went through the process of announcing the position. I don't think we ever received a referral listing of who was qualified.

Q. What happened that prompted you to cancel the announcement?

R. NAVFAC housing was notified of a functionality assessment that was going to take place. They felt the activity housing offices would be impacted. They gave us several options: privatization of all of housing, going through a contracting assessment, or going through a property management situation, which would eliminate all of the housing manager positions and contract that service out. If we did take the third option, it would eliminate the privatization and CA study. Everyone left in the organization would maintain their jobs. Because we had two Housing Manager positions vacant and a vacant Personal Support Supervisor, GS-1173-11, position, we felt the best alternative was to go with the third option.

Q. Did you find out about the functionality assessment verbally or in writing?

R. CAPT Cooper was notified about it first, and told me what the talk was. I think she found that out at the regional level and informed me of the assessment. I know that CAPT Cooper found out about it prior to June of 2001. The reason I know that was in June 2001, we went through a housing review by NAVFAC LANTDIV (Atlantic Division), and at that time, one of the days was put aside to have contract people come up from the Norfolk to explain the process for contracting out those services. When we were meeting with the people at LANTDIV, the Public Works Director was not aware of what was taking place at that time.

Q. What did you do at that point?

R. On June 21, 2001, I sent to an email to Karen Peckham advising her to cancel the recruitment. CAPT Cooper wanted to inform the local candidates personally what was going on,



Affiant's Initials CD

156

382

so asked for a list of qualified candidates at Naval Station Newport only, and Karen Peckham was able to provide that to us.

I do not know the date, but we had a meeting with the candidates. There were about 10 candidates. CAPT Cooper; the Executive Officer, Commander Cunha; Karen Peckham; James Allen, Union President; and myself attended the meeting. CAPT Cooper began the meeting indicating why we canceled the recruitment and why we thought that was the best thing to do for the organization. She said she did not want to hire someone and then about six months to a year later, do away with the positions where the individual could be out of a job.

Q. Were there any comments from the group?

R. There was a comment from one of the candidates who said Karen Peckham made a commitment to him, and he appeared upset.

Q. Did Mr Bradley make any comments?

R. I think he did, but I do not recall what they were.

Q. During any of the discussions about canceling the recruitment, did CAPT Cooper ever apprise you of the settlement agreement between the agency and Mr Bradley that afforded him priority consideration for the Housing Manager position?

R. I was not informed of the agreement, and I do not know what priority consideration means. I was aware that there was some agreement or discussion about Alan getting the job, but I was never shown the agreement or advised of the specific terms. What I do recall was that CAPT Cooper and I talked about Alan Bradley possibly getting the job and what kind of concessions we would need to make. We also talked about getting him a golf cart for him to commute between houses, specifically the green lane area. That is our biggest housing area. The discussions about Mr Bradley occurred before any knowledge of the functionality study. I think those discussions occurred a couple of days after I got my position as Housing Director, which was towards the end of April 2001.

Q. When you put in the request for recruitment, did Karen Peckham tell you that Mr Bradley was going to be given priority consideration for the position?

R. I don't recall that.

Q. Why couldn't you fill the position either permanently or temporarily?

R. I was very uncomfortable with the decision I was forced to make. I felt an obligation to the people who worked for me to try and protect their positions. However, I also wanted to fill the Housing Manager positions with civil service employees. I felt it was a lose/lose situation.



Affiant's Initials CH

Our concern about hiring an employee temporarily was that someone coming into the organization that has prior military or that has any other benefits might wipe out someone who had been with the organization 10 or 20 years, if we had to do away with personnel. I don't think we had the option of filling the position temporarily.

Q. What is the current status of Housing Manager positions?

R. The final response to the property management was in October 2001, we found out that the FA was taking place, but just at the NAVFAC LANTDIV levels. It did not come down to the local housing authorities. The current rumor is privatizing all of housing in the Northeast. I have not filled the Housing Manager positions internally. I went out and hired outside contractors to fill those positions. The contract will terminate September 30, 2002.

Q. Who has been performing the duties of the position over the past year?

R. Contract employees.

Q. Did you place Victor Ramsey in one of the positions?

R. Recently, we had a Housing Manager receive another job and leave this command. I had Mr Ramsey working in the planning department at the time. He had filled in as a Housing Manager several years ago, so I moved him in to fill the void of her leaving.

Q. What type of personnel action did you take to document the action?

R. I moved him there temporarily. I have not processed any personnel action. I was trying to fill a void during the summer months, which is our busiest time.

Q. Was Mr Bradley's medical condition a factor in your decision to cancel the announcement for the Housing Manager position?

