UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

ALAN BRADLEY
Plaintiff

v.

CA. NO. 04-412ML

GORDON R. ENGLAND in his capacity as Secretary of the Department of the United States Navy
Defendant

**DEPOSITION OF WILLIAM MURPHY**, taken on behalf of the Plaintiff, pursuant to the Rhode Island Rules of Civil Procedure, on Friday, March 10, 2006, at the Law Offices of Joseph F. Hook, before Florence Almeida, Notary Public, convening at 10:00 A.M.

**APPEARANCES**:

LAW OFFICES OF JOSEPH F. HOOK
BY: JOSEPH F. HOOK, Esquire
Counsel for the Plaintiff

U.S. ATTORNEY'S OFFICE
BY: ANTHONY DIGOIA, Esquire
Counsel for the Defendant

FILE COPY

**WILLIAM MURPHY**, having been duly sworn, deposes and testifies as follows:

**EXAMINATION BY MR. HOOK:**

Q. Mr. Murphy, my name is Joseph Hook, Jr. I represent Alan Bradley in an employment discrimination case in the U.S. District Court entitled Alan Bradley vs. Gordon R. England in his capacity as Secretary of the Department of the United States Navy in a pending civil litigation in the U.S. District Court.

You are here pursuant to a notice of deposition served upon you?

A. Yes.

Q. Are you currently employed by the Department of the Navy?

A. Yes.

Q. What is your job there sir?

A. I am right now working for the housing office in the liaison branch as a liaison representative for the government in the GMH housing contract.

Q. Sir, what GS level are you at sir?

A. I am right now a GS-9 in title, but getting paid as a GS-10.

Q. How long have you been employed by the Department

of the Navy?

A. Twenty-nine and a half years.

Q. Prior to the current position that you hold were you a housing manager supervisor?

A. Yes.

Q. Is that the position in the 1173 series?

A. Yes.

Q. Do you know when you became a housing manager supervisor?

A. I want to say around 2000, 2001.

Q. Did you have to go through a competitive process to become a housing manager supervisor?

A. Yes.

Q. You submitted an application and were interviewed for the job?

A. Yes.

Q. Who interviewed you for the job?

A. I am not positive whether it was an interview. If it was, it would have been Captain Cooper or Charles Silvia. The director at that time.

Q. After submitting your application you were hired to the position of the housing manager supervisor, is that correct?

A. Yes, sir.

Q. You were either interviewed by Charles Silvia, who was the director at the time?
A. Yes. Or Captain Cooper who was the next -- let me get this straight. Next level of our chain of command, I guess. He was in charge of housing.
Q. Now, Mr. Murphy, are you familiar with Alan Bradley?
A. Yes. I know him.
Q. Did you work with Alan Bradley during your employment at the Department of Navy?
A. Yes.
Q. When did you work with Alan Bradley?
A. I probably worked with Allen in a few different capacities over let's say since about 1987, I think. '88, around that time frame in the housing arena.
Q. At that time were you working within the Housing Department, 1987, 1988?
A. Yes.
Q. Was Allen also working in the Housing Department at that time?
A. As far as I know. I'm not sure of the date, as far as I know it was around '87, '88. I think that he -- it probably might have been earlier than that,

but around that time frame.
Q. What was your job back in 1987-1988 in the Housing Department?
A. I was either one of two. I was either the assistant manager, or the assistant maintenance schedule, I think it was called. Scheduled the houses to be maintained, check for quality assurance, and brought them back on line with a referral personnel. To be actually rented out to the military families.
Q. Between 1988 -- '89 did you remain in the Housing Department through the present time?
A. Yes.
Q. The current position you hold that's not in the 1173 series, is it?
A. I think they have all been changed since we've been through a privatization. I think they're 1173, I'm not positive on that. I don't think the liaison branch is.
I'm not sure what the other side is.
Q. When did that change occur?
A. I want to say two years ago, probably around 2004.
Q. Now, were you ever a housing manager before you became the housing manager supervisor?

A. I was in the capacity of all managerial levels. Whether it was in the staff orders, administration and/or the housing for Green Lane, Anchorage, Fort Adams, or Coddington Cove. I've served in all those managing positions.
Q. Are you familiar with Jane Thiebault?
A. Yes.
Q. And Mary Beth Oliveira?
A. Yes. I work with them now.
Q. You currently work with them?
A. Yes.
Q. What positions do they currently hold?
A. Mary Beth is my supervisor now. And Jamie Thiebault is the supervisor, as far as I know. In capacity supervisor of the referral section of our office.
Q. Do you know what current grade Jamie Thiebault's position is?
A. I want to say it's 11.
Q. Do you know what current grade Mary Beth Oliviera's position is?
A. It's 11.
Q. GS-11?
A. Yes.

to be honest with you. No. I was not out there for the accident.
Q. All right. Did you have any conversation with Charles Silvia about the accident?
A. In what sense? Did he have a accident; that they took him to the hospital. Yes, sir.
Q. So you had a conversation with Charles Silvia regarding the accident at least that to the extent that Charles Silvia took Alan to the hospital?
A. Well I'm not sure he took him. The ambulance took him to the hospital. I think Charles followed him to the hospital. To make sure he was all right.
Q. Do you have any information as to whether Alan had an epileptic seizure at the time of that accident?
A. No.
Q. You don't know one way or the other?
A. No.
Q. Do you know whether Alan was prohibited from operating government vehicles on the base after that accident?
A. I don't know about prohibited, but there was a concern about letting Alan go back out to drive.
Q. Who had those concerns?
A. The director.

