IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| ALAN BRADLEY,<br>Plaintiff<br><br>vs.<br><br>GORDON R. ENGLAND,<br>Secretary of the U.S.<br>Department of the Navy,<br>Defendant | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | C.A. NO. 04-412ML |

# SUPPLEMENTAL APPENDIX

GORDON R. ENGLAND, SECRETARY,
DEPARTMENT OF THE NAVY,

By his attorneys,

ROBERT CLARK CORRENTE
United States Attorney

/s/ Anthony C. DiGioia
ANTHONY C. DIGIOIA, #2495
Assistant U.S. Attorney
Chief, Civil Division
United States Attorney's Office
Fleet Center
50 Kennedy Plaza, 8th Floor
Providence, Rhode Island 02903
(401) 709-5000
(401) 709-5017 (Fax)
Email: anthony.digioia@usdoj.gov

little more than half the question was asked was there a hire headquarters freeze imposed on those positions, do you see that?

A. Yes.

Q. That's referring to the 1173 series position?

A. That is correct.

Q. You answered that yes there was a freeze imposed in April of 2002?

A. Like I said, the dates are fuzzy. I probably said that in the affidavits. Yes. I did.

Q. Is it consistent with you that it was about that time?

A. Yes.

Q. You were asked in the very next question has the agency made any permanent placements in the housing function since being informed of the functionality assessment, do you see that question?

A. Yes.

Q. Do you see your answer?

A. No.

Q. Do you now believe that, in fact, there were some positions filled after hearing of the functionality assessment?

A. Yes. The ones that we knew would be continued on.

SA1

The senior manager positions. I had housings director positions like Mr. Silvia. Like the lady down in Groton that were leaving. And I did fill those positions.

Q. Was there any thought that certain positions within housing might be more vulnerable than others?

A. Yes.

Q. What kinds of positions were thought to be more vulnerable?

A. Those that specifically had to do with the housing manager position. We have two types of positions. We actually had three types. Housing management type of position, property manager. We had maintenance type positions. And we also had referral positions.

The maintenance and the property managers were very vunerable.

Q. But the referral positions were less vunerable?

A. Yes. Less.

MR. DIGOIA: If I could just have one moment. I'm all through.

CONTINUED EXAMINATION BY MR. HOOK:

Q. Doctor, in 2001 Captain Cooper was your superior?

A. Yes. That is correct.

SA 1a

A. I don't understand your question.
Q. At the time of this meeting June 14, 2001 there was nobody that told you that you were prohibited from hiring a person to serve the functions as a housing manager?
A. No. There was no direct prohibition, that is correct.
Q. There was no hiring freeze?
A. Not that I remember. Later on there was.
Q. Even if they were a hiring freeze, there are certain procedures that can be implemented to fill a position where there's a need, not withstanding a hiring freeze?
A. Again, that is a function not in my office. That would be a function of the human resources office.
Q. If a Charlie Silvia or a similar director who you supervised had a need within their field for a particular position to be filled appeared and there was a hiring freeze on that position, do you know whether there would be a process where that position could be filled, not withstanding the hiring freeze?
A. It would be a long arduous process, if there was one. One that would take up more time and would be

Patricia Martin, who also works in that office with Dennis. At that point there was another specialist, Rick McNally.

Q. Prior to a job announcement going out, would there have been a request from a supervisor or somebody in the particular area of where the job was -- concerning the job that was being announced, would make a request that the job be filled?

A. Yes. They would send what we call a standard Form 52. It's a recruit for personnel action. It comes out from whatever department or store front that is actually doing the recruitment. They would forward it on to HRO with the approval authority to go out and say they want to request that recruitment. HRO then adds to what needs to be added. Whatever paperwork HRC needs to have. In addition to the approval, we would like the position description, a crediting plan. That type of thing. And forward it to HRC. Then they would announce the position.

Q. There was a process that was underwent before a position was actually announced?

A. Right. The approval came from whoever has the position to send it out. Forward it out to the local HR. The local HR forwards it to the HRFC in

SA 3

Philadelphia. And they do the actual recruitment.

Q. In your current position working for HRO, do you actually receive the job applications?

A. No. We don't even see them. We don't get them until they actually send us a certificate of eligible candidates. And what we see are those people determined eligible and the listing at that point. Before then we don't see. We really don't know who has applied for the position.

