UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

ALAN BRADLEY,
       Plaintiff,

v.                                                   C.A. No. 04-412-ML

GORDON R. ENGLAND,
Secretary of the United States
Department of the Navy,
       Defendant.

## MEMORANDUM AND ORDER

This matter is before the Court on a motion for summary judgement filed by Defendant

Gordon R. England, in his capacity as Secretary of the United States Department of the Navy

("Navy"), pursuant to Rule 56 of the Federal Rules of Civil Procedure.  For the reasons set forth

below, the Navy's motion is GRANTED in part and DENIED in part.

## I. Standard of Review

Summary judgment is only appropriate "if the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to a judgment as a

matter of law." Fed. R. Civ. P. 56(c).  "A factual issue is genuine if it may reasonably be

resolved in favor of either party and, therefore, requires the finder of fact to make a choice

between the parties' differing versions of the truth at trial." DePoutot v. Raffaelly, 424 F.3d 112,

117 (1st Cir. 2005) (citation and internal quotation marks omitted).  A fact is "material" if it "has

the capacity to sway the outcome of the litigation under the applicable law." Nat'l Amusements,

Inc. v. Town of Dedham, 43 F.3d 731, 735 (1st Cir. 1995) (citations omitted).

The moving party bears the burden of demonstrating that no genuine issue of material fact exists. Clifford v. Barnhart, 449 F.3d 276, 280 (1st Cir. 2006). "In determining whether that burden is met, a court must view the record in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences in its favor." Id. (citing Nicolo v. Philip Morris, Inc., 201 F.3d 29, 33 (1st Cir. 2000)). Once the moving party has made this preliminary showing, the nonmovant "may not rest upon the mere allegations or denials of [its] pleading," Fed. R. Civ. P. 56(e), but must "produce specific facts, in suitable evidentiary form, to establish the presence of a trialworthy issue." Triangle Trading Co. v. Robroy Indus., Inc., 200 F.3d 1, 2 (1st Cir. 1999) (citation and internal quotation marks omitted). "As to any essential factual element of its claim on which the nonmovant would bear the burden of proof at trial, its failure to come forward with sufficient evidence to generate a trialworthy issue warrants summary judgment to the moving party." Clifford, 449 F.3d at 280 (citation and internal quotation marks omitted).

## II. **Background**

On May 9, 1985, Plaintiff Alan Bradley ("Bradley") began working for the Navy. In 1988, Bradley was employed as a GS-5 "Housing Management Assistant"at the Newport Naval Base.[1] Among his duties, Bradley was required to drive to the many housing units on the base and inspect the work being done by the Public Works Department. Sometime in 1988, Bradley

---

[1] There are two principle pay systems for federal employees, the General Schedule ("GS") and the prevailing rate wage system ("WS"). United States v. Clark, 454 U.S. 555, 556-57 (1982). The GS applies to federal "white-collar" employees and is divided into 18 numbered grades; as the number of the grade increases, so does the pay and responsibilities. Id. The WS, on the other hand, primarily applies to those federal "blue-collar" employees specifically excluded from the GS. Id.

had an epileptic seizure while driving a government vehicle between housing units.  As a result

of that seizure, Bradley was involved in an automobile accident.  Following the accident, Bradley

was prohibited from driving on the naval base by Robert Corey ("Corey"), the director of the

Housing Department.  Corey was concerned that Bradley could have another accident if he

continued to drive on the base.  Bradley's job description, therefore, was modified so that the

bulk of his duties could be performed in the office.  If Bradley needed to visit a particular

housing unit, the Navy arranged for another employee to drive him.  For his part, Bradley was

relieved that his job no longer required him to drive.[2]

Several years after his accident, Bradley was reassigned to a GS-6 "Supply Technician"

position.  On June 23, 1999, however, the Navy announced two vacant GS-7 Housing

Management Assistant positions.  Bradley applied for these vacant positions but was not

selected.  Two other employees were selected to fill the GS-7 positions.  Bradley was notified of

the Navy's decision by a letter dated September 29, 1999.  Approximately two months later,

Bradley learned that the existing GS-7 Housing Management Assistant positions were being

reclassified as GS-9 "Housing Management Specialists."  As a GS-6 employee, Bradley was

ineligible to apply for a GS-9 position.

