WHEREUPON,

RUTH A. COOPER,

a witness, was called for examination by counsel for the plaintiff, and after having been duly sworn, was examined and testified as follows:

EXAMINATION BY COUNSEL FOR PLAINTIFF

BY MR. HOOK:

Q I have a document which is a subpoena that was served on you. Is that correct, Captain Cooper?
A That is correct.
Q You are here pursuant to that subpoena?
A That is correct.

MR. HOOK: If the stenographer could mark this as plaintiff's 1, please.

(Cooper Exhibit No. 1 was marked for identification.)

BY MR. HOOK:

Q Captain Cooper, what is your address?
A 7774 Grandwind Drive, Lorton, Virginia.
Q How long have you resided there?
A Two years.

Q Have you ever given a deposition before?
A No. Not that I remember.
Q Just basic rules. You have to answer yes, or no, or verbal answer. You can't nod because the stenographer needs to take the answer down. Also wait for me to finish the question and I will try to wait for you to answer the question so we don't run over each other so the stenographer can take the information down accurately.
Okay. That is essentially the ground rules.
A Yes. I understand.
Q Now Captain Cooper, you were a captain in the United States Navy. Is that correct?
A Did you say currently?
Q Yes.
A Yes.
Q And are you retired from the United States Navy?
A Yes.
Q When did you retire?
A 1 July 2005.

Q When you were captain in the United States Navy, were you at one point in time stationed at Newport, Rhode Island? Yes?
A Yes.
Q When?
A June 2000 through February 2004.
Q And what position did you hold at Naval Station Newport?
A I was the commanding officer until August 2003. I was also the program manager for Community Services for Navy Region Northeast from April, and I'm not sure of the year. I think it was 2001 until August 2003.
Q And when were you transferred out of Newport, Rhode Island?
A February of 2004.
Q And you previously had provided testimony in an equal employment opportunity investigation concerning Alan Bradley. Is that correct?
A I believe that's correct. Yes.
Q I am going to ask you to take a look at a document which purports to be an affidavit signed by

you, and I'm going to ask you about that.
MR. DIGIOIA: May I?
THE WITNESS: I have the document.
BY MR. HOOK:
Q You have it?
A I have it. What would you like me to do?
Q Is that the affidavit you in fact gave in the investigation at the Equal Employment Opportunity investigation concerning Alan Bradley?
A I wouldn't be able to tell you when I gave it, but yes. This is my signature, and I do recognize as a statement by me.
Q Okay. And on the last page of the document there contains a signature. Is that your signature?
A Yes. And my initials.
Q And that's on page 151 of the investigation report?
A Yes. I agree.
Q Okay. And this is dated August 16, 2002?
A That's what it says. That's correct.
Q You have no reason to believe that it

wasn't provided on a different day other than August --

A No. I have no reason to believe otherwise.

Q The information you provided in the affidavit was true to the best of your knowledge and information that you had at that time?

A Correct.

Q In the affidavit, the second page of the affidavit you testify that you were program manager for Quality of Life?

A Yes.

Q And what did that entail? What were your responsibilities?

A That was for Navy Region Northeast. That included family housing, bachelor housing, fleet and family support centers, child development centers, and moral, welfare, and recreation activities.

This would have been for all of the bases that were in Navy Region Northeast Naval Air Station Brunswick, the portions of the shipyard at Portsmouth New Hampshire or Maine depending on which senator you

listen to.

The subbase at Graeton, the Naval Station Newport, Weapons Station Earl. Towards the last portion of my tour, we picked up responsibilities for family housing at Great Lakes, Illinois, Crane, Indiana. I am not sure if I got the name right. There was a weapons station in Indiana.

We picked up full responsibility for Portsmouth, New Hampshire. For all those programs that I previously listed.

Q Were you responsibility for the housing operations at Naval Station Newport?

A Under the program manager concept as the commanding officer, I had the overall responsibility to monitor and insure that services were being provided at the appropriate and adequate level for the personal station at Naval Station Newport.

But from for person who had overall fiduciary responsibility, and accountability, and authority, that was as the program manager.

Q Okay. But did you wear the cap as a program manager?

