have proofed it. Before I sign anything, I read it. If I want to make changes, I will make changes.

Q You signed that letter?

A That is my signature, and I signed that letter.

Q You reviewed it for information for accuracy before you signed it?

A Yes.

Q It contains your understanding. It was your response to a letter that you had received from my office? Is that correct?

A According to the letter, it references your letter of 26 June.

MR. HOOK: Can we mark what's page 225 of the investigative report as plaintiff's --

MR. DIGIOIA: Can you use my copy. That is marked page 255 for the record.

THE WITNESS: I am sorry, 255.

MR. DIGIOIA: And, Mr. Hook, is it accurate to say you have agreed that the witness' discussion of what may have happened with the document that is marked as page 120 was speculation

on her part and we're going to move on and deal with page 255 what is now been marked as Exhibit 4?

MR. HOOK: Yes.

MR. DIGIOIA: Okay. Thank you.

(Cooper Exhibit No. 4 was marked for identification.)

BY MR. HOOK:

Q Now, Captain Cooper, I am going to ask you to identify page 245 of the investigative report which is a letter from my office dated June 26, 2002, that was not addressed to you, but it was copied to you, Mr. Bradley, and M.E. Sams. If you could take a look.

A Sure. All right.

Q What's been marked as Plaintiff's 4 is a letter that you wrote in response to the letter dated June 26, 2002, that I wrote?

A All I know is the letter I signed references that letter. I can't really answer the rest of your question except that is the letter from you dated 26 June is referenced.

MR. HOOK: I would ask the stenographer

to mark page 245 of the investigative report a letter from my office dated June 26th as Plaintiff's 5.

(Cooper Exhibit No. 5 was marked for identification.)

BY MR. HOOK:

Q In your letter that's been marked Plaintiff's 4, you refer to a letter that I wrote June 26, '02. Is that correct?

A That's what the reference line refers to. Yes.

Q You wrote that the terms of the settlement agreement have been adhered to since the settlement agreement was signed.

A Uh-huh. That's what that line says.

Q And you wrote that in June 2001 the Command advertised for housing management specialist GS-1173 at the 7-9 grade level which meets the terms of the agreement. Is that correct?

A That's what the letter states.

Q Fine. Now, the settlement agreement required that the open housing management positions be advertised at the GS-7 and 9 level, correct?

A That's what the agreement states.
Q But it also required that the complainant, being Mr. Bradley, be afforded priority consideration for the positions.
A That's what the agreement states.
Q Was Mr. Bradley afforded priority considerations for the positions?
A At what time?
Q At any time to your knowledge?
A I don't know what you're specifically asking me. That's rather open ended.
Q Prior to your writing in here of August 2002, was Mr. Bradley afforded priority consideration for any housing management position?
A For what? You're just saying for a position. For an existing position? For a position somebody is in? For a vacant position? For what? You are not giving me specifics here.
Q Your letter refers to in June of 2001 Command advertised for housing management specialist GS-1173 at the 7 and 9 grade level. That position that was referred to in your letter.

Q But you did not have an agreement with 10,000 other people.
A But the agreement is if there is a billet to hire into.
Q Does it say that in the agreement?
MR. DIGIOIA: Objection. The agreement speaks for itself. We don't need to get into argumentative questioning about what does the agreement mean.
BY MR. HOOK:
Q The terms of the agreement is a better way to put it. The terms of the agreements are set forth in what's marked as Plaintiff's Exhibit 3. Is that correct?
A That's correct.
Q Now subsequent to canceling the house management positions that are referred to in this letter, did you have a meeting with Mr. Bradley, a union representative, and Mr. Evans concerning the canceling of the positions?
A I don't recall Mr. Evans being engaged. There were several -- There was one meeting in the

conference room where it was an open meeting for anybody who had applied for those positions, and I invited Mr. Allen to attend.

I subsequently had meetings with Mr. Bradley and Mr. Allen in my office separately. I am not sure how many there were. There may have been several meetings with Mr. Bradley and other representatives present in the room.

I just don't remember Mr. Evans being engaged in those.