R. Absolutely not.

Q. Were his EEO complaints a factor in your decision?

R. No.

Q. Do you have anything further to add at this time?

R. The sole reason we canceled the announcement was the strong possibility that the housing manager positions would be contracted out. We have not taken any action to fill those positions permanently at this time. The Portsmouth Naval Shipyard Housing Office has done exactly what



Affiant's Initials ______

they were proposing for us to do. They have actually abolished the housing manager positions permanently filled their jobs by contract.

*END OF STATEMENT*

*I have been afforded the opportunity to provide information relevant to the issues. I have nothing further to add to my affidavit.*

*I have read the above statement consisting of _7_ pages and it is true and complete to the best of my knowledge and belief. I understand that the information I have given is not considered confidential and that it may be shown to the interested parties.*

Subscribed and sworn before me
at: Naval Station Newport, Rhode Island,
on this 16th day of August 2002.

**TERRY CALCUTT**
Investigator

**CHARLES SILVIA**
Affiant



Affiant's Initials CS

From: HOUSING DEPARTMENT HEAD

Subj: SITREP FOR THE WEEK ENDING 15 JUNE 2001

STAFFING:

1. HRO Philadelphia is currently qualifying and rating 17 applicants for the GS-11 Housing Managers Supervisor position.
2. Secretary position was filled 1 July.
3. We are preparing the necessary paperwork to contract 3 temporary Housing Manager Assistants and a Referral Clerk to fill the vacant positions created from recent retirements.
4. The Personnel Support Supervisor position description is pending approval at the North East Region level.

FUNDING: None.

PROGRAMS:

1. Received final Housing Management and Staffing Review report last week. We are currently preparing a response to meet the 30 days requirement.

FACILITY:

1. Reviewing site plans for CHI, Cloyne Court and Melville with the Captain Cooper Friday morning.

REGIONAL: None.

LOCAL:

1. Caption Cooper, The Union President and I are meeting Tuesday, July 10, 2001 with the 7 Naval Station Employees that applied for the canceled GS-7/9 Housing Managers positions.

PERSONAL:

2. I will be on travel Wednesday with the Housing Director from Northern Division, visiting another regional Housing Office.

Charles R. Silvia
Family Housing Department Head
Naval Station Newport
Building #690
Newport, Rhode Island 02841-1620
Voice (401) 841-4209
Fax (401) 841-7138
Email silviac@nsnpt.navy.mil



PENGAD-Bayonne, N. J. PLAINTIFF'S EXHIBIT NO. 4 FOR IDENTIFICATION DATE: 1-15-06 RPTR: [initials]

**Bradley, Alan GS (NSNPT 43A1)**

**From:**
**Sent:**
**To:**
**Subject:** FW: SITREP FOR THE WEEK ENDING 31 MAY 2002

-----Original Message-----
**From:** Silvia, Charles GS (NSNPT 90)
**Sent:** Tuesday, May 28, 2002 1:44 PM
**To:** Cooper, Ruth CAPT (NSNPT 00)
**Cc:** Shannon, Al GS (NSNPT N7); Jankowski, Edward GS (NSNPT N72); Cunha, Jim CDR (NSNPT 01); DLNSNPTDH - DEPT HEADS; DLNSNPTHSG - HOUSING-Code(90)
**Subject:** SITREP FOR THE WEEK ENDING 31 MAY 2002

Subject: **SITREP FOR THE WEEK ENDING 31 MAY 2002**

**FROM:** **HOUSING DEPARTMENT HEAD**

**SUBJECT:** **SITREP FOR THE WEEK ENDING MAY 31, 2002**

**STAFFING:** Vic Ramsey will be temporarily assigned as the Greene Lane Housing Project Manager for 190 days starting 1 June 2002. As Vic is part of the Housing Department, we are able to transfer him without crossing Department or Regional boundaries.

**FUNDING:** NONE

**PROGRAMS:** NONE

**FACILITY:** 1. The Joppa grounds contract is being modified to include maintaining the grass within the two fenced construction areas in Greene Lane. Grass will be maintained between 4 and 12 inches.

2. Brush clearing was completed in Rainbow Heights and the contractor is currently cleaning the area and preparing the area for grading and seeding.

3. Asbestos ceiling replacement has been completed on the first group of units in Fort Adams and the contractor have demobilized until more units vacate after the June War College Graduation.

**REGIONAL:** NONE

**LOCAL:** NONE

PLAINTIFF'S EXHIBIT NO. 6 FOR IDENTIFICATION DATE: 1-15-06 RPTR: [illegible]
PENGAD-Bayonne, N. J.