Q. Were you present during any conversation that Victor Ramsey had with Charles about making that position a permanent position?
A. When Victor came on board I want to say it was in June of that summer, I was left with the impression that this could lead into his becoming a permanent manager, which we needed at that time.
Q. At that time you needed a permanent housing manager?
A. Yes.
Q. In 2002 there was a need for a permanent housing manager?
A. We hired temporaries. I felt, in other words, we needed as a supervisor/manager more stability there.
Q. How were you left with that impression that Victor Ramsey the position would lead to a permanent position, how did you have that impression?
A. In the conversation when Victor came on board, Charles called me in the office and said Victor is going to be working in the Green Lane area as the housing manager.
Q. Did he say anything else?

A. I want to say he said it was a temporary appointment or a -- I don't know whether he said a ninety day appointment. Whatever he might have said. But, in general, he said he was on board with us on the work, especially during the summer move.

Q. Did he have any conversations with Victor Ramsey in terms of how long the appointment would be?

MR. DIGOIA: Objection.

A. I'm not sure during that time if he did mention ninety days to Vic.

Q. Did you work with Victor Ramsey?

A. Yes.

Q. Do you recall at all the expiration of Victor Ramsey's temporary period of time, were you present during any conversation that Victor Ramsey had with Charles Silvia concerning the continuation of his appointment?

A. Yes.

Q. What was said during that conversation?

A. Victor was called in the office to speak to Charlie. I'm not sure what day it was. Victor came back and said he was going back tomorrow or that day to Green Lane. To do his old job.

It was in the middle of the war college move. I asked him why that happened. He said Charlies said that he just has to go back. He can't stay any longer. The appointment was over.

Q. Did he tell you why he had to go back when the appointment was over?

A. Not at that time.

Q. At a subsequent time did he tell you why?

A. I'm not sure what Victor said. I can't answer that.

Q. Did he tell you that the appointment could not be continued, because Alan Bradley objected to Victor Ramsey holding that position?

MR. DIGOIA: Objection. Asked and answered. He just said he can't tell you what he said.

A. I'm not sure on that.

Q. Did you have any conversations with Charles Silvia concerning keeping Victor Ramsey in that appointment?

A. Yes.

Q. What was said during that conversation?

A. After Victor was going back I wanted to know why we could not keep him. I went into Charlie's office.

I'm not sure whether it was the Friday or the Monday. And I questioned why we were letting him go back without having someone to run that area. And Charlie said to me that Alan was complaining about the appointment. It was just about past due, if not overdue for him to go back. I said to Charlie I thought you were going to keep this position, because I needed personnel to run the organization. I said why don't you give me Alan. I'll put him in the housing area. And he could do the inspections out there and run it from there.

Q. What did Charles Silvia say with respect to your request?

A. He said no Alan is not coming to this organization.

Q. Did he tell you why Alan would not come to the organization?

A. No.

Q. What were his exact words, to the best of your recollection?

A. To the best of my recollection -- let me get this right. It was no we don't want Alan -- wait I'm trying to think exactly what he said -- when I asked him to let Alan Bradley be put out in the area to run that. He said no we don't want Alan in

the organization. That's it. That was the end of the conversation.

Q. At that time in your role as a supervisor did you feel there was a need to have a housing manager assisting you in that area?

A. Yes. At that time we had temporary employees who would come in and assist us. At that time I think they were going away also, which left me with only a couple of people to run the housing areas.

My concern was I needed people to run the organization.

Q. Did you care whether it was Vic or Alan?

A. In truth I didn't care if it was Alan, Vic, or even the temporaries. I needed somebody to get the mission to continue to go forward. I could not do that with only a couple of people.

Q. Did you ever hear Charles Silvia say anything concerning Alan's ability to perform the duties of a housing manager?

A. Be more specific.

Q. Did you ever hear Charles Silvia say anything regarding whether Alan could be a housing manager, could or could not be a housing manager?

A. No.

Q. Did he ever say how can we put him in that position he can't drive a car, or words to that effect?
A. I can't recall that. What time frame are you asking this?
Q. Between 1987 and 1994?
A. I would not say that he said things directly about that. But, there was a concern about that after the accident.
Q. There was a concern about Alan working as a housing manager?
A. It was a concern about him driving.
Q. Did Victor Ramsey ever state to you his displeasure about his position at Green Lane not being continued, did he ever say anything to you or voice anything to you?
A. Oh, yes. At the end?
Q. Yes.
A. He. Yes. He was very unhappy going back.
Q. Did he say anything concerning his displeasure with Charles Silvia?
A. He was angry at the situation.
Q. Did he say anything concerning Charles Silvia not keeping his word or anything like that?
A. Not directly to me. He was angry at the situation.

walk these distances between buildings than if they were driving?