Q. In 2004 there was a MEO process that occurred on the Naval base in Newport?

A. Yes.

Q. What was your involvement within the MEO process?

A. The MEO was is created by the people in the public works who actually creates -- there's a team that actually creates the MEO. Which is a most efficient organization. It's part of the whole contracting out process, the CA process. That is kept secret and quiet until we find out -- until we find out if we actually won the bid or not.

In our case public works did win the bid. Then the MEO becomes public. My job involved that. I worked closely with personnel and with the reduction of force; kind of oversaw what they were

be specific. I'm trying to think this through.

I know what the conversation was. Because, again, I needed a manager. I needed somebody to help me to continue to move. We were in the midst of a war college move, which is the biggest time of year. If I am correct, and I'm not positive. I think I was losing the temporary people also, which put me really under a rock to accommodate the customers coming in. So what I was trying to do again is trying to have somebody there to assist me. You know, to get the mission or whatever we needed done. So I mean maybe it was not organization, but it was at least he felt no. He was going to say that's it. And there was no more conversation after that. So I went back to my position and tried again to balance what was going on in the organization.

Q. So he said what you recall is that he said we don't want Alan?

A. Yes.

Q. What you don't recall him saying is in the organization?

A. I can't say that. Yeah. In general, the conversation was. No. I was not going to be able

SA 5

to have what I wanted.
Q. Which was Alan?
A. Well, either Alan or Vic. He was sending Vic back to me again.
Q. I think you explained very clearly you were looking at all of it from the standpoint of what your responsibilities were, what you had to do you, and you wanted what you thought were the necessary people to get the job done?
A. Right.
Q. That's why you went in to see Charlie, when you learned that Vic was going?
A. Yeah. Absolutely.
Q. Charlie didn't say to you why we don't want Alan, did he?
A. Not in that conversation, no.
Q. You never heard Charlie say we don't want Alan because he's handicapped?
A. He never said that to me. No.
Q. You never heard him say we don't want Alan because he files EEO complaints?
A. No.
Q. You never heard Charlie saying anything derogatory about Alan's medical condition or disabilities?

A. Not that I can recall.
Q. Alan and Charlie had, and I'm sorry I'm using first names, I guess I have been doing that because you did a few times. When I say Alan I mean Alan Bradley, and when I said Charlie, I mean Charlie Silvia, I'll try to use last names as well, but, if I fail to, please understand that's who I'm referring to.
A. Okay.
Q. There were times when Alan Bradley and Charlie Silvia worked together, weren't there?
A. Yes.
Q. Can you tell me some of the locations where they worked together?
A. Again, it would be K-61. They had a maintenance building that they worked together out, Building 15.
I can't recall any other.
Q. They worked together for some period of time, is that right?
A. Yes.
Q. And that was before the conversation that you just described in which Charlie Silvia said we don't want Alan?

A. Yes.
Q. You didn't think that they liked each other, did you?
A. I'd have to say there was a coldness there. Yes.
Q. In fact, didn't you tell me that you had observed years of pettiness between the two of them?
A. At times.
Q. That was a two-way street, right?
A. Yes, sir.
Q. Alan was petty with Charlie, Charlie was petty with Alan, and you frankly don't know which one started it, do you?
A. No. Nor was it not my concern. It was their thoughts to each other.
Q. Understood. But, you don't know which one started it?
A. No.
Q. All you know was it was your impression by the time that you had that conversation with Charlie where Charlie said we don't want Alan, that Charlie and Alan didn't get along. They would be petty with each other?
A. I hadn't been working with them for a while, so I don't know what the last few years of their

relationship was.
Q. What you last observed they were petty with each other?
A. You're saying petty, I would say disagreeable.
Q. Okay. That's fine. I'm not trying to put words in your mouth. You used that word earlier, didn't you?
A. I might have. I think disagreeable towards each other is better.
Q. Was it the typical kind of disagreeable behavior between a subordinate and a supervisor where the supervisor might say do this, and the subordinate might say why do I have to do it that way, is that an example of the kind of disagreeable relationship?
A. Probably.
Q. Had you ever had disagreeable people work for you?
A. Yes. But, what's that got to do with this?
Q. And you have had disagreeable people work for you?
A. Sure.
Q. If you're in a situation of having an opportunity to hire person A, who has been disagreeable with you or hire person B who has not, might you want to