In March of 2000, Bradley's position as a Supply Technician was transferred from the

Housing Department to the Public Works Department.  On March 25, 2000, Bradley filed a

complaint with the Equal Employment Opportunity Commission ("EEOC"), alleging, inter alia,

that his non-selection for the 1999 vacant Housing Management Assistant positions was based on

disability discrimination.  Although Bradley failed to file his complaint with the EEOC within 45

---

[2] In addition to epilepsy, Bradley has a partially paralyzed right arm and lazy eye.

days of receiving the Navy's decision, as required by 29 C.F.R. § 1614.105(a)(1), the Navy opted to settle Bradley's complaint in an agreement signed on January 24, 2001. The agreement provided that in return for Bradley's withdrawal of his EEOC complaint, the Navy would agree to announce any vacant Housing Management Specialist positions at the GS-7 and GS-9 levels for a period of two years. The Navy also agreed to give Bradley "priority consideration" for the positions. The settlement agreement was signed on behalf of the Navy by Captain Ruth Cooper ("Cooper"), the commanding officer at the Newport Naval Base. Cooper understood priority consideration to mean that if Bradley was qualified for a vacant position, he would be the first person selected to fill that position.

On May 3, 2001, the Navy announced two vacant Housing Management Specialist positions at both the GS-7 and GS-9 levels. Bradley applied for these positions. Cooper advised Charles Silvia ("Silvia"), the newly appointed Housing Director, that because of the settlement agreement Bradley was a likely candidate to fill one of these positions. The position required the selected employee to hold a valid driver's license (which Bradley did), and be able to drive between the housing units on the base. Cooper and Silvia discussed ways for Bradley to fulfill the duties of a Housing Management Specialist despite his inability to drive on the base.

On June 14, 2001, Cooper, Silvia, and Cooper's deputy, Alan Shannon ("Shannon") met with Jana Hubner, the Deputy Director of the Office of Naval Housing at Naval Facilities Engineering Command Atlantic. The purpose of the meeting was to discuss potential upcoming changes to the operations of Naval Housing in Newport. Although there is some disagreement about what was said at the meeting, all of the participants agree that the discussion centered around the future privatization of Naval Housing in Newport. Hubner strongly recommended

-4-

that any vacant housing positions in Newport be filled with contract employees from that point

forward. Cooper, Silvia, and Shannon accepted Hubner's recommendation. Consequently, on

June 21, 2001, the announcement for the vacant GS-7 / GS-9 Housing Management Specialist

positions was cancelled.

On July 12, 2001, Cooper, Silvia, and James Allen ("Allen"), the union representative,

met with everyone who had applied for the open housing positions, including Bradley. Cooper

explained to those present that she had cancelled the openings because of the possibility that

Naval Housing was going to be privatized. If Naval Housing were privatized, the Housing

Management Specialist positions would be vulnerable to a Reduction-in-Force ("RIF").

Consequently, she did not want to put anyone in a position that could potentially be eliminated

sometime in the near future. Following this meeting, Cooper met privately with Bradley and

Allen. Bradley was upset and accused Cooper of cancelling the positions to get out of fulfilling

the settlement agreement. Cooper denied this allegation and offered to extend the settlement

agreement for another two years, but Bradley refused. According to Allen, Cooper also

mentioned that she was under the belief that Bradley did not hold a valid driver's license and,

therefore, could not hold the position anyway.

On July 26, 2001, Bradley and Allen again met with Cooper. Buzz Evans ("Evans"),

Bradley's supervisor in the Public Works Department, was also present. Cooper reiterated her

reason for cancelling the openings, i.e., the potential privatization of Naval Housing. Cooper

explained her concern about placing Bradley in one of the Housing Management Specialist

positions because of the possibility that he could lose his job if a RIF occurred. Nevertheless,

Bradley advised Cooper that he wanted the Housing Management Specialist position and was

willing to take the risk of losing his job in a future RIF.  Cooper refused this request.