A As program manager, yes. But not as the commanding officer.
Q Okay.
A That was once when program management started.
Q When did that program management start?
A Either 1st of April 2001 or 2002, and I honestly don't remember which year. I would say 75 percent it was 2001.
Q Okay. And as program manager, did you have -- supervise any civilian employees?
A Yes, I did.
Q Who did you supervise?
A Al Shannon, my direct employee. Al Shannon was my direct employee. The person that I supervised. He was my assistant program manager or deputy program manager.
Q Did Mary Silvia work for you?
A She would have for the first -- Well, in directly. She would have worked for me as the head of Fleet and Family Support Center for the first portion when I was the commanding officer prior to

regionalization, after regionalization. And she would have worked for me as a regional employee.

Q While you were in Newport before regionalization, did she work for you?

A Yes.

Q What was her job?

A She was the director of the Fleet and Family Support Center.

Q What were her responsibilities as a director of the Fleet and Family Support Center?

A They manage all of the -- They do spouse employment referrals. They do spouse and child abuse cases. They handle welcome packages for new families that move in to provide them with pots, pans, and bedding until they get their household goods delivered.

They provide them with assistance when they have the next set of orders, getting information on the next place they are going to. There were a host of those type of programs that fell under Fleet Family and Support Center.

Q Did she perform any administrative duties

for you?

A Well, her job was administrative.

Q So, she had an administrative job?

A That's correct.

Q In that job, she performed some administrative duties in performing her duties?

A That's correct.

Q When it went to regionalization, what was her job at that point?

A It stayed the same. She was still director of Fleet and Family Support Center, but now she reported to the regional program manager for Fleet and Family Support Center who would then report to Al Shannon and he would then report to me as program manager.

Q Did you know or did you have a relationship with Mary Silvia outside of work?

A No, I did not.

Q Did you engage -- have any social relationship with her at all?

A No.

Q Now, Charles Silvia. Did he work for you

at Naval Station Newport?

A The same set of relationships as with Mary Silvia. As commanding officer prior to regionalization although at that time he wasn't the housing director. So, yes. He worked for me but under various layers of supervision. Do you want me to go into all the different layers?

Q Yes.

A When I first got there, he was not the housing director. So, there would have been the executive officer, and housing manager, and whoever else he might have reported to.

After regionalization, he would have been under the regional layers which would have been Al Shannon and the regional housing manager. And then it would have been Charlie Silvia once he got hired into the housing director position at Newport.

Q Did you participate in the hiring of Charlie Silvia as the housing director?

A I was the final approval, but I did not participate in the job interviews.

Q All right. So, it's your testimony that

you did not interview him?

A I don't remember. I don't recall being engaged in interviews where -- for that position.

Q Do you know who would have made a recommendation as to whether to hire Charlie Silvia as the director?

A It most likely would have been Al Shannon. That would have been his job and his position to do so.

Q All right. And then he became the housing director at a point in time housing went into regionalization?

A Uh-huh.

Q When did that occur?

A I told you regionalization I think it's April 2001. I cannot recall the date that he was hired as a manager.

Q Did you have a relationship with Charlie Silvia outside of work?

A No, I did not.

Q Did you socialize with him?

A No, I did not.

Q Did you have him perform any favors for you not related to work?

A No.

Q I'm going to you a document, Captain Cooper, and ask you to identify the document.

MR. HOOK: While we are doing that, if the stenographer could please mark the affidavit Captain Cooper identified dated 16 August 2002 as plaintiff's 2.

(Cooper Exhibit No. 2 was marked for identification)

THE WITNESS: Okay.

BY MR. HOOK:

Q Can you identify what this document is?

A It says it's a settlement agreement.

Q All right. It's date 24 January 2001. Does it contain your signature on it?

A It does.

Q Have you seen this document before, Captain Cooper?

A I most likely did sign. My signature is on it. So, I would say that is a yes.

Q Do you understand this is a settlement agreement that was entered between the Navy and Alan Bradley concerning a prior employment discrimination complaint that he had?

A Yes.

MR. DIGIOIA: Objection, form of the question. Description of it as prior complaint. You may answer, and that's okay.

I am not sure I ever formally told you I may be objecting. If I do unless it's a matter of privilege, I won't be instructing you not to answer. You will answer anyway. Pardon the interruption there.

THE WITNESS: Did I answer it?

MR. DIGIOIA: I think the answer was yes.