Q All right. And in those meetings that you had with Mr. Bradley and the union representative, did you offer to extend the settlement -- the terms of the settlement agreement in terms of it's period to extend it an additional two years?

A I don't know the exact timing. But once it was brought to my attention that was one of the key issues that Mr. Bradley had, I stated that I had absolutely no problem at all extending it for an additional two years starting that day.

Q Okay. Now, you also referred to in this

particular letter marked as Plaintiff's 4 that I offered to extend your settlement agreement for two years since the Department of the Navy required a freeze on the hiring of the GS-1173 positions while a functionality assessment was being completed.

And you rejected on -- you refused that offer. Is that correct?

A That's what's in the letter. Yes.

Q Now, this letter is dated August 2002. And at that time, the Department of the Navy had a hiring freeze. That's what you wrote in your letter. Is that correct?

A I would have to check other documents to verify that that is accurate.

Q However when the positions that are referred to in this letter were canceled, there was no hiring freeze. Is that correct?

A I would have to consult documents on dates. I don't have that chronology in my mind.

Q Well, I am just trying to flush something out. At the time that this letter was written, there was a hiring freeze on hiring housing management

specialist otherwise you would not have wrote it in the letter. Is that correct?

A Most likely.

Q But that did not necessarily mean that at the time that you canceled the positions back in 2001, a year earlier, that there was a hiring freeze.

A I really don't know. I mean like I said, I don't know what the chronology time line is to be able to answer that question.

Q As part of the functionality assessment that was ongoing, were you considering contracting out all of the housing duties?

A I don't remember that much about when the functionality assessments started, when we started putting together an MEO, what the MEO was. There are so many other things going on I really don't remember that.

Q Do you remember at all thinking about or considering contracting out housing the private enterprises?

A Those were things that were always discussed, not just in housing but in any of the

Q You had offered to extend the settlement agreement for an additional two years and he refused that offer.

A Uh-huh.

Q Doesn't that infer there were other issues other than the two years?

A If there were other issues, they were never brought to my attention by Mr. Bradley or anybody representing Mr. Bradley.

Q Did you inform after you met with Mr. Allen who was the union representative and Mr. Bradley, did you inform Mr. Evans, Buz Richard Evans, to increase Alan Bradley's duties so he could obtain a promotion from the GS-6 level?

A I have some vague remembrance of talking about issues of Mr. Bradley being able to get into a higher grade position, Public Works, but I cannot tell you how any of those conversations started who said what to do and who initiated what to do.

Q But if you did tell Richard Evans to increase Mr. Bradley's duties to a higher level within Public Works, to increase his duties so he

would be eligible for a higher level, would you expect that he would follow through and do that, correct?

A Only if there were duties available, it was within the MEO that they were conducting in Public Works, and it was something that Mr. Bradley was fully capable of performing.

Q You wrote finally -- Not finally but the second to the last sentence of Plaintiff's 4, you wrote that I consider that a settlement agreement in effect at this time and will continue to abide by it in the future when vacancies are announced. Is that correct?

A That's what it states.

Q At that time, you intended to abide by the settlement agreement?

A That's correct.

Q If there were any open housing management positions that Alan Bradley would be afforded priority consideration for those positions?

MR. DIGIOIA: Objection. Go ahead. You may answer.

THE WITNESS: They would meet the terms of the settlement agreement which statements 7-9. States 1173, 7-9s.

BY MR. HOOK:

Q Did Mr. Silvia subsequent to your canceling the positions that were referred to in this letter make any request to you to fill the housing management positions?

A I really don't remember those conversations.

Q Did Mr. Silvia request that he be permitted to fill the housing management position with Victor Ramsey?

A I really don't remember those conversations.

Q How often did you speak with Mr. Silvia regarding housing --

A Maybe at least once a day if not every other day. We have so many conversations for me to be able to specifically recall certain conversations is not something that I can accurately do to answer your question.

Q Subsequent to canceling the positions that are referred to in what's been marked Plaintiff's 4, did you have any conversations with Mr. Silvia concerning Alan Bradley?