A. Only if you were changing area to area.

Q. Let me ask you a follow-up question. You said earlier a person might have to be at one house at 9:00 in the morning and at another one fifty houses away right afterwards at 10:00, or whenever the next appointment was, is that accurate?

A. Yes.

Q. If a person had to get from house number one to a house fifty houses away, would he get there faster if he was walking or driving?

A. Obviously, driving.

Q. I want to take you back to a conversation which you described with Charlie, Charlie Silvia, when you asked him to let you have Alan?

A. Yes, sir.

Q. You said I believe we don't want Alan in the organization?

A. Yes.

Q. Are you sure that's what he said, in the organization?

A. Well, I think he might have said we don't want Alan. It was something specific to that. I can't

be specific. I'm trying to think this through.

I know what the conversation was. Because, again, I needed a manager. I needed somebody to help me to continue to move. We were in the midst of a war college move, which is the biggest time of year. If I am correct, and I'm not positive. I think I was losing the temporary people also, which put me really under a rock to accommodate the customers coming in. So what I was trying to do again is trying to have somebody there to assist me. You know, to get the mission or whatever we needed done. So I mean maybe it was not organization, but it was at least he felt no. He was going to say that's it. And there was no more conversation after that. So I went back to my position and tried again to balance what was going on in the organization.

Q. So he said what you recall is that he said we don't want Alan?

A. Yes.

Q. What you don't recall him saying is in the organization?

A. I can't say that. Yeah. In general, the conversation was. No. I was not going to be able

to have what I wanted.
Q. Which was Alan?
A. Well, either Alan or Vic. He was sending Vic back to me again.
Q. I think you explained very clearly you were looking at all of it from the standpoint of what your responsibilities were, what you had to do you, and you wanted what you thought were the necessary people to get the job done?
A. Right.
Q. That's why you went in to see Charlie, when you learned that Vic was going?
A. Yeah. Absolutely.
Q. Charlie didn't say to you why we don't want Alan, did he?
A. Not in that conversation, no.
Q. You never heard Charlie say we don't want Alan because he's handicapped?
A. He never said that to me. No.
Q. You never heard him say we don't want Alan because he files EEO complaints?
A. No.
Q. You never heard Charlie saying anything derogatory about Alan's medical condition or disabilities?

from one unit to the next, was it possible that the appointments could be scheduled apart to accommodate his need to walk from Unit A to Unit B?

A. There are only so many inspections that can be done in a day. They're usually separated by an hour to forty-five minutes.

You're asking my opinion you could walk anywhere in the Green Lane complex within those time frames. Unless you were late from the last appointment.

Q. Now, concerning -- Mr. DiGoia asked you regarding derogatory remarks regarding Alan, and you said that you had not heard any derogatory remarks from Charlie Silvia concerning Charlie's handicapped condition, is that correct?

A. Correct.

Q. Did you hear Mr. Silvia make any derogatory remarks at all concerning Alan?

MR. DIGOIA: Objection. Relevance.

A. Not that I can remember.

Q. Did you make any remarks concerning Alan's ability to operate a motor vehicle?

MR. DIGOIA: Objection. Asked and answered. Beyond the scope of cross-examination.

Q. You can answer.
A. In the early stages after the accident there was a concern with Alan being able to drive, for his safety along with --
Q. Is it your testimony that Charles Silvia had a concern about his ability to drive?
MR. DIGOIA: Objection. Calls for a conclusion on the part of the witness. How does he know what Charlie Silvia was thinking. Ask him if he heard Charlie say that.
MR. HOOK: I'm trying to get to it.
MR. DIGOIA: Sorry.
Q. You indicated there was a concern about Alan's ability to drive a vehicle after the accident?
A. Yes.
Q. How did you have that -- how did you come to the understanding there was a concern about Alan's ability to drive a vehicle?
A. The concern, again, his safety. It was a conversation, as far as I can remember, between some of the managers and/or directors. There was concern after the accident of Alan being able to drive a car again.
Q. Who were the managers or directors?

A. Bob Arbour, Bob Corey, and some of the housings managers. The older ones I can't remember the name.
Q. Was one of them Charlie Silvia?
A. I think so. I think he was one of the ones privileged in Bob's office.
Q. Were you present during that conversation?
A. I was outside.
Q. Did you hear that conversation?
A. I heard the concern for Alan being able to drive and his safety driving.
Q. Now the ratings panel that you were on where you testify that you rated Jamie Thiebault and Mary Beth Oliveira higher than Alan to your knowledge, Jamie Thiebault and Mary Beth Oliveira -- strike that. I just want to make sure I said it correctly.
The ratings panel you were on with Jamie Thiebault and Mary Beth Oliveira were also applicants with Alan, is that correct?
A. Yes.
Q. To your knowledge neither Jamie Thiebault nor Mary Beth Oliveira received the job that was being considered at that time, is that correct sir?