hire person B?
A. You're asking my personal opinion. I would try to be fair.
Q. But, might you not say that person A is disagreeable, if they're both equal, I'd just as soon as have person B?
A. I would try to be fair.
Q. And might not a fair person say that, that these two people are equal and this one is not?
A. Not if I was as disagreeable as that other person.
Q. You think if you were that disagreeable you'd be more understanding?
A. To the best of my ability.
Q. You can understand why one person might not want to work with a disagreeable person with someone that they constantly had disagreeable conflicts with?
A. Not if I was as disagreeable as the other person.
Q. You didn't imagine that a person wants to avoid disagreeable contact?
A. Yes. You would, but we have established it was both ways.
Q. Now let me direct your attention to 1999 or thereabouts, when they were two openings, I believe you addressed this on direct examination, these

Q. Okay. And how long did you work down there in the GS-6 supply clerk position?

A. I worked in Building 15 from that date, February 1996, and it was, I believe, through May of 1999.

Q. And who did you work for? Was it Charlie Silvia --

A. Charlie Silvia.

Q. -- the whole time?

A. Yes, it was.

Q. How did you and Charlie get along?

A. Got along very well. Charlie was an all right guy to work with unless you sort of -- you didn't do things the way he wanted and that's the way he was with everybody, a lot of people on the base. He was known to be that way.

If you did everything that he wanted to do, you could be best of friends. In fact, we used to do things, we used to go out with different people in the office but if Charlie -- you did something that he didn't want you to do or you didn't do something that he decided to do, he would get all bent out of shape and start yelling and calling you names and everything else.

Q. And he was known for that?



SA 11

A. And he was known for that.
Q. And he did it with a lot of people?
A. Exactly. Yes, he did.
Q. Okay. Now, what -- we're still on the listing of your jobs.
A. That's okay.
Q. What did you -- what job did you go to, what happened in May of '99?
A. In May of 1999, my son Nicholas was born, okay? And -- in fact, can I scratch that, please, to August?
Q. Okay.
A. August of 1999. My son Nicholas was born in May of 1999 and my wife was on maternity leave and what I did is I requested from Charlie Silvia and Bob Corey was there an opportunity that I could get on paternity leave? And I went on paternity leave from August of 1999 to September of 1999.
Q. Through September of '99?
A. Yes.
Q. Did you come back to work in September?
A. Yes, I did. No, October.
Q. October?
A. It was like October 20th or something like that.


SA12

A I believe it was Captain Cooper, Janet Hiebner and myself.

Q Was anybody else there at that meeting?

A I think I recall A.J. Jankowski being there.

Q At that time, did you decide to cancel the vacant Housing manager positions?

A I'm not sure I would agree with that.

Q Do you recall the Housing manager positions that were open, the two open positions being cancelled at that time?

A Absolutely, and I remember canceling them. I just don't agree that it was my decision.

Q Do you have a recollection as to why those Housing manager positions were cancelled at that time?

A To the best of my recollection was that the Northern Division who we work for and the Northeast region was directing Naval Station of Newport to go into a property management arrangement which would require an outside developer to come in and take over the management of all the Navy housing in the Newport area.

Q So is that a study, a property management study or --

Q And during the course of your -- while you worked together, you obviously had conversations?
A Oh, sure.
Q So is it your testimony, you don't recall ever having a conversation with him concerning hiring Alan Bradley?
A What I'm saying is that I'm sure we must have had conversations, but I don't recall what the conversations involved. Let me just try to clarify. I'm sure we had conversations about Alan in working as a Housing manager because at the time the jobs were open, Captain Cooper made it quite clear that we were going to do that, and we were going to do our very best to compensate anything that we had to.
Q All right. So at that time, it was before the positions were cancelled, Captain Cooper had made it clear to you that she was going to do the best she could to make it so that Alan could fill one of those positions?
A I think I can be specific in saying that she told me that she made a commitment to Alan that she would do everything in her power to possibly get him a Housing manager's job. That's what I recall.
Q Was there any reason at that time that you



Case 1:04-cv-00412-ML-LDA Document 46 Filed 10/11/2006 Page 3 of 22

SA 14