On September 21, 2001, Bradley filed another complaint with the EEOC, claiming that the Navy had breached the terms of the settlement agreement by failing to provide him with priority consideration for the vacant housing positions.  Bradley alleged that the Navy's decision not to fill the vacant housing positions with permanent civilian employees (as opposed to contract employees) was a result of disability discrimination.  Bradley also claimed that his non-selection was retaliation by the Navy for his prior EEOC activity.

In April of 2002, a formal Navy-wide hiring freeze was put in place for housing positions like the ones that had been cancelled at the Newport Naval Base.  In May, however, a Housing Management Specialist position became vacant.  Silvia assigned Victor Ramsey ("Ramsey") to fill the vacant position for a period of 180 days.  Ramsey, unlike Bradley, was a member of the Housing Department.  Although Cooper considered temporarily assigning Bradley to the position, she ultimately decided that it was not in his best interest.  At the time, Bradley was a member of the Public Works Department.  Like the Housing Department, the Public Works Department was undergoing a privatization study, and Cooper feared that, if Bradley were temporarily transferred out of the Public Works Department and into the Housing Department, his Supply Technician position could be eliminated.  Cooper reasoned that if the study found that the Public Works Department could continue to function without someone in the Supply Technician position, the position could be viewed as unnecessary.  When the temporary assignment ended, Cooper concluded, Bradley would be left without a position in either the Public Works Department or the Housing Department.  When Bradley learned of Ramsey's temporary assignment, however, he contacted Cooper and advised her that, in his view, the Navy

had breached the terms of the settlement agreement by not affording him priority consideration

for the position. Cooper explained her decision and reminded Bradley that she had offered to

extend the settlement agreement for another two years, but Bradley had refused her offer.

At the end of Ramsey's temporary assignment as a Housing Management Specialist, he

was transferred back to his old position within the Housing Department. Because there was a

need for someone to fill the position on a permanent basis, however, William Murphy

("Murphy"), a supervisor within the Housing Department, approached Silvia about making

Ramsey's assignment permanent. Despite the Navy-wide hiring freeze, Silvia told Murphy that

he could not permanently assign Ramsey to the position because "[Bradley] was complaining

about the appointment." (Murphy Dep. 25:4-5, Mar. 10, 2006). Murphy asked Silvia to just hire

Bradley then, but Silvia replied, "we don't want [Bradley]." (Id. at 31:23-24).

Ramsey also approached Silvia about making his assignment to the Housing Management

Specialist position permanent, but was informed by Silvia that "Bradley had filed a complaint,

and that because of that complaint, [] he would have to hire Alan Bradley before he could make

[Ramsey's] promotion permanent." (Ramsey Aff. ¶ 4). Silvia told Ramsey that "[Bradley]

would not be given a position in the Housing Department while he was there," and "that

[Ramsey] could thank [Bradley] for not getting a permanent promotion." (Id.). Two years later,

the Navy informed Bradley that he was being downgraded from a GS-6 Supply Technician to a

WS-5 dispatcher.

On February 3, 2005, Bradley filed a second amended complaint, alleging disability

discrimination and retaliation, based on the Navy's decision to cancel the two vacant Housing

Management Specialist positions on June 21, 2001, as well as the Navy's decision to temporarily

assign Ramsey to the Housing Management Specialist position in May of 2002.[3] Bradley brings

his claims of disability discrimination and retaliation pursuant to the Rehabilitation Act of 1973,

29 U.S.C. §§ 701-796, and the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101-

12213.[4]

### III. Discussion

Federal employers are prohibited from discriminating against employees based on

physical or mental disability by § 501 of the Rehabilitation Act.  29 U.S.C. § 791.  "Section 501

of the Rehabilitation Act establishes a program within the federal government to encourage the

employment of individuals with disabilities, and applies to '[e]ach department, agency, and

instrumentality . . . in the executive branch.'"  Rivera, 157 F.3d at 103 (quoting 29 U.S.C. §

791(b)).  Congress created a private right of action to enforce § 501 by making Title VII remedies

available to an employee "with respect to any complaint under [§ 501] of this title . . . ."  29

U.S.C. § 794a(a)(1); see Rivera, 157 F.3d at 103.  It appears from Bradley's second amended

complaint, however, that he may also be seeking to invoke § 504 as well.  Bradley's second

amended complaint alleges that the Navy is "an agency that is part of the executive branch of the

---

[3] Bradley's complaint also contained claims for breach of the settlement agreement (Count I) and disability discrimination based on Bradley's non-selection for the open housing positions in 1999 (Count II).  At the hearing on the Navy's motion for summary judgment held on December 4, 2006, Plaintiff's counsel conceded that Counts I and II should be dismissed.  Accordingly, those counts are dismissed.