MR. REPORTER: Yes.

BY MR. HOOK:

Q And this is an agreement that you signed on behalf of the Navy?

A Yes.

Q And in your capacity as the commanding officer of Naval Station Newport?

A Yes.

MR. HOOK: I would like the reporter to mark this as plaintiff's Exhibit 3.

(Cooper Exhibit No. 3 was marked for identification.)

BY MR. HOOK:

Q Captain Cooper, do you recall Alan Bradley having an employment discrimination complaint that led to the settlement agreement?

A That was -- I don't recall anything that led up to that.

Q Okay. Were you aware at the time or around the time of the settlement agreement that Alan Bradley had epilepsy? Did he bring that to your attention?

A I have no remembrance of that at all.

Q Today you have no memory of that at all?

A No. I don't know what was said back then.

Q Do you remember Alan Bradley from working during your days working at Naval Station Newport?

A I do remember. Yes.

Q How did you come into contact with Alan Bradley?

A I think my first contact was when I got some type of a complaint about his working conditions that I read in my office, and I --

Q And did you in fact work to rectify that complaint that he had concerning his condition?

A I wanted to look into it. I wanted to have my own firsthand knowledge before I made a decision on it. I went down and met with him and asked him to show me specifically the issues that he was talking about in his letter.

So, we spent one to two hours. I had him show me there was pieces of equipment he complained about. So, I had them turn all the equipment on so I could hear how loud they were and the noise they made.

He said there were shadows in the stairwell that could be a trigger. So, I had him show me the stairwell. He said his duties required him to get up on a ladder to take pieces of equipment off a shaft.

I asked him to show me. We walked over to the warehouse. He showed me the ladder, the ladder to climb on. I asked him where do you have to go to meetings so that I could see for myself the exact issues that he was talking about in his letter.

Q Okay. In your affidavit that's been marked plaintiff's 2, you indicated that you first became involved in knowing Mr. Bradley when he put in a request for accommodation. That's an accurate statement, ma'am?

A At the time I said that. So, I have no reason to believe that when I said it that was true.

MR. DIGIOIA: Excuse me. Can the witness please see that exhibit. I object to that question as not accurately stating what's in the document.

BY MR. HOOK:

Q If you could take a look at the last response that you made on page 145 of the investigative report which is page two of the affidavit. If you --

MR. DIGIOIA: I withdraw the objection. Go ahead.

BY MR. HOOK:

Q But while we're here, you also stated in that affidavit that -- and I am going to paraphrase briefly -- he needed -- Strike that.

I am going to state it correctly. He needed to be in a quieter environment. He needed natural light, and he had restrictions from ladder climbing, and lifting because of an impairment with his arm.

Is that information that you received from Alan Bradley?

A His statement here is what I'm doing here is paraphrasing what was in his letter. I'm not making these statements nor is this information from another source. This is an attempt to paraphrase the letter from himself that I was reading from. So, this would have been information that was from Mr. Bradley.

Q So. You received some information from Mr. Bradley. He had in correspondence notified you of the request or the limitations that he had with his arm and you paraphrased that in this affidavit?

A That would be my belief of where that information came from.

Q Okay. Turning to the next page of your affidavit and commencing on page two, you wrote I do not know the exact diagnosis of his arm problem, but he informed me his limitations with his arm are related to his condition of epilepsy.

Is that information that was provided to you by Alan Bradley, as well?

A That would most likely have been where I got that information. I mean this whole paragraph is I'm paraphrasing information that he had provided me.

Q So at the time you first came in contact with Alan Bradley, you had some information that Alan Bradley had a problem with his arm, and he also had a condition of epilepsy. Is that correct?

A From the information he had provided me. That's correct.

Q You are not a doctor, correct?

A Absolutely.

Q So, you are relying on information that was provided? You were simply paraphrasing

information that was provided by Alan Bradley?

A That's most likely correct. Yes.

Q That's fair enough. Also turning to the middle page of your affidavit, I'm going to -- You indicated that you worked with Mr. Bradley in his accommodation request and his resolution of his EEO complaints, and you had no other interactions with him. Is that correct?

A That's what I said at the time, and I believe it still to be correct.

Q You believe that still to be true?

A Yes.

Q In terms of his EEOC complaint, the resolution was the settlement agreement that was reached between the Navy and Alan Bradley that's been marked Plaintiff's 3?