MR. DIGIOIA: I am sorry. Can I hear that question again, please.

(The record was read by the reporter.)

THE WITNESS: I am sure we had conversations, and I'm sure in fact we would have had to have discussed it leading up to the conference room meeting where I explained the rationale for canceling the announcements.

BY MR. HOOK:

Q Okay. This might be redundant and I apologize if it is. At the meeting with Jana Hubner, was Charlie Silvia present at that meeting?

A Yes. He would have been present at that meeting.

Q And Alan Shannon, would he have been present?

A He should have been.

Q I am going to ask you to take a look at

page 50 of the investigative report, Captain Cooper, and ask you if you can identify what that document is.

A At the top it says agenda for 14 June meeting. So, it would appear to be an agenda that Jana Hubner had compiled for that meeting.

Q Do you know whether that was the meeting where the June 14, '01 wherein it was discussed whether the issue -- whether to cancel the housing management positions were discussed?

A You mean at this meeting?

Q Yes.

A This would not have been the meeting where that was discussed. This is the meeting where the impact on the housing staff realignment termination through attrition.

Q And what does that mean, impact on housing staff realignment termination through attrition?

A Well, what it says is what's the impact of whatever it is that she was going to talk about and she does not state in this agenda.

Then you either realign with existing employees to fill vacancies with existing employees, and you achieve termination through attrition meaning people who would normally retire or would move because they're a spouse of a military member and they leave for other reasons.

Q Okay. So at the meeting that occurred on January 14th, you discussed --

A June.

Q June 1st --

A 14.

Q June 14, thank you, of '01, you discussed the impact on the housing staff realignment and termination through attrition. Is that correct?

A Well, that would have been some of the topics that were discussed at that meeting. As you can see from the agenda, there were quite a few other topics that were discussed at the meeting.

Q All right. Did you also discuss how to implement a property management contract?

A I don't -- I can look at this agenda and this agenda says it was discussed, but I couldn't

give you from my memory what was discussed other than the one that had the impact on me.

Q How often did you meet with Jana Hubner?

A Not that often. She was from Naval Facilities Engineering Headquarters. This would have been a visit from a higher echelon headquarters member staff which I might have seen her quarterly either at -- when she was up there or maybe when I was visiting somewhere else.

Q So, you might see her quarterly --

A Or less or more.

Q Were you considering a pilot program to contract out housing?

A No. Not that I was considering.

Q You never were considering having housing contracted out for a pilot program?

A What do you mean by pilot program?

MR. HOOK: If I could have the stenographer mark page 50 of the investigative report as Plaintiff's 6.

(Cooper Exhibit No. 6 was marked for identification.)

BY MR. HOOK:

Q Captain Cooper, I am going to ask you to take a look at what appears to be a series of e-mail communications that was at page 51 to 57 of the investigative report.

In those e-mails, it refers to a property pilot program. I am going to ask you to take a look at this document, and I am going to ask you some questions about it.

A How detailed do you want it?

Q In those e-mail correspondence, there is reference to a pilot -- contracting out of a pilot program for housing. Is that correct?

A Yes. This is correct. They use those terms.

Q At that time or strike that. What was that pilot program?

A I really don't know.

Q You have no --

A The first three pages are all between people at NAVFAC Headquarters, Navy Facility Command Headquarters. The first three pages are them talking

about going back and forth. It never leaves engineering field detachment Atlantic or the NAVFAC Headquarters. It isn't until we get to page 54 that they start cutting somebody in the region in on it. I just don't remember that much about it.

Q Now, the pilot program, was that a reason that's referred to in the correspondence that you are holding now in your hand --

A No.

Q Was that a reason that you decided to cancel the recruitments that are referred to in Plaintiff's Exhibit 4?

A No. Any idea of a pilot program would not have been the logic. I mean all I remember was that Jana Hubner said you're going to have to RIF people out of housing. Do whatever you can ot to fire people.

Now if the pilot was part of that bundled with the FA, that could have been part of the over-arching warning being issued by Jana Hubner. So, you know, I can't say definitively.