[4] As a federal employee, Bradley is entitled to protection from discrimination based on his disability under the Rehabilitation Act.  Clifford, 449 F.3d at 277 n.1.  The ADA, however, is not available to federal employees.  Calero-Cerezo v. United States Dep't of Justice, 355 F.3d 6, 11 n.1 (1st Cir. 2004) (citing Rivera v. Heyman, 157 F.3d 101, 103 (2d Cir. 1998)).  Nonetheless, the same standards apply to claims under the ADA as under the Rehabilitation Act.  Calero-Cerezo, 355 F.3d at 11 n.1 (citing Oliveras-Sifre v. Puerto Rico Dep't of Health, 214 F.3d 23, 25 n.2 (1st Cir. 2000)).  As such, although the ADA does not apply to Bradley, "the case law construing the ADA generally pertains equally to claims under the Rehabilitation Act."  Calero-Cerezo, 355 F.3d at 19.

United States government, and thus is subject to the provisions of 29 U.S.C. § 794." (Second

Am. Compl. at 3). Bradley, however, also brings this action, and invokes this Court's

jurisdiction, "under the provisions of the Rehabilitation Act," 29 U.S.C. §§ 701-796, as a "civil

service employee of the United States Navy." (Id. at 1 and 4). It is unclear, therefore, whether

Bradley meant to invoke § 504, § 501, or both.

"Section 504 does not on its face apply to federal employees; rather, it prohibits

'discrimination under any program or activity receiving federal financial assistance or under any

program or activity conducted by any Executive agency . . . .'" Taylor v. Small, 350 F.3d 1286,

1291 (D.C. Cir. 2003) (quoting 29 U.S.C. § 794). There is some disagreement, however, among

the circuit courts as to whether or not a disabled federal employee can assert a claim under § 504.

Rivera, 157 F.3d at 104. "The Fifth, Sixth, and Eighth Circuits have concluded that section 501

and section 504 of the Rehabilitation Act overlap, and that federal employees can sue under both

provisions . . . . The Seventh, Ninth, and Tenth Circuits have held that section 501 is the

exclusive remedy for federal employees suing under the Rehabilitation Act." Id. (adopting the

approach of the Seventh, Ninth, and Tenth Circuits). In 2003, the D.C. Circuit joined the

majority of courts to have addressed this issue, finding "that § 504 does not provide federal

employees an 'alternative route for relief under the Rehabilitation Act.'" Taylor, 350 F.3d at

1291 (quoting Rivera, 157 F.3d at 104). The First Circuit has not yet addressed this question.

In Rivera, the Second Circuit concluded that because "Congress explicitly made Title VII

remedies available for violations of section 501, and yet limited the remedies for violations of

section 504 to those available under Title VI . . . the two sections were not intended to provide

alternative means of relief for the same act of discrimination against a federal employee." 157

F.3d at 104-05. This Court finds the reasoning of the Second Circuit in <u>Rivera</u> persuasive, and

accordingly, finds that § 501 is the sole remedy for federal employees suing under the

Rehabilitation Act. 157 F.3d at 104-05. The Court will, therefore, treat Bradley's second

amended complaint as stating claims for disability discrimination and retaliation under § 501 of

the Rehabilitation Act.[5]

## A. <u>Disability Discrimination</u>

"[E]mployment discrimination cases alleging disparate treatment ordinarily proceed

under the three-step, burden-shifting framework outlined in <u>McDonnell Douglas Corp. v. Green</u>,

411 U.S. 792 (1973) . . . ."[6] <u>Quiñones v. Buick</u>, 436 F.3d 284, 289 (1st Cir. 2006). First, Bradley

must carry the initial burden of establishing a prima facie case of disability discrimination. <u>See</u>