A Yes.

Q Okay. Now, the resolution of that complaint required the Navy for a period of two years to announce housing managing specialist positions at GS-1173-9 at the Naval Station Newport at both the GS-7 and GS-9 level. Is that correct, ma'am?

A Yes. That's what it says.

Q And to afford the complainant priority considerations for such positions as noted above?

A That's what it states. Yes.

Q Do you understand what the concepts of priority consideration is?

A I have my understanding of it, but that may not be the exact definition.

Q What is your understanding of it?

A As long as an individual that had priority consideration was qualified that the person would be the first selected for the position.

Q So, your understanding of it and I will paraphrase. Strike that. I will leave that question alone.

Now after you entered into the settlement agreement, were you aware that there were two retirements at Naval Station Newport and there became two vacancies for the housing management specialist?

A At what point are you asking me that I became aware of that.

Q Strike that. After you executed this

agreement, did there come a point in time where you became aware that there were two vacant positions, housing management specialist position at Naval Station Newport?

A Yes.

Q And that was in the spring of 2001, correct?

A I don't remember when.

Q You don't know the exact date?

A No.

Q And after those positions were announced at both the GS-7 and 9 level, those positions were canceled. Is that correct? They weren't filled?

A Yes.

Q And the decision to cancel those positions was that your decision?

A Yes because as the commanding officer and program manager that would ultimately be my decision.

Q And who did you consult with to obtain advice as to whether to fill those positions or not?

A Alan Shannon as my deputy program manager and also Charlie Silvia was involved in some of those

discussions. And Karen Peckham also would have been involved in some of those discussions.

Q So, did you have a meeting with Mr. Shannon, Mr. Silvia, and Ms. Peckham?

A I believe there were numerous meetings discussing the situation.

Q And what did Mr. Silvia say to you?

A About what?

Q About those conversations concerning whether to cancel those positions or not. What advice did he give you?

A He probably did not want to cancel the positions because he wanted to get some people in there to work because they were short-handed.

Q Do you remember what he said to you?

A No.

Q What advice did Mr. Shannon give you?

A He sees the problem is I really cannot remember what these people said. I'm telling you what I think what their position would have been.

Q Okay. Don't guess.

A I really can't answer those questions. I

the shore infrastructure.

Q But they are not rare occasions?

A No. They are not rare.

Q Okay. Prior to your -- Strike that. At the time that you decided to terminate and not fill the positions, there were two retirements. How was -- Do you recall how the need -- the government's need for housing managers was filled at that time?

A No.

Q You don't know?

A No.

Q Do you know whether they were filled with outside contractors?

MR. DIGIOIA: Objection. Asked and answered. Go ahead. You may answer.

THE WITNESS: Just depends on what time frame you're talking about.

BY MR. HOOK:

Q In the summer of 2001, do you know whether outside contractors filled the position of housing managers?

A Now, that time reference doesn't help me.

Q After you canceled the positions that were advertised, the housing manager positions were advertised and had the meeting with Jana Hubner, there was a request to fill certain positions because of the retirements and you had made a decision that you were not going to fill the positions.

How did the Navy meet the needs for housing managers? Were they filled with contractors at this time?

MR. DIGIOIA: Objection again. Asked and answered. Go ahead. You may answer.

THE WITNESS: It was after that we realized we couldn't hire permanently into those positions because of the pending FA. It was at that point there was a request to hire contractors into those positions because we would then not be putting any employee at risk.

BY MR. HOOK:

Q Now at the time you made the decision not to fill the positions that were previously canceled, there was not a hiring freeze at that time, correct?

A Not that I remember. No.

Q Later on, there was a hiring freeze approximately a year later?

A There was a subsequent hiring freeze. I would not be able to tell you the time frame except that it happened afterwards.

Q Okay. Now, the person who would have made the request to full the housing manager positions would have been Charlie Silvia. Is that correct?

A That would be the most likely person who would have requested that.

Q I am going to ask you to turn to page four of you have affidavit, 147 of the investigative report. The last paragraph there you testified that Mr. Silvia contacted me and said he wanted to advertise the position.

So, at that time that was the information that you had, correct?

A Contact me and wanted to advertise the position. Yes.