All I knew was that Jana Hubner was

strongly advising me from the headquarters staff to do what you could not to fire people. So, I can't say that the pilot was -- was a predominant causal thought for canceling those, but it was part of the over-arching situation in the future.

Q Okay.

MR. HOOK: Can we mark pages 51 through 57 which you've referred to in discussing pilot program as Plaintiff's 7.

(Cooper Exhibit No. 7 was marked for identification.)

BY MR. HOOK:

Q Now, at the time the positions were canceled referred to in Plaintiff's 4 and you had the meeting with Alan and the union representative, did Mr. Bradley tell you that he was willing to take the chance of being rifted and that he wanted to be hired as a housing manager anyway?

A I don't remember.

Q I am going to turn to page six of your affidavit and 149 of the investigative report. The last question on page six is why couldn't you fill

the positions either temporarily.

And on page 150, you responded that I looked into that and had discussions with Karen Peckham about that. Mr. Bradley is in Public Works which is undergoing an A76 study for contracting out.

If we move Mr. Bradley out of that billet, we lose that billet for Public Works. If Mr. Bradley were placed in housing on a temporary hire and his permanent billet were either eliminated by the A76 study, he could be left without a billet.?

A That is what it says. Yes.

Q At the time you provided that information, that was accurate information as you knew it at that time?

A Correct.

Q So, you did look in to see whether you could fill that housing position at least on a temporary basis and you contacted Karen Peckham to discuss that.

A Uh-huh. Specifically for being able to detail Mr. Bradley.

Q All right. So, you made a specific

inquiry as to whether you could detail Mr. Bradley into housing, and you contacted Karen Peckham?

A Uh-huh. Correct.

Q And you made a determination that that wasn't a good idea because Public Works was undergoing an A76 study?

A Yes.

Q Which A76 study that is the CA study?

A That's correct.

Q And he could lose his billet in Public Works.

A Correct.

Q Do you recall whether Mr. Bradley told you that at that time he didn't care whether he was on -- could lose his jobs in Public Works, that he was willing to take that risk?

A Well, I don't recall that specific statement, but it's Public Works that would lose the billet. So, you have to understand there's two parts of that equation.

While that billet could be eliminating Mr. Bradley to lose his jobs, Public Works now has

lost that billet and that person who had performed the work in that position.

So it does not really matter whether that person had Mr. Bradley in it or not. If that billet was empty because Mr. Bradley was working somewhere else, Public Works would lose the manhours that would be assigned to that billet to get work done.

So, it's not just Mr. Bradley that had something to sacrifice, but Public Works would have also had to sacrifice the ability to have a person working in that job.

Q So after speaking with Karen Peckham, you made -- concerning whether you could detail Mr. Bradley to housing on a temporary basis, you made a decision that it wasn't in the best interest of Public Works and perhaps Mr. Bradley? Is that a fair statement?

A That's correct. Yes. That was a good way of saying it. It was not in the best interest of Mr. Bradley nor in the best interest of the Navy.

Q All right. Do you recall, however, Mr. Bradley indicating to you at that time from his

perspective that he was willing to take the risk of losing his billet in Public Works?

MR. DIGIOIA: Objection. Asked and answered. This is the third time it's been asked. She answered twice she does not remember Alan saying he is willing to risk being rifted. And she went on to add, however, even if he did that wasn't the only consideration.

But this question's been asked and answered twice. This is the third time she's being asked.

THE WITNESS: I still don't remember. No.

MR. HOOK: All right. Off the record.

(Off the record.)

MR. HOOK: Would you read back my last question.

(The record was read by the reporter.)

BY MR. HOOK:

Q You referred to Victor Ramsey before. At any time, did you advise or instruct Charlie Silvia not to hire Victor Ramsey?

A I don't recall if I did or not.
Q Turning to page 150 of your investigative report and your affidavit page seven, you were asked did you discriminate against Mr. Bradley.
Did you personally discriminate against Mr. Bradley and you stated no. Is that correct?
A That's correct.
Q Then a question was asked do you have any knowledge of anyone else discriminating against him. And there's no response.
A I have no idea why it's blank because I would have said no. And there should be a no in there. I know I've got it initialed, but I can't explain to you why there is a blank there.
Q Prior to coming to today's deposition, did you review this affidavit?
A Yes, I did.
Q And in the copy you have, there is no answer?
A That's correct.
Q All right. Do you have any personal knowledge of whether or strike that.