<u>Clifford</u>, 449 F.3d at 280. The burden then shifts to the Navy to articulate some legitimate, non-

discriminatory reason for Bradley's non-selection. <u>See</u> <u>Id.</u>; <u>see also</u> <u>McDonnell Douglas</u>, 411

U.S. at 802. This entails only a burden of production, not a burden of persuasion; the task of

proving discrimination remains Bradley's at all times. <u>See</u> <u>Mesnick v. General Elec. Co.</u>, 950

F.2d 816, 823 (1st Cir. 1991). If the Navy provides such a reason, the inference raised by the

---

[5] Although § 501 and § 504 have different remedial schemes, both sections provide that the standards used to determine whether a violation has occurred are those used under the ADA. <u>See</u> 29 U.S.C. §§ 791(g) and 794(d).

[6] "The <u>McDonnell Douglas</u> model applies to many types of discrimination, and always must be tailored to address particular situations. [The Court] speak[s] here of discrimination in employment based on an individual's disability." <u>Dichner v. Liberty Travel</u>, 141 F.3d 24, 30 n.5 (1st Cir. 1998). Although § 501(g) of the Rehabilitation Act instructs courts to use the standards of the ADA, the First Circuit has often drawn freely on precedents in other types of discrimination cases to interpret the ADA. <u>Id.</u> (citing <u>EEOC v. Amego, Inc.</u>, 110 F.3d 135, 145 n.7 (1st Cir. 1997) (recognizing that "the ADA is interpreted in a manner similar to Title VII"); <u>Serapion v. Martinez</u>, 119 F.3d 982, 985 (1st Cir. 1997) ("We regard Title VII, ADEA, ERISA, and FLSA as standing <u>in pari passu</u> and endorse the practice of treating judicial precedents interpreting one statute as instructive in decisions involving another.")).

prima facie case dissolves, and the burden is on Bradley to demonstrate that the non-discriminatory reason is mere pretext and that the real reason was discrimination.  See Id.; Quiñones, 436 F.3d at 289.

### 1. Cancellation of 2001 Vacancy Announcement

Bradley alleges that the Navy failed to select him for the open GS-7 / GS-9 Housing Management Specialist positions in June of 2001 because of his physical disabilities.  In order to establish the elements of a prima facie case of discrimination based on his non-selection, Bradley must show (1) that he is a member of a protected class; (2) that he applied for an open position with the Navy; (3) that he was not selected; and (4) that the Navy hired another individual with similar qualifications.  See Clifford, 449 F.3d at 281 (citing Gu v. Boston Police Dep't, 312 F.3d 6, 11 (1st Cir. 2002)).  The Navy does not seriously challenge Bradley's ability to establish the first three elements of his prima facie case, i.e., Bradley is disabled, he applied for the open Housing Management Specialist positions in May of 2001, and he was not selected.  The Navy does dispute, however, Bradley's ability to demonstrate that the Navy hired other individuals with similar qualifications to fill the open positions.  Indeed, the Navy points out that the vacancy announcement was cancelled, and no one was hired to fill the vacant positions.  The Navy, therefore, questions how Bradley can demonstrate disparate treatment when he was treated in the same way as every other applicant for the vacant housing positions.  See e.g. Webber v. International Paper Co., 417 F.3d 229, 235-36 (1st Cir. 2005).

In response, Bradley argues that the fourth element of his prima facie burden can be met by demonstrating that the positions he applied for were left unfilled.  Alternatively, Bradley claims that he can meet his burden by showing that the Navy filled other positions in the Housing

Department for which he never applied.  In support of this argument, Bradley draws the Court's

attention to Patterson v. McLean Credit Union, 491 U.S. 164, 186-87 (1989).  Bradley cites

Patterson for the proposition that a plaintiff in a failure-to-hire or failure-to-promote context can

meet his prima facie burden by showing that the position he applied for was left open or was

filled by someone outside the plaintiff's protected class.  Bradley argues that the housing

positions remained open because the Navy chose not to fill them with permanent employees.