Q You told him to make sure that the positions were advertised at the GS-7 and 9 level.

Is that correct?

A Yes.

Q And that was because of the settlement agreement, correct?

A Correct.

Q You go on to say I did not specifically tell him there was an EEO settlement agreement and did not show him the agreement. Is that correct?

A That's what I said at that time. Yes.

Q Then you go on to say I did discuss our agreement with Mr. Bradley to advertise the position at the GS-7, 9 level and that Mr. Bradley would be afforded priority consideration.

A Uh-huh.

Q So, did you tell Mr. Silvia that you had an agreement with Mr. Bradley that the positions were to be advertised at the 7, 8 level and that he, Mr. Bradley, would be afforded priority consideration?

A I don't remember anything in addition to what's there. I just don't remember things back that far.

Q Okay. Do you recall having any

conversations with Mr. Silvia concerning ways to accommodate Alan Bradley's inability to drive a motor vehicle?

A Yes, I do because I wanted there to be a positive feel for going on to this.

Q So, you had a conversation with Mr. Silvia in terms of ways to make the settlement agreement work?

A That if this were to be one of the employees that we were to select and we would need to be thinking along those lines.

I always said he might be, he could be, this might be somebody. We need to start thinking along these lines.

Q Where did it come to your attention or how did you get information that Alan Bradley had a problem with driving a motor vehicle?

A The most likely source that I can remember would have been Charlie Silvia.

Q Okay. And that would have caused you to think about having ways to accommodate his driving issue so he could work as a housing manager?

A That's correct.

Q At the time that you chose not to fill the housing manager positions, were you aware that there were also -- there was a vacant housing manager supervisor position in the 1173 series at that time?

A I don't really recall whether I knew that or not.

Q Do you know whether or not Mr. William Murphy was subsequent to the briefing that you had with Jana Hubner that he was subsequently hired as a housing manager supervisor in the 1173 series?

A I really -- I believe that may have happened, but to tell you what position it was, what level it was, I don't have those kinds of details at my recall.

Q Do you remember a Victor Ramsey?

A I remember the name.

Q What is it about the name that you remember or is it just the name that you remember?

A Just the name.

Q Do you recall Charlie Silvia requesting that he be assigned as a housing manager in May of

2002 on a temporary basis?

A I don't specifically remember those type of detailed conversations.

Q Do you remember Alan Bradley raising a complaint that Victor Ramsey was assigned temporarily to the position of as Green Lane housing manager?

A I don't remember that one specifically.

Q I am going to ask you to take a look at a document.

MR. HOOK: Can I go off the record for a second.

(Discussion held off the record.)

MR. HOOK: Back on.

BY MR. HOOK:

Q Captain Cooper, I'm going to show you a document dated 15 July '02. I would like you to take a look at that document and ask you what that document is.

A Can I make my comments.

MR. DIGIOIA: Sure.

THE WITNESS: I do not believe this letter was ever signed or sent. This is an

unserialized unsigned letter. A letter would have to have a serial number after the slash to be an official letter that goes into the command serial log.

And if it's on letterhead, it's supposed to have an official number to be an official letter. Someone has just written down slash signature slant. Somebody put down here signature obtained.

But if this is supposed to represent a copy of a valid letter, there should be a serial number there so this letter can be reflected in the command serial log.

Q Okay.

A Now --

Q Go ahead.

A There is a subsequent letter that Mr. DiGioia showed me that basically is the exact same letter, but it has a signature and it has a serial number.

So, I believe this may have been the rough drafted typed up prepared. For some reason, this didn't get signed until the subsequent letter

was prepared and that was the one that was signed.

MR. DIGIOIA: Can we go off the record for a moment of.

MR. HOOK: Sure.

(Discussion held off the record.)

THE WITNESS: I see this letter, but it does not show that I signed this letter.

Q So, page 120 of the investigative report just to summarize your testimony was a draft of a subsequent letter that you didn't sign.

A I guess since you're saying I can't speculate as to draft. All I am saying it's a letter for all intents and purposes is the same letter as 255. This letter marked 120 I have not signed and it's unserialized.

Q But page 225 of the investigative report which is a letter dated --

A 28 August 2002.

Q That is a letter that you --

A It has a serial number and my signature.

Q That's a letter that you drafted?

A I don't know who drafted it. I would