Did Charles Silvia ever make any derogatory remarks regarding Alan Bradley to you?
A I couldn't say that he made derogatory remarks nor could I repeat them. I could sense that maybe he didn't like him, but I couldn't give you specifics as to what those conversations were or what I was basing that feeling on.
Q Did he ever give you or did he ever say to you that he didn't want to hire Alan as a housing manager?
A Probably not in those words, but I would say at some point that type of -- of -- I'm trying to get the right word. That that type of feeling was expressed, but I cannot quote you what the conversation was, what the words were, or how it was expressed.
Q Based upon a summary of conversations and your contacts with Mr. -- communications with Mr. Silvia concerning Alan, were you left with the impression, as you sit here today, that he did not want to hire Alan as a housing manager?
A I would have been left with that

impression.

Q Did Mr. Silvia ever say anything to you concerning Alan Bradley filing EEO complaints?

A Not that I recall. Not that type of a specific comment.

Q In preparing for today's deposition, you indicated you looked at the affidavit that's been marked. I believe your affidavit which is marked Plaintiff's 2. Did you review any other documents?

A The -- These letters. The letter that is marked Cooper Number 4?

Q Did you review any other documents?

A And I reviewed the agenda which is marked Cooper Number 6.

Q Did you review anything else?

A I did review Exhibit Number 3. And that would be it from what you have laid out here.

Q All right. There may be some other documents that you've reviewed that you didn't bring with you?

A I didn't bring anything with me except the summons.

MR. DIGIOIA: Objection. We are far afield here. There is absolutely no relevance as to what her understanding of what an IG investigation is in connection with whether or not Mr. Bradley was discriminated against.

MR. HOOK: I am not going further into this.

MR. DIGIOIA: We can go off the record for a minute.

(Off the record.)

BY MR. HOOK:

Q At the beginning of your testimony, you referred to Mary Silvia as a person who worked underneath you. Is that correct?

A That's correct.

Q Was she your primary assistant? Did she provide you --

A No. She was a department head. I had multiple department heads, and she was one of them.

Q And how much contact did you have with her? Did you have contact with her every day?

A Just like I had contact with all the

department heads on a daily basis.

Q You spoke to her every day?

A As I did all the other department heads on a daily basis.

Q Did you discuss with Mary Silvia the issue concerning the cancellation of the appointments, the vacancies referred to in Plaintiff's 4?

A I don't remember all the conversations I had with her.

Q Now, Mary Silvia to your knowledge she's the spouse of Charlie Silvia?

A To my knowledge, she is.

MR. HOOK: I have nothing further.

EXAMINATION BY MR. DIGIOIA:

Q Very, very briefly and we will be through. There were questions earlier by Mr. Hook, and he referred to your earlier affidavit. I believe it is marked as Exhibit 2.

At one point, there was reference to a paragraph on or an answer to a question in which you said that you would understand that the problem with

Mr. Bradley's arm was related to his epilepsy. Do you recall that?

A That it's in the affidavit? Yes, I do.

Q Have you ever been certain that that's what it was related to or were you lumping several things together there?

A This was giving my impression of the information that Mr. Bradley had given me that it all seemed to be one issue.

Q So, you discussed a number of things and central to that discussion involving his health concerns -- central to that discussion was the epilepsy?

A Correct.

Q All right. You are not sure if actually the problem that he may or may not have with his arm is related to epilepsy or something else, are you?

A I have no way of knowing. It seemed lumped together.

Q Earlier, Mr. Hook asked you some questions about -- please excuse me -- referring to Exhibit Number 4 which is the letter or memorandum

updated August 28th, 2002, from you to Alan Bradley.

And he -- bear with me -- he referred you to paragraph three where you reference -- which references I also offered to extend your settlement agreement for two years since the Department of Navy required a freeze on the hiring of GS-1173 positions. Do you recall being asked about that?