    This argument is simply incorrect.  Patterson describes the fourth element of a prima facie

case in this factual setting as requiring the plaintiff to show that the employer "continued to seek

applicants for the position" for which the plaintiff applied.  491 U.S. at 186-87.  Likewise, in

McDonnell Douglas, the Supreme Court stated that a plaintiff seeking to fulfill the fourth

element of his prima facie case in the failure-to-hire context must show that "after his rejection,

the position remained open and the employer continued to seek applicants from persons of

[plaintiff's] qualifications."  411 U.S. at 802 (emphasis added); see Gadson v. Concord Hosp.,

966 F.2d 32, 34 (1st Cir. 1992).  Accordingly, Bradley's argument that his burden can be met by

demonstrating that the Navy chose not to fill the open Housing Management Specialist positions

with permanent employees is without merit.  The Navy did not continue to seek applicants for the

open positions, nor did it fill the positions Bradley applied for with individuals outside of

Bradley's protected class.

    Furthermore, Bradley offers no support for the assertion that his prima facie burden can

be met by showing that the Navy hired individuals outside of his protected class to fill positions

in the Housing Department for which Bradley never applied.  Bradley points specifically to the

hiring of Murphy as a GS-11 "Housing Management Supervisor" within the Housing Department

during the Summer of 2001. Bradley, however, by virtue of his GS-6 classification was ineligible to apply for a GS-11 position. Bradley fails to show how the hiring of Murphy, therefore, demonstrates that the Navy "hired another individual with similar qualifications" for the position for which he applied. Clifford, 449 F.3d at 281. Accordingly, Bradley's argument fails to pass muster.

Even if he could meet his prima facie burden, Bradley is unable to show that the legitimate non-discriminatory reason offered by the Navy for his non-selection "is mere pretext and that the real reason was discrimination." Quiñones, 436 F.3d at 289. The Navy asserts that it cancelled the open housing positions on June 21, 2001, because of the threat of Navy Housing being privatized, and the strong suggestions of Hubner that it was best not to fill any vacant housing positions at that time. "Where, as here, the case arises on the employer's motion for summary judgment, the plaintiff's task is to identify a genuine issue of material fact with respect to whether the employer's stated reason for the adverse employment action was a pretext for a proscribed type of discrimination." Rathbun v. Autozone, Inc., 361 F.3d 62, 72 (1st Cir. 2004).

In an attempt to meet this obligation, Bradley questions the discrepancies in the recollections of Cooper, Shannon, Silvia, and Hubner concerning the June 14, 2001, meeting.[7] Specifically, Bradley points out that each of the individuals present for that meeting recall the focus of the meeting differently. See Santiago-Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 56 (1st Cir. 2000) (finding that a plaintiff may prove pretext by demonstrating

---

[7] Cooper remembered the focus of the meeting to be on a Navy-wide Functionality Assessment of housing operations; Shannon remembered discussing a Navy-wide Commercial Activity (or A76) study, a Public-Private Venture, and the extension of a pilot project of private housing management; and, Hubner thought that the focus of the meeting was on a discussion of the pilot project.

-13-

"weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons such that a fact finder could infer that the employer did not act for the asserted non-discriminatory reasons"). Bradley argues that these discrepancies are sufficient evidence of pretext to satisfy his burden. The Court disagrees.

It is undisputed that the purpose of the meeting was to discuss the potential impact of the future privatization of Navy Housing. Any one of the programs or studies discussed would have resulted in a smaller civilian-employee housing staff at the Newport Naval Base. As the Navy correctly points out, it is not unusual for different individuals to remember the details of the same event differently. These discrepancies, however, do not rise to the level of a triable issue of material fact.[8]

"A plaintiff may not simply refute or question the employer's reasons. To defeat summary judgment at this stage, a plaintiff must produce evidence that the real reason for the employer's actions was discrimination." Gadson, 966 F.2d at 34 (citation omitted). Bradley, however, has failed to come forward with some evidence that would allow the Court to infer that the Navy did not act for the asserted non-discriminatory reason it offered. Indeed, Bradley testified at his deposition that he believed that the reason offered by the Navy for cancelling the open housing positions was the truth, and that he had no evidence that the reason was a pretext. (Bradley Dep. 129:3-20, May 26, 2006). Accordingly, Bradley has failed to generate a triable