A Yes, I do.

Q Do you recall now as you sit here today whether there was a freeze on the 1173 positions on or about August 28th when you wrote this?

A I really don't recall. I really don't remember what the time line was on the dates. When events happened and when letters were signed.

MR. DIGIOIA: Can we have this marked as Defendant's 1, please.

(Defendant's Exhibit No. 1 was marked for identification.)

BY MR. DIGIOIA:

Q I hand you what's been marked as 1. It's pages 71, 72, and 73. Let me ask you to take a look at that document. We can go off the record for a

second.

(Discussion held off the record.)

MR. DIGIOIA: If we could have this marked as 2.

(Off the record.)

(Cooper Exhibit No. 8 was marked for identification.)

BY MR. DIGIOIA:

Q I am handing you what's been marked collectively as Cooper Number 8. And that is actually the defendant's first exhibit in this deposition. It consist of pages 69, 70, 71, 72, and 73.

The number of Exhibit 8 is actually on page 71.

MR. DIGIOIA: Can we agree that this is all one exhibit even though it's marked on the third page?

MR. HOOK: Yes.

BY MR. DIGIOIA:

Q I am handing you this, and let me ask you have you seen this before?

A Yes, I have.
Q And that document marked as Exhibit 8, does that in fact reflect a freeze in hiring 1173 positions?
A It does state that in subparagraph one. Effective immediately hiring controls are in place for all 1173 series personnel.
Q That's on page 72 in the black numbers at the bottom center. Is that correct?
A That's correct.
Q Now, can you tell from the first two pages, 69 and '70, the date of that notification?
A That would have been 30 April 2002. The date of the message.
Q And that was actually received at some later time in Newport. Is that right?
A Correct. This is the trail of e-mails as being forwarded around the e-mail system, but the actual effective date of the message is reflected in the date.
Q Back in Exhibit 4, your memo or letter of August 28, 2002, at the time this letter was sent and

signed by you there was in fact a freeze on the hiring of 1173 positions as reflected in this exhibit. Is that right?

A It would appear to be put in the time line together between those two documents.

Q All right. Now at the meeting where Jana Hubner briefed you on the FA, the functionality assessment, there was no freeze imposed at the time, was there?

A Not that I recall. I don't believe there was one.

Q If you could refer to page 148 roughly two-thirds of the way down, you were asked did the headquarters mandate that you not file the 1173 positions, referring to the meeting of June 14. And what did you answer?

A I replied that it was not a mandate but it was strongly recommended and strongly encouraged statement.

Q And is that a fair characterization of the impression you were left with by Jana Hubner following that meeting that we discussed?

14th meeting?

A As it's been shown to me.

Q Okay. And please bear with me.

MR. DIGIOIA: Can I have 58 marked as Exhibit Number 9, I believe, in sequence.

(Cooper Exhibit No. 9 was marked for identification.)

BY MR. DIGIOIA:

Q I'm handing you what's marked as Exhibit Number 9 for purposes of this deposition. It's page 58 from the investigative report and ask you if you can take a look at that, please.

A Okay.

Q Have you seen it before?

A Yes.

Q Is it correct that that's a series of e-mails dated June 21, 2001?

A That's correct. They're all dated June 21, 2001.

Q And was it these e-mails which canceled the announcement of the GS-7-9 housing manager positions?

A This would have started the procedure. Karen Peckham would have had to contact somebody at HRSC because they're the organization that handles the announcement and the mechanics of hiring. So, it would have had to have gone outside of the Command to actually cancel them.

Q So, it would have had to go outside of Newport, but this is initiating the process through which they would be canceled?

A Correct.

Q Those are all dated on the 21st?

A That is correct.

Q That is you would agree a week after the meeting that's referenced in the agenda?

A It is. That's seven days.

Q Okay. Now, the cancellation of those positions was not based on the freeze which did not occur until almost a year later in 2002. Is that right?

A Is that when the freeze was?

Q We need Exhibit 8.

A Yes. April 2002.