---

[8] Bradley also argues that the Navy's reason for cancelling the open housing positions in June of 2001, i.e., the future privatization of Navy Housing, must be pretext because, despite allegedly cancelling all housing positions, the Navy hired Murphy as a GS-11 Housing Management Supervisor. Again, Bradley misses the mark. Although Shannon initially testified in his deposition that the Navy decided to cancel all open housing positions after the meeting with Hubner, he later corrected himself, and explained that some senior management positions were filled because those positions would likely survive the privatization of Navy Housing. (Shannon Dep. 34-35, March 10, 2006).

issue that his non-selection by the Navy for the open Housing Management Specialist positions in June of 2001 was motivated by discriminatory animus.[9]

2. Non-Selection for 2002 Temporary Assignment

Bradley also alleges that the Navy's decision to temporarily assign Ramsey to the vacant Housing Management Specialist position in May of 2002 was discrimination based on his physical disabilities. The Navy does not, however, challenge Bradley's ability to establish the elements of a prima facie case of discrimination based on his non-selection for the temporary assignment. Instead, the Navy offers a non-discriminatory reason for not putting Bradley in the temporary position, and asserts that Bradley can not demonstrate pretext and discriminatory animus. The Court disagrees.

In May of 2002, a member of the Housing Department was transferred to another assignment, and a Housing Management Specialist position became vacant. The position could not be filled on a permanent basis because a Navy-wide hiring freeze had gone into effect the month before.[10] Although Cooper considered temporarily assigning Bradley to the position, she ultimately decided that it was not in his best interest. Cooper explained that she was concerned that if Bradley were temporarily assigned from his position as a Supply Technician to the

---

[9] Bradley argues that his claim can survive under the mixed-motive analysis of Desert Palace, Inc. v. Costa, 539 U.S. 90 (2003). The mixed motive analysis applies in cases where both legitimate and illegitimate reasons motivated the adverse employment decision. Id. at 93. Bradley, however, has not produced sufficient evidence to show that disability discrimination played a motivating part, let alone any part, of the Navy's decision to cancel the open housing positions in 2001. Accordingly, the Court finds that even under mixed-motive analysis, Bradley's claim fails as a matter of law.

[10] Bradley also argues that the Navy's decision not to permanently fill the vacant housing position in May of 2002 was somehow based on his physical disabilities. It is undisputed, however, that a Navy-wide hiring freeze took effect in April. There is no evidence, therefore, nor could there be, that the Navy enacted a nationwide hiring freeze to avoid hiring Bradley as a GS-7 Housing Management Specialist. Accordingly, Bradley has failed to generate a triable issue of material fact.

Housing Department, he could lose his job in the Public Works Department in a future RIF.  The Public Works Department was undergoing its own privatization study at the time.  Cooper believed that if the study found that the Public Works Department could continue to function without someone in the Supply Technician position, the position could be viewed as unnecessary.  When the temporary assignment ended, Cooper concluded, Bradley would be left without a position in either the Public Works Department or the Housing Department.  Although Bradley told Cooper that he was willing to take the risk of losing his position in the Public Works Department for the opportunity to work in the Housing Department, Cooper still refused.  Instead, Silvia, the Housing Director at the time, temporarily assigned Ramsey to the vacant housing position for a period of 180 days.

The Civil Service Regulations, however, provide that an employee on temporary assignment at the time of a RIF, will compete in the RIF from his or her permanent position, and not from the temporary assignment.  See 5 C.F.R. §§ 351.403 and 351.404.  Consequently, even if Bradley had been temporarily assigned to the vacant position in the Housing Department, for the purpose of any privatization study or RIF in the Public Works Department, Bradley would have been evaluated as if he continued to hold the Supply Technician position.  Accordingly, the reason given to Bradley for why he could not be temporarily assigned to the vacant housing position appears to be premised on a mistaken understanding of the Civil Service Regulations.

Of greater concern to the Court, however, are Silvia's comments to Murphy and Ramsey about how "[Bradley] would not be given a position in the Housing Department while [Silvia] was there," and "we don't want [Bradley]."  These statements raise questions about the Navy's motivation for not assigning Bradley to the temporary assignment.  Furthermore, both Silvia and

-16-

Cooper were aware that Bradley had epilepsy and was prohibited from driving on the Newport

Naval Base.  Cooper also remarked to Allen that Bradley could not hold a Housing Management

Specialist position because he did not hold a valid driver's license.  Viewing the evidence as a

whole, and taking all inferences in Bradley's favor, the Court finds that Bradley has presented

sufficient evidence to generate a triable issue on the Navy's decision not to temporarily assign

him as a Housing Management Specialist in May of 2002.

## 2. Retaliation

"The Rehabilitation Act prohibits retaliation against employees for complaining about

violations of the Act." Quiles-Quiles v. Henderson, 439 F.3d 1, 8 (1st Cir. 2006) (citing 29

U.S.C. § 791); see 29 C.F.R. § 1614.101(b).  Such claims are typically evaluated through a

variant of the McDonnell Douglas burden-shifting framework.  See Vives v. Fajardo, 472 F.3d

19, 21 (1st Cir. 2007).  To prove retaliation, Bradley must first "establish that (1) he engaged in

protected conduct; (2) he experienced an adverse employment action; and (3) there was a causal

connection between the protected conduct and the adverse employment action." Quiles-Quiles,

439 F.3d at 8 (citing Calero-Cerezo, 355 F.3d at 25).  In order to establish an "adverse

employment action" in a retaliatory failure-to-hire context, Bradley must show that (1) he applied

for a particular position (2) which was vacant and (3) for which he was qualified.  See Velez v.

Janssen Ortho, LLC, 467 F.3d 802, 803 (1st Cir. 2006).  "In addition, of course, [he] must show

that [he] was not hired for that position." Id.

### 1. Cancellation of 2001 Vacancy Announcement

Bradley alleges that the Navy failed to select him for the open GS-7 / GS-9 Housing

Management Specialist positions in June of 2001 because of his prior EEOC activity.  The Navy

argues, however, that Bradley can not demonstrate a causal connection between his EEOC activity and his non-selection for the open housing positions. The Navy concedes that the settlement of Bradley's EEOC complaint on January 24, 2001, was the last EEOC activity Bradley engaged in prior to the Navy's decision to cancel the open housing positions on June 21, 2001. Nonetheless, the Navy argues that five months is too long a period to generate any inference of causation. See Clark County School Dist. v. Breeden, 532 U.S. 268, 273-74 (2001) ("The cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be 'very close'"); Calero-Cerezo, 355 F.3d at 25 (noting that "[t]hree and four month periods have been held insufficient to establish a causal connection based on temporal proximity."). Even if Bradley could show a causal connection between his EEOC activity and the Navy's decision to cancel the open housing positions, the Navy correctly points out that Bradley has failed to offer any evidence to show that the Navy's decision was motivated by retaliatory animus. Accordingly, Bradley's claim of retaliation based on the Navy's decision to cancel the GS-7 / GS-9 Housing Management Specialist positions on June 21, 2001, must fail as a matter of law.

   2. Non-Selection for 2002 Temporary Assignment

   Bradley also alleges that the Navy's decision to temporarily assign Ramsey to the vacant Housing Management Specialist position in May of 2002 was retaliation based on his prior EEOC activity. On September 21, 2001, Bradley contacted the EEOC and filed a complaint alleging disability discrimination and retaliation based on the Navy's decision to cancel the open housing positions in June of 2001. Approximately six months later, Cooper and Silvia decided

-18-

to temporarily assign Ramsey to the vacant Housing Management Specialist position in the Housing Department.  Not surprisingly, therefore, the Navy again argues that Bradley can not demonstrate a causal connection between his EEOC activity and his non-selection.  The difference this time, however, is that Bradley has more than mere temporal proximity to rely on. See Breeden, 532 U.S. at 273.  According to both Murphy and Ramsey, Silvia stated that "[Bradley] was complaining about the appointment," and that "Bradley had filed a complaint, and that because of that complaint, [] he would have to hire Alan Bradley before he could make [Ramsey's] promotion permanent."  These statements, taken together with Bradley's prior EEOC activity, are enough to generate a triable issue of retaliatory animus.

## IV. Conclusion

For the foregoing reasons, the Navy's Motion for Summary Judgment is GRANTED in part and DENIED in part.

SO ORDERED.

Mary M. Lisi
Chief United States District Judge
April 